UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Capstar Radio Operating Company, a Delaware    :
Corporation,    :
   :
           Plaintiff,    :
   :
      v.    :    No. 08 CV 2976 (LAK)
   :
Anthony Campbell; Louis Carpino; Adam Gross;    :    Filed Electronically
Jose Luis Torres; Citadel Broadcasting Corporation, :
a Nevada Corporation; and John Does 1-10,    :
   :
           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF DEFENDANTS IN OPPOSITION TO
## MOTION FOR TEMPORARY RESTRAINING ORDER

DEBEVOISE & PLIMPTON LLP
Jeremy Feigelson (JF-4963)
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT. ...................................................................................1

STATEMENT OF FACTS. .........................................................................................4

   1.  The True Nature Of The Information Clear Channel Claims To Own. ......................4

   2.  The Individual Defendants And Their Job Changes. ................................................5

   3.  The Non-Compete "Agreements." ...........................................................................7

   4.  Defendants' Activities Since Joining WABC. ..........................................................9

   5.  Litigation Proceedings To Date. .............................................................................10

ARGUMENT. ...........................................................................................................11

I.  This Court Lacks Jurisdiction Because There Is Incomplete Diversity .....................11

II.  Clear Channel Is Not Likely To Succeed On The Merits Because It Has No
Legally Protectible Interest. .......................................................................................11

   A.  The Radio Ad Sales Business Is Based On Publicly Available Information
      And Techniques. .................................................................................................12

   B.  Clear Channel's Non-Competes Are Overbroad And Unenforceable. ....................15

III.  The Balance Of Hardships Weighs Strongly In Favor Of Defendants Because
The Livelihoods Of Four Individuals Are At Stake.....................................................16

IV.  Expedited Discovery And A Prompt Evidentiary Hearing Would Be
Appropriate. .............................................................................................................17

CONCLUSION ..........................................................................................................18

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152 (E.D.N.Y. 1986) ...................................16

*Datatype Int'l Inc. v. Puzia*, 797 F. Supp. 274 (S.D.N.Y. 1992) ................................. 17-18

*Demetriades v. Kaufmann*, 698 F. Supp. 521 (S.D.N.Y. 1988).........................................14

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171
   (2d Cir. 1991) ...............................................................................................................13

*Ivy Mar Co., Inc. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547 (E.D.N.Y. 1995)....................13

*John Hancock Mut. Life Ins. Co.*, 916 F. Supp. 158 (S.D.N.Y. 1996) .............................14

*N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) ..................................13, 15

*Pepsico, Inc. v. Wendy's Int'l, Inc.*, 118 F.R.D. 38 (S.D.N.Y. 1987)...............................12

*Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586 (S.D.N.Y. 2001)..........13

*Ticor Title Ins. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) .................................................15, 16

## STATE CASES

*Am. Broad. Cos. v. Wolf*, 52 N.Y.2d 394; 438 N.Y.S.2d 482 (N.Y. 1981)..........................15

*Apa Sec., Inc. v. Apa*, 37 A.D.3d 502; 831 N.Y.S.2d (2d Dep't 2007).............................13

*Ashland Mgmt. Inc v. Janien*, 82 N.Y.2d 395; 604 N.Y.S.2d 912 (N.Y. 1993) ...............15

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382; 690 N.Y.2d 854 (N.Y. 1999) ....................16

*Computer Task Group, Inc. v. Prof'l Support, Inc.*, 88 A.D.2d 768; 451 N.Y.S.2d
   502 (4th Dep't 1982) ...................................................................................................13

*Eagle Comtronics, Inc. v. Pico Products Inc.*, 256 A.D.2d 1202; 682 N.Y.S.2d
   505 (4th Dep't 1998) ...................................................................................................14

*Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387; 328 N.Y.S.2d 423 (N.Y. 1972) ...............13, 15

*Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303; 386 N.Y.S.2d 677 (N.Y. 1976)...........................................................................................................13, 16

*Reidman Agency Inc. v. Musnicki*, 79 A.D.2d 1094; 435 N.Y.S.2d 837 (4th Dep't 1981).................................................................................................................15

*Savannah Bank, N.A. v. Savings Bank of the Fingerlakes*, 261 A.D.2d 917; 691 N.Y.S.2d 227 (4th Dep't 1999) ......................................................................14

*U.S. Coachways, Inc. v. Silverman*, No. 102317/06, 2007 WL 218728 (N.Y. Sup. Ct. Jan. 17, 2007) .......................................................................................17

iii

Defendants Anthony Campbell, Louis Carpino, Adam Gross and Jose Luis Torres (the "Individual Defendants") and Citadel Broadcasting Corporation ("Citadel," together with the Individual Defendants, "Defendants") submit this opposition to the application by plaintiff Capstar Radio Operating Company, a subsidiary of Clear Channel Communications ("Clear Channel"), for immediate injunctive relief. The very limited record before the Court does not support such relief and a complete evidentiary record will decisively prove that such relief is inappropriate. Defendants therefore agree that expedited discovery is appropriate and request that a prompt evidentiary hearing be held before the Court considers the issue of injunctive relief.

## Preliminary Statement

Clear Channel seeks to restrain four young ad salesmen, formerly employed at will, from pursuing their profession for the next six months. This effort must fail because Clear Channel cannot show that any of the information it seeks to protect is truly confidential or proprietary. It therefore has no likelihood of success on the merits and no prospect of showing that the balance of hardships favors it.

- **Advertisers**. The identity of which businesses advertise on which radio stations is about as public a fact as can possibly be. Not only are such advertisements aired on the radio for all to hear, but enormous amounts of detail – *e.g.*, exactly what ads are running, on which stations and at what times – can be assembled in seconds via widely-available subscription-based Internet services. *See, e.g.*, Declaration of Anthony Campbell, dated March 24, 2008, ("Campbell Decl.") ¶¶ 6-7

1

- **Sales Techniques**.  Nor does the pursuit of advertisers by radio station ad salesmen, or the training of those salesmen, involve any rocket science or proprietary secrets.  Radio ad sales is a straightforward, call-them-up-and-pitch-them kind of business.  *See, e.g.*, Campbell Decl. ¶ 11.

- **Software**.  The software described by Clear Channel as "proprietary" in fact is provided to it by third parties and widely available to any radio company that wishes to pay for it.  *See, e.g.*, Campbell Decl. ¶ 10.

On top of this, Clear Channel's own conduct, some of which is of record and more of which will come out in discovery, further undercuts its claims:

- Advertising salespeople routinely leave Clear Channel to work for competitors, without Clear Channel seeking to enforce its boilerplate non-competes or asserting that any proprietary knowledge will be lost.  Clear Channel's failure to consistently enforce its purported rights means that its purported trade secrets have already made their way into the market at large, and any trade secret status is lost forever.  Campbell Decl. ¶ 13.

- Clear Channel itself routinely encourages newly hired salespeople -- including two of the Individual Defendants -- to pursue client contacts from their previous jobs.  The evidence will show that it does so because Clear Channel believes the identity of those clients and their contact information are public and non-proprietary.  Campbell Decl. ¶ 16; Declaration of Louis Carpino, dated March 24, 2008, ("Carpino Decl.") ¶ 10.

These facts show that Clear Channel's boilerplate non-compete "agreements" are overbroad on their face.  They purport to bar the Individual Defendants from any work at all in the radio or television industry for 180 days – a restriction that goes far beyond any conceivable legitimate interest of Clear Channel.  Moreover, these non-competes cannot be salvaged by judicial blue-penciling.  As a matter of law, non-competes cannot be used

2

to prevent the use of information and techniques that are not truly proprietary or confidential.  Clear Channel simply has no legitimate interests that these non-competes can properly be applied to protect.

Prior to hiring the Individual Defendants, Citadel instructed them not to bring with them or to use any confidential or proprietary materials of Clear Channel.  None of the Individual Defendants have consulted any Clear Channel presentation materials, rate cards, pricing information or the like in connection with their brief employment at WABC.  In the limited time since receiving plaintiff's TRO application, however, Citadel has discovered that one of the Individual Defendants took with him some presentation materials that he had created at Clear Channel and which he mistakenly believed were his personally.  Citadel also has learned that one of the Individual Defendants has some Clear Channel presentation materials on his home computer, not because he took them in connection with his Clear Channel employment but because they are left over from a time when he was working from home on Clear Channel's behalf.  Citadel is now in the process of ensuring that all these materials are returned and made unavailable for any business use.

With Citadel having taken these steps voluntarily, there is no need for immediate injunctive relief because the Individual Defendants can and will perform their tasks for Citadel without any resort to Clear Channel proprietary materials.  The balance of hardships also tips decidedly against any injunction, because Clear Channel's proposed order would prevent the Individual Defendants from working in their chosen profession

3

for six months even if – as Defendants have represented will be the case – none of them uses anything proprietary to Clear Channel during that period.

Defendants ask that the application for immediate injunctive relief be denied, that expedited discovery proceed and that a hearing be scheduled so that a full evidentiary record can be presented to the Court before it rules on Clear Channel's application for immediate injunctive relief.

### Statement of Facts[1]

### 1.    The True Nature Of The Information Clear Channel Claims To Own.

This case is all about local radio ad sales.  The category of local sales means primarily sales to small and mid-size businesses in the New York area, like car dealerships, restaurants and health care providers.

It is easy to find out which local businesses are advertising on what radio stations. Any member of the public can do so by listening to the radio.  Radio stations' websites are also a fertile source of this information.  Ad salesmen at major radio station companies, including Citadel and Clear Channel, also have access to a vast subscription database called Media Monitors.  Through Media Monitors it is possible to instantly get a detailed report showing, for any given station, exactly who is advertising, on what days and during what time periods.  It is even possible to listen to the exact ads as they were

---

[1]    The timing of Clear Channel's application -- Friday afternoon of Easter weekend -- has limited Defendants' ability to investigate the facts and law thus far. Defendants reserve all rights to present additional facts and arguments as this matter proceeds.

broadcast.  Salesmen routinely use Media Monitors reports to identify prospects if they want to target a competing station's advertisers.  They also use a database program called X-Ray, which allows searching by advertiser to find out dollars spent in a particular time in the New York market.  Campbell Decl. ¶¶ 6, 7, 8 & Exs. B, C (sample Media Monitors report for Clear Channel station WKTU and print out of a media advertiser history report from the X-Ray database).

For any given advertiser or prospect, it is also easy to find out who is responsible for making advertising buys.  Simple telephone and online research typically leads to the name of the right person within a few minutes.  Campbell Decl. ¶ 9.

Contrary to Clear Channel's contention, the "Best Rate," "Radio Fusion" and "Tapscan" software tools used by Clear Channel are not "proprietary" at all.  Clear Channel Mem. at 4-5.  These are third-party products that are used by other radio companies too, including Citadel.  Campbell Decl. ¶ 10 & Ex. D.  Nor is there anything unique or proprietary about the training provided by Clear Channel to its sales staff.  This is essentially generic sales training similar to what any radio company might provide; it gives the Individual Defendants no special information or tools that are proprietary to Clear Channel.  *Id.* ¶ 11; Carpino Decl. ¶ 4; Gross Decl. ¶ 4; Torres Decl. ¶ 4.  Plaintiff has not established that its training programs are of independent origin, and discovery may show otherwise.

### 2.     The Individual Defendants And Their Job Changes.

Each of the Individual Defendants is a young ad salesman who recently left Clear Channel for Citadel.  They are:

- Anthony Campbell, 26. Mr. Campbell worked at Clear Channel from April 30, 2007 to March 5, 2008. He sold ads for WKTU, a Clear Channel station in the "rhythmic adult contemporary" format (*i.e.*, playing current dance music). He previously worked in sales at Emmis Communications, another major radio station company. When he joined Clear Channel, Mr. Campbell pursued his former Emmis clients on Clear Channel's behalf with the knowledge and approval of Clear Channel. Mr. Campbell resigned from Clear Channel effective March 5, 2008 and joined Citadel effective March 5, 2008. Campbell Decl. ¶¶ 2, 3, 16.

- Lou Carpino, 26. Mr. Carpino worked at Clear Channel from March 20, 2006 to March 5, 2008. He sold ads for WLTW, a/k/a "Lite FM," a Clear Channel station in the adult contemporary format (*i.e.*, playing "light" pop music). He previously worked in local sales at CBS Radio; when he joined Clear Channel, he was specifically encouraged by Clear Channel to go after his CBS customers on Clear Channel's behalf. Mr. Carpino resigned from Clear Channel effective March 5, 2008 and joined Citadel effective March 5, 2008. Carpino Decl. ¶¶ 2, 3, 10.

- Adam Gross, 22. Mr. Gross worked at Clear Channel from July 9, 2007 to March 5, 2008. He sold ads for WKTU. This was his first job after graduation from college. Mr. Gross resigned from Clear Channel effective March 5, 2008 and joined Citadel effective March 17, 2008. Declaration of Adam Gross, dated March 24, 2008 ("Gross Decl.") ¶¶ 2, 3.

- Jose Luis Torres, 30. Mr. Torres worked at Clear Channel from July 9, 2007 to March 5, 2008. He sold ads for WKTU. This was his first job in the radio industry after a short career in insurance. Mr. Torres resigned from Clear Channel effective March 5, 2008 and joined Citadel effective March 5, 2008. Declaration of Jose Luis Torres, dated March 24, 2008 ("Torres Decl.") ¶¶ 2, 3.

Earlier this month, all four resigned from Clear Channel and joined Citadel to sell ads for WABC-AM. WABC is a news and talk station, featuring well-known radio personalities such as Don Imus and Rush Limbaugh. Campbell Decl. ¶ 4. The four were motivated by the chance to work again for Jonathan Mason, their former boss at Clear Channel and a mentor and friend to each. *Id.* ¶¶ 2, 3; Torres Decl. ¶¶ 2, 3; Carpino Decl. ¶ 2; Gross Decl. ¶ 2. Mr. Mason (not a party to this action) had just concluded a non-compete/non-solicit period that followed the end of his employment at Clear Channel.

Campbell Decl. ¶ 3.  After that period ended, Mr. Mason joined WABC, and WABC made job offers to Messrs. Campbell, Carpino, Gross and Torres, which they accepted.

In taking the WABC jobs, the Individual Defendants relied in part on Clear Channel's own past practices.  The Individual Defendants are aware of several other Clear Channel salespeople who recently left for competing companies.  The Individual Defendants believe, and expedited discovery should prove, that these other salespeople had access to the same purportedly confidential information and training techniques, and were subject to the same form of boilerplate non-compete agreement, as the Individual Defendants.  To the best of the Individual Defendants' knowledge, Clear Channel took no action against any of these other individuals.  *See* Campbell Decl. ¶ 13.  At a minimum, Clear Channel's selective enforcement policy means it has no basis for asserting trade secret protection in this case.

### 3.    The Non-Compete "Agreements."

When they joined Clear Channel, each of the four Individual Defendants was forced to sign an identical preprinted form captioned "Confidentiality, Trade Secrets and Non-Compete Agreement" (the "Non-Compete").  None of the four was given any opportunity to review or negotiate the terms of their Non-Competes, and they were not given copies of the Non-Compete after signing.  Campbell Decl. ¶ 5; Carpino Decl. ¶ 4; Gross Decl. ¶ 4; Torres Decl. ¶ 4.  In the section of the Non-Compete quoted in Clear Channel's papers, the document states:

> Employee agrees that in consideration of his/her employment of continued employment with Employer, training in Employer's techniques, access to confidential trade secrets or Employer's expenditure of money and energy

7

> in advertising, training, promoting or dissemination of Information about Employee or various programs in which Employee may participate. Employee does hereby agree that during his/her employment with Employer in the capacity above stated or otherwise and for a period of one hundred eighty (180) days thereafter, he/she shall neither engage directly or indirectly the rendering of services similar to those provided for Employer nor have any direct or indirect interest in or employment relationship with any radio or television station (including cable organization or supplier) or firm or affiliated company owning or operating a radio or television station or cable system located within or purporting to serve the above-referenced Metropolitan Statistical Area(s), as defined by the US Government, other than properties operated by Employer.

Declaration of L. Lynnette Sarno dated March 21, 2008, ("Sarno Decl.") Exs. C, E, G and I.

In language that Clear Channel chose not to quote, it expressly acknowledges that its Non-Compete could be seen as overreaching and, at a minimum, subject to judicial scrutiny and reformation:

> The parties have attempted to limit Employee's right to compete only to the extent necessary to protect Employer from unfair competition. The parties recognize, however, that reasonable people may differ in making such a determination. Consequently, the parties hereby agree that, if the scope or enforceability of the restrictive covenant is in any way disputed at ay time, a court may modify and enforce the covenant to the extent that it believes to be reasonable under the circumstances existing at the time.

*Id.*

The Non-Competes are neither fully-executed (Clear Channel did not sign them) nor entirely coherent. The preprinted form Non-Compete form says that it applies in "the above-referenced Metropolitan Statistical Area ["MSA"], as defined by the U.S. government." But the line for the MSA has been left blank on Mr. Carpino's Non-Compete, Sarno Decl. Ex. C, while for the other Individual Defendants it has been filled

8

in to say "New York City" or "NY, NY."  Sarno Decl. Exs. E, G and I.  The U.S.

government has not defined any MSA called "New York City" or New York, New York.

New York City actually is just one part of a vast MSA that also includes Long Island and

parts of upstate New York, New Jersey and Pennsylvania.  *See* United States Census

Bureau, http://www.census.gov/population/www/estimates/metro_general/2006/List4.txt

(last visited Mar. 24, 2008).  The Non-Compete also states that it is governed by the law

of the state where the particular radio station is incorporated.  That would mean Delaware

for WKTU, Sarno Decl. Exs. E, G and I, and Texas for WLTW.  *Id*. Ex. C.  Yet in its

TRO papers, Clear Channel argues for the application of New York law.

Clear Channel now seeks to have this document strictly enforced, including an

order that would bar Messrs. Campbell, Carpino, Gross and Torres for 180 days from

holding any employment with any radio or television station or affiliated company that

has an office in New York City.  See Complaint at 26, ¶ (d); Plaintiff's proposed Order to

Show Cause With Temporary Restraining Order ¶ 1.

**4.    Defendants' Activities Since Joining WABC.**

The Individual Defendants have only been working at WABC for a week or two.

None of them has yet closed any advertising sales, whether to prospects that are Clear

Channel advertisers or to other prospects.  For the most part, they have focused on

developing new client contacts.  The Individual Defendants have made contact with

certain prospects who were their clients or prospects at Clear Channel.  Campbell Decl. ¶

16; Carpino Decl. ¶ 6; Gross Decl. ¶ 6; Torres Decl. ¶ 6.

9

Before Messrs. Campbell, Carpino, Gross and Torres started work at WABC, they were instructed not to bring with them, and not to use, any confidential or proprietary materials of Clear Channel.  Campbell Decl. ¶ 15; Carpino Decl. ¶ 5; Gross Decl. ¶ 5; Torres Decl. ¶ 5.  They have tried in good faith to follow this instruction.  In one instance, Mr. Campbell took some presentation documents that he created at Clear Channel, which he incorrectly thought of as belonging to him.  Campbell Decl. ¶ 15.  Mr. Carpino still has some Clear Channel presentation materials left over on a flash drive from his time at Clear Channel.  Carpino Decl. ¶ 5.  WABC has restated its instructions to make clear that any and all such documents should now be turned over to counsel.

To be clear, however, client contact information is not covered by WABC's instructions.  Just as Messrs. Campbell and Carpino brought their contacts lists from previous sales jobs with them when they joined Clear Channel, WABC is allowing them to bring and utilize their contacts lists in their new jobs.

None of the Individual Defendants brought with them or has used Clear Channel's "Ask the Expert" Powerpoint presentation that is mentioned in Plaintiff's moving papers.  Nor do any of the Individual Defendants have any personal knowledge of this issue.  Campbell Decl. ¶ 14; Carpino Decl. ¶ 4; Gross Decl. ¶ 4; Torres Decl. ¶ 4.  Investigation of this issue is continuing.  If, in fact, Clear Channel's Powerpoint slides have been used at Citadel, then Citadel will see that this is stopped immediately.

**5.    Litigation Proceedings To Date.**

Clear Channel launched this action on the afternoon of Good Friday with "notice" calculated to limit, if not entirely prevent, a full evidentiary record from being developed.

Clear Channel did not advise Citadel's general counsel of the application, although the two companies are already in litigation on another matter and the general counsel's identity is a matter of public record. Instead they placed a phone call to the general manager of WABC, got a message saying that the WABC offices were closed, and sent the general manager an email that did not attach copies of the moving papers. *See* Plaintiff's Rule 65 Certification ¶¶ 2-3 (Mar. 21, 2008).

That email eventually found its way to Citadel's general counsel, who notified outside counsel. Citadel's counsel eventually learned by calling the courthouse that Judge Baer, sitting in Part I, was moments away from hearing the TRO application. Judge Baer then held a brief conference in which Plaintiff's counsel was present in chambers and Citadel's counsel participated by speakerphone. Judge Baer declined to enter a TRO. He instructed that the papers be served on Citadel's counsel, and put the matter over to Monday, March 24, 2008 before Judge Kaplan. Declaration of Jeremy Feigelson, dated March 24, 2008, ("Feigelson Decl.") ¶¶ 2-3.

<u>**Argument**</u>

**I.      This Court Lacks Jurisdiction Because There Is Incomplete Diversity.**

The TRO should be denied, and this case dismissed, because federal jurisdiction is lacking. Plaintiff Capstar identifies itself in the caption of the Complaint as a Delaware corporation. Capstar *mis*identifies defendant Citadel Broadcasting Corporation as a Nevada corporation. Complaint ¶ 16. In fact, Citadel Broadcasting Corporation is incorporated in Delaware. Feigelson Decl. Ex. 9 (cover page of Citadel Broadcasting Corporation 10-K, identifying Delaware as state of incorporation).

11

The presence of Delaware-incorporated companies on both sides of the caption destroys complete diversity, *see, e.g., Pepsico, Inc. v. Wendy's International, Inc.*, 118 F.R.D. 38, 40 (S.D.N.Y. 1987) (Leval, J.), and with it the only basis of federal jurisdiction.  *See* Complaint ¶ 19 (asserting diversity as only grounds for federal jurisdiction).  Denial of the motion and dismissal of the case should follow.

Even if this Court were to look past this fundamental jurisdictional flaw to the merits, no TRO should issue for all the reasons discussed in the balance of Defendants' papers.

## II.     Clear Channel Is Not Likely To Succeed On The Merits Because It Has No Legally Protectible Interest.

### A.     The Radio Ad Sales Business Is Based On Publicly Available Information And Techniques.

All of Clear Channel's claims fail for the simple reason that there is nothing confidential or proprietary about the business information that its requested injunction would protect.  Clear Channel recites that its application for immediate injunctive relief is based on the "misappropriation and unauthorized use of Clear Channel's trade secrets and other confidential" information.  Clear Channel Br. at 2.  It does not, however, meet its burden of demonstrating why that information is proprietary.  A full record will show it cannot do so.

To the contrary, (a) Clear Channel's customer identities and contact information are matters of public record; (b) its software systems are created by third parties who make those same systems available to Clear Channel's competitors; and (c) its sales

training techniques are matters of common sense and do not significantly differ from those of its competitors.

Discovery will confirm this and also will show that Clear Channel cannot prevail on any of its legal theories, because the existence of truly confidential or proprietary information is a central element of every substantive cause of action alleged:

- **Count I:**  (Breach of Contract, *i.e.*, the Non-Compete); *see Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 605-07 (S.D.N.Y. 2001) (customer identities, preferences and pricing information that were easily generated and well known could not be trade secrets, especially when there was no evidence plaintiff had spent significant time or money to compile such information); *Ivy Mar Co., Inc. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547, 557- 58 (E.D.N.Y. 1995) (denying injunction, in part, because the identity of retail merchants and their preferences could be determined from books and were widely known); *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308; 386 N.Y.S.2d 677, 680 (N.Y. 1976) (reversing injunction where customer information was generated "through the use of nationally known publications such as Dun and Bradstreet's *Million Dollar Directory* where even the name of the person to contact regarding these services is readily available"); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393; 328 N.Y.S.2d 423, 428 (N.Y. 1972) (refusing to enjoin defendants from soliciting former employer's customers when they were "openly engaged in business in advertised locations and their names and addresses may readily be found by those engaged in the trade"); *Apa Sec., Inc. v. Apa*, 37 A.D.3d 502, 503; 831 N.Y.S.2d 201, 203 (2d Dep't 2007) (declining to issue injunction when the identities of customers were "readily ascertainable from nonconfidential sources").

- **Count II:**  (Misappropriation of Trade Secrets); *see Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1991) (plaintiff must demonstrate that (i) it has a trade secret and (ii) defendant has used it in violation of some duty or agreement).

- **Count III**:  (Breach of Fiduciary Duty of Loyalty); the duty allegedly breached here was the common-law duty not to disclose confidential information or trade secrets; *see N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 47 (2d Cir. 1999) ("New York law imposes a duty not to use trade secrets in competition with a former employer."); *Computer Task Group, Inc. v. Prof'l Support, Inc.*, 88 A.D.2d 768, 769; 451 N.Y.S.2d 502, 503 (4th Dep't 1982) ("There is an implicit duty upon an employee not to use confidential knowledge acquired in his

13

employment in competition with his principal, even after the employment is terminated.").

- **Count IV**:  (Unfair Competition); *see Demetriades v. Kaufmann*, 698 F. Supp. 521, 526 (S.D.N.Y. 1988) ("We begin with the bedrock premise that, notwithstanding the expansive scope of the doctrine as fashioned by New York's courts, a claim of this nature must remain bottomed on the misappropriation of a property right belonging to another."); *Eagle Comtronics, Inc. v. Pico Products Inc.*, 256 A.D.2d 1202, 1203; 682 N.Y.S.2d 505, 506 (4th Dep't 1998) ("[T]he gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets.").

- **Count V:**  (Tortious Interference against Citadel); this claim cannot stand because such a claim requires that the underlying contract – here, the Non-Compete – be valid and enforceable.  *See Savannah Bank, N.A. v. Savings Bank of the Fingerlakes*, 261 A.D.2d 917, 918; 691 N.Y.S.2d 227, 229 (4th Dep't 1999) (tortious interference claim was "properly dismissed because [it was] based upon an unenforceable restrictive covenant").

The cases cited by Clear Channel are not to the contrary.  They recognize that "[r]igid employer-employee restrictive covenants are generally unenforceable," *John Hancock Mut. Life Ins. Co.*, 916 F. Supp. 158, 163 (S.D.N.Y. 1996), but are supportable only to the extent they protect bona fide trade secrets or confidential information.  For that reason, it is not enough for Clear Channel simply to label its customer lists and information as confidential.  Clear Channel Br. at 20-21.  Instead, it must prove why that is so.

Clear Channel cannot do that.  As a matter of law, Clear Channel's customer lists and contact information cannot be proprietary because that information is publicly and widely available.  "Generally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or

14

products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers."  *Silfen*, 328 N.Y.S.2d at 427; *see also N. Atl. Instruments*, 188 F.3d at 44; *Tactica*, 154 F. Supp. 2d at 606-07;  *Strauman*, 386 N.Y.S.2d at 680.

Here, the identity and contact information of local businesses advertising on Clear Channel stations is something anyone with access to a radio, Media Monitors and a telephone can quickly generate on his or her own.  *See Ashland Mgmt. Inc v. Janien*, 82 N.Y.2d 395, 407; 604 N.Y.S.2d 912, 917 (N.Y. 1993) ("[A] trade secret must first of all be secret.").  Similarly, third party software systems, available to anyone willing to pay, and generic training materials, even somewhat customized, cannot support an injunction.

That the Individual Defendants still possess a couple of Clear Channel presentations also does not support injunctive relief, because they have not used these materials and have committed voluntarily to return them.  *See Reidman Agency Inc. v. Musnicki*, 79 A.D.2d 1094, 1094; 435 N.Y.S.2d 837, 838 (4th Dep't 1981) (once party returns confidential information, no further relief is required).

### B.    Clear Channel's Non-Competes Are Overbroad And Unenforceable.

Restrictive employment covenants, such as the Non-Competes in this case, are disfavored in New York and "will be rigorously examined and specifically enforced only if [they] satisf[y] certain established requirements."  *Am. Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 403; 438 N.Y.S.2d 482, 486 (N.Y. 1981).  The Non-Competes can only be enforced "to the extent that [they are] reasonable in time and area, necessary to protect the

15

employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Strauman*, 386 N.Y.S.2d at 679.

Clear Channel's effort to enforce the Non-Competes fails across the board under the test stated in *Strauman*:

- The Non-Competes are unreasonable in area, since they do not even clearly define one. *See* pp. 10-11, *supra* (Non-Competes purportedly are limited to a particular U.S. government MSA but do not actually list any recognized MSA).

- The Non-Competes do not serve to protect any "legitimate interests" of Clear Channel; the concept of "legitimate interests" is limited to the "protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389; 690 N.Y.S.2d 854, 857 (N.Y. 1999) (citing *Strauman*, 386 N.Y.S.2d at 680); *see also Ticor Title Ins. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). As noted above, there are no trade secrets, confidential information or extraordinary services at stake here.

- The burden on the Individual Defendants is unreasonable by any measure. They would effectively be forced out of their chosen industry altogether for six months – in the case of Mr. Gross, almost as long as he worked at Clear Channel in the first place.

## III.    The Balance Of Hardships Weighs Strongly In Favor Of Defendants Because The Livelihoods Of Four Individuals Are At Stake.

Even if Clear Channel could show a likelihood of success, its motion should be denied because it cannot also show that the balance of hardships tips in its favor. *Ticor*, 173 F.3d at 68 (in order to get preliminary relief, movant must show both likelihood of success and balance of equities in its favor). The proposed TRO would completely prevent Messrs. Gross, Torres, Campbell and Carpino from earning a living in their chosen field and in their home town for the next six months, in a recession environment

16

where alternative work would be hard to come by. The absence of compensation during these six months only compounds the unfairness.

Against this hardship, Clear Channel can offer only the unsupported argument that an injunction is necessary to protect its interests in nonproprietary information. *See Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 158 (E.D.N.Y. 1986) (denying request for an order that would "enjoin defendants from soliciting any customer whose name appears on plaintiff's customer list," because to do so "would have a marked and obvious effect on the individual defendants' ability to earn a living"); *U.S. Coachways, Inc. v. Silverman*, No. 102317/06, 2007 WL 218728, at *6 (N.Y. Sup. Ct. Jan. 17, 2007) ("any balancing of the equities at this early stage of the proceedings must favor the individual and corporate defendants, whose respective livelihoods and operations would be severely impacted by a preliminary injunction"). The ability of four real people to actually make a living should trump Clear Channel's abstract and factually baseless concerns.

## IV.    Expedited Discovery And A Prompt Evidentiary Hearing Would Be Appropriate.

Defendants agree with Clear Channel that all parties should provide expedited discovery in this matter. To implement this commitment, Defendants have provided the Court with a proposed Scheduling and Confidentiality Order and a set of initial discovery requests. Feigelson Decl. Exs. 2-4. The resulting record will permit this Court to properly inquire into the existence of any truly protectible confidentiality interest. That this is the proper approach, as opposed to the one urged by Clear Channel, is clear even from Clear Channel's authorities. *See, e.g., Datatype Int'l Inc. v. Puzia*, 797 F. Supp. 274

17

(S.D.N.Y. 1992) (hearing conducted before issuing injunction in employee restrictive

covenant case; most of plaintiff employer's claims found overbroad; its "proof at trial

failed for the most part.")

## <u>Conclusion</u>

For all the foregoing reasons, the Court should deny the motion for a TRO, grant

the cross-motion for entry of the proposed scheduling and confidentiality orders, and set

this matter down for a prompt evidentiary hearing.

Dated: New York, New York
         March 24, 2008

                                  DEBEVOISE & PLIMPTON LLP


                                  By:  /s/ Jeremy Feigelson_____
                                       Jeremy Feigelson (JF-4963)

                                  919 Third Avenue
                                  New York, New York 10022
                                  (212) 909-6000

                                  *Attorneys for Defendants*

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Capstar Radio Operating Company, a Delaware     :
Corporation,
                                                :
                                                :
            Plaintiff,                          :
                                                :
      v.                                        :          No. 08 CV 2976 (LAK)
                                                :
Anthony Campbell; Louis Carpino; Adam Gross;    :     **CERTIFICATE OF**
Jose Luis Torres; Citadel Broadcasting Corporation, :  **SERVICE**
a Nevada Corporation; and John Does 1-10,       :
                                                :
            Defendants.                         :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


        The undersigned, an employee of Debevoise & Plimpton LLP, counsel for defendants,

certifies: On the 24th day of March 2008, I caused the within Memorandum of Defendants in

Opposition To Motion For Temporary Restraining Order and Declaration of Jeremy Feigelson to

be served by hand on counsel for plaintiff, L. Lynnette Sarno, Esq., Seyfarth Shaw LLP, 620

Eighth Avenue, New York, New York 10018.


Dated:  New York, New York
        March 24, 2008

                                    /s/ Benjamin Sirota

                                    Benjamin Sirota