UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

Capstar Radio Operating Company, a Delaware
Corporation,

          Plaintiff,

            v.

Anthony Campbell; Louis Carpino; Adam Gross;
Jose Luis Torres; Citadel Broadcasting Corporation,
a Nevada Corporation; and John Does 1-10,

          Defendants.

------------------------------------------------------------x

: 08-CV-

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, A PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Dated:   New York, New York
        March 21, 2008

Of Counsel:

      L. Lynnette Sarno (LS-2421)
      Gloria Galant (GG-2818)

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500
Attorneys for Plaintiff
Capstar Radio Operating Company

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF RELEVANT FACTS ............................................................ 3

    A.   Clear Channel and Its Business .......................................................... 3

    B.   Clear Channel's Confidential and Proprietary Information .................. 3

    C.   Clear Channel Protects its Trade Secrets and other Confidential Information........ 6

    D.   Individual Defendants' Employment with Clear Channel .................... 9

    E.   Events Giving Rise to This Action ...................................................... 12

    F.   Citadel's Pattern of Soliciting Business from Clear Channel's Clients ............... 14

ARGUMENT...................................................................................................... 15

I.   CLEAR CHANNEL IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ........................................ 15

    A.   Legal Standard For Issuance of a Temporary Restraining Order and a Preliminary Injunction.............................................................. 15

    1.   Clear Channel Will Likely Succeed on the Merits of Its Claims. ......................... 15

        a.   Clear Channel will succeed on the merits of its claims for breach of contract. ................................................................ 16

        b.   Clear Channel will likely succeed on its misappropriation of trade secrets claim. .................................................................. 20

        c.   Clear Channel is likely to succeed on its unfair competition claim ............................................................................................. 23

        d.   Clear Channel will likely succeed on its breach of fiduciary duty claim. ................................................................................. 24

        e.   Clear Channel is likely to succeed on its claim for tortious interference with contractual relations. ...................................... 26

II.   CLEAR CHANNEL WILL CONTINUE TO SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT INJUNCTIVE RELIEF..................... 27

III.   A BALANCE OF HARDSHIPS WEIGH IN CLEAR CHANNEL'S FAVOR. ............. 29

IV.   INJUNCTIVE RELIEF SHOULD RUN FROM THE DATE OF THIS COURT'S ORDER................................................................................... 31

V.    CLEAR CHANNEL SHOULD BE GRANTED EXPEDITED DISCOVERY ................31

CONCLUSION ........................................................................................................................34

## TABLE OF AUTHORITIES

### CASES

7th Sense v. Liu,
220 A.D.2d 215, 631 N.Y.S.2d 835 (1st Dep't 1995).........................................................25

ABC v. Wolf,
52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981).......................................................................18

ABKCO Music, Inc. v. Harrisongs Music, Ltd.,
722 F.2d 988 (2d Cir. 1983).........................................................................................25

Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.,
No. 94 Civ. 5620 (JFK), 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994).....................31, 32

American Para Prof'l Sys. v. Examination Mgmt. Servs.,
214 A.D.2d 413, 625 N.Y.S.2d 33 (1st Dep't 1995)......................................................26

Anacomp, Inc. v. Shell Knob Servs., Inc.,
No. 93 Civ. 4003 (PKL), 1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ..........................20, 25

Arnold's Ice Cream Co. v. Carlson,
330 F. Supp. 1185 (E.D.N.Y. 1971) ...............................................................................26

B-S Indus. Contrs. v. Burns Bros. Contrs.,
256 A.D.2d 963, 681 N.Y.S.2d 897 (3d Dep't 1998) .....................................................26

B.U.S.A. Corp. v. Ecogloves, Inc.,
No. 05 CIV. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan. 31, 2006)...................20, 22

Bausch & Lomb, Inc. v. Smith,
630 F. Supp. 262 (W.D.N.Y. 1986).................................................................................21

Borne Chem. Co. v. Dictrow,
85 A.D.2d 646, 445 N.Y.S.2d 406 (2d Dep't 1981) .......................................................17

Churchill Commc'ns Corp. v. Demyanovich,
668 F. Supp. 207 (S.D.N.Y. 1987) ...........................................................................21, 28

Coors Brewing Co. v. Anheuser-Busch Cos.,
802 F. Supp. 965 (S.D.N.Y. 1992) ................................................................................24

Datatype Int'l, Inc. v. Puzia,
797 F. Supp. 274 (S.D.N.Y. 1992) ................................................................................17

Delphine Software Int'l v. Electronic Arts, Inc.,
No. 99 Civ. 4454 (AGS), 1999 WL 627413 (S.D.N.Y. Aug. 18, 1999) ...........................32

Dial Info. Servs. Corp. v. Thornburgh,
    938 F.2d 1535 (2d Cir. 1991) ................................................................32

DoubleClick Inc. v. Henderson,
    No. 116914/97, 1997 WL 731413 (Sup. Ct. N.Y. Cty. Nov. 7, 1997)......................*passim*

Duane Jones Co. v. Burke,
    306 N.Y. 172, 117 N.E.2d 237 (1954) ......................................................26

Eastern Artificial Insemination Coop. v. La Bare,
    210 A.D.2d 609, 619 N.Y.S.2d 858 (3d Dep't 1994) ......................................21

Ecolab, Inc. v. Paolo,
    753 F. Supp. 1100 (E.D.N.Y. 1991) ............................................15, 20, 28

Educational Comm'n for Foreign Sch. Med. Graduates v. Repik,
    No. Civ. A. 99-1381, 1999 WL 317052 (E.D. Pa. May 17, 1999)...................32

Electrolux Corp. v. Val-Worth, Inc.,
    6 N.Y.2d 556, 190 N.Y.S.2d 977 (1959)....................................................24

Ellsworth Assocs., Inc. v. United States,
    917 F. Supp. 841 (D.D.C. 1996)...............................................................32

Estee Lauder Cos. v. Batra,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ..................................................28, 29

FMC Corp. v. Taiwan Tainan Giant Indus. Co.,
    730 F.2d 61 (2d Cir. 1984) ......................................................................27

Fortune Personnel Agency, Inc. v. Livingston,
    102 Misc. 2d 369, 423 N.Y.S.2d 360 (Sup. Ct. N.Y. Cty. 1979) ...................21

Gelder Med. Group v. Webber,
    41 N.Y.2d 680, 394 N.Y.S.2d 867 (1977)..................................................17

Giffords Oil Co. v. Wild,
    106 A.D.2d 610, 483 N.Y.S.2d 104 (2d Dep't 1984) ..................................20

H. B. Fuller Co. v. Hagen,
    363 F. Supp. 1325 (W.D.N.Y. 1973)..........................................................17

Ikon Office Solutions, Inc. v. Leichtnam,
    No. 02-CV-0721E(SC), 2003 WL 251954 (W.D.N.Y. Jan. 3, 2003) ...............32

Inflight Newspapers v. Magazines In-Flight, L.L.C.,
    990 F. Supp. 119 (E.D.N.Y. 1997) ..................................................................................21

John Hancock Mut. Life Ins. Co. v. Austin,
    916 F. Supp. 158 (N.D.N.Y. 1996) ................................................................................17

Johnson Controls, Inc. v. A.P.T. Critical Sys.,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ....................................................................15, 27

Kaufman v. IBM,
    97 A.D.2d 925, 470 N.Y.S.2d 720 (3d Dep't 1983) ......................................................30

L. M. Rabinowitz & Co. v. Dasher,
    82 N.Y.S.2d 431 (Sup. Ct. N.Y. Cty. 1948) .................................................................25

Levitt Corp. v. Levitt,
    593 F.2d 463 (2d Cir. 1979) .........................................................................................31

Lumex, Inc. v. Highsmith,
    919 F. Supp. 624 (E.D.N.Y. 1996) ..........................................................................21, 27

Mallory Factor, Inc. v. Jicka,
    168 A.D.2d 344, 562 N.Y.S.2d 666 (1st Dep't 1990) ...............................................17, 18

Mallory Factor, Inc. v. Schwartz,
    146 A.D.2d 465, 536 N.Y.S.2d 752 (1st Dep't 1989) ...............................................17, 18

Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc.,
    100 A.D.2d 81, 474 N.Y.S.2d 281 (1st Dep't 1984) ......................................................24

Markovits v. Venture Info Capital, Inc.,
    129 F. Supp. 2d 647 (S.D.N.Y. 2001) ...........................................................................29

Natsource LLC v. Paribello,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001) ......................................................................27, 30

New York v. United States Metals Ref. Co.,
    771 F.2d 796 (3d Cir. 1985) .........................................................................................31

North Atl. Instruments, Inc. v. Haber,
    188 F.3d 38 (2d Cir. 1999) .................................................................................20, 25, 27

Onan Corp. v. United States,
    476 F. Supp. 428 (D. Minn. 1979) ................................................................................32

Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.,
    783 F. Supp. 53 (E.D.N.Y. 1991) .................................................................21

Pashaian v. Eccelston Props.,
    88 F.3d 77 (2d Cir. 1996) .......................................................................... 15

Richardson v. Suzuki Motor Co.,
    868 F.2d 1226 (Fed. Cir. 1989) ..................................................................27

Roanoke Eng'g Sales Co. v. Rosenbaum,
    290 S.E.2d 882 (Va. 1982) ........................................................................ 31

Roy Export Co. Establishment v. CBS,
    672 F.2d 1095 (2d Cir. 1982) .....................................................................24

Saratoga Vichy Spring Co. v. Lehman,
    625 F.2d 1037 (2d Cir. 1980) .....................................................................23

Service Sys. Corp. v. Harris,
    41 A.D.2d 20, 341 N.Y.S.2d 702 (4th Dep't 1973) .......................................... 18

Stanley Tulchin Assocs., Inc. v. Vignola,
    186 A.D.2d 183, 587 N.Y.S.2d 761 (2d Dep't 1992) ...................................17, 28

Textron, Inc. v. Teleoperator Sys. Corp.,
    554 F. Supp. 315 (E.D.N.Y. 1983) ..............................................................27

Ticor Title Ins. Co. v. Cohen,
    173 F.3d 63 (2d Cir. 1999) .........................................................................29

United States Naval Inst. v. Charter Commc'ns, Inc.,
    875 F.2d 1044 (2d Cir. 1989) .....................................................................32

Velo-Bind, Inc. v. Scheck,
    485 F. Supp. 102 (S.D.N.Y. 1979) ..............................................................28

Webcraft Techs., Inc. v. McCaw,
    674 F. Supp. 1039 (S.D.N.Y. 1987) ...................................................18, 20, 24

Wenner Media LLC v. Northern & Shell N. Am. Ltd.,
    No. 05 Civ. 1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) .............................27

## STATUTES & RULE

Restatement of Torts § 757 cmt. b (1939) ..................................................................................20

Restatement (Third) of Unfair Competition § 39 & cmt. b (1995) .............................................20

Fed. R. Civ. P. 34(b) ..................................................................................................................31

Capstar Radio Operating Company, a Delaware Corporation, and an indirect subsidiary of Clear Channel Communications Inc., a Texas Corporation ("Clear Channel" or "Plaintiff"), by and through its attorneys, Seyfarth Shaw LLP, respectfully submits this memorandum of law in support of its motion for a temporary restraining order and a preliminary injunction against Defendants Anthony Campbell ("Campbell"), Lou Carpino ("Carpino"), Adam Gross ("Gross"), Jose Luis Torres ("Torres") (together, "Individual Defendants"), John Does 1-10, and Citadel Broadcasting Corporation, a Nevada Corporation ("Citadel") (collectively with Individual Defendants, the "Defendants"), pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiff also seeks expedited discovery in advance of its hearing on this motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Clear Channel, a leading broadcasting company, can only succeed by maintaining a competitive edge in the advertising market by developing strategic business plans and forming and maintaining key client contacts. As a result, Clear Channel takes great care and precaution to safeguard its trade secrets and confidential information. One of the ways Clear Channel safeguards its proprietary information and trade secrets is to have its Account Executives sign a Confidentiality, Trade Secrets and Non-Competition Agreement as a condition of employment. The Agreement, which prohibits employment in the radio and/or television industry in the New York area for a period of one hundred eighty (180) days upon their separation of employment with Clear Channel, is not only reasonable in scope and narrowly tailored, but necessary for Clear Channel to protect its trade secrets and goodwill, and maintain a competitive edge in the industry.

Account Executives, by virtue of their roles, have access to Clear Channel's confidential and proprietary information including its proprietary software systems; its proprietary client

contact information; detailed client data; pricing strategies, marketing techniques and business plans. The only way to safeguard that information, which is not publicly available, is to have its Account Executives agree to keep it confidential and not to compete in the industry for a period of at least one hundred eighty (180) days following their separation.

This action and the instant application for injunctive relief arise, *inter alia*, out of Defendants' blatant misappropriation and unauthorized use of Clear Channel's trade secrets and other confidential and proprietary business information, and Individual Defendants' breach of their common law and contractual obligations to Clear Channel. Indeed, the facts establish that Individual Defendants orchestrated an en masse departure from Clear Channel to gain employment with a competing radio station in the New York area and perform duties which are identical to the duties they performed at Clear Channel. Individual Defendants also contacted Clear Channel clients and used Clear Channel's trade secrets and proprietary business information, to divert business away from Clear Channel to their new employer Citadel. Further, there is evidence that Citadel used materials prepared by Clear Channel during Individual Defendants' employment with Citadel and passed it off as Citadel work product in an effort to divert business away from Clear Channel to Citadel. Through their conduct, the Individual Defendants have breached their confidentiality provisions and non-compete agreements with Clear Channel. Moreover, despite having knowledge that the Individual Defendants are bound by contractual and common law duties to Clear Channel, which prohibit their employment with Citadel, Citadel continues to employ Individual Defendants and to use the confidential data that they misappropriated from Clear Channel to gain an unfair competitive edge in the market.

The consequences of Defendants' unlawful actions will continue to irreparably harm Clear Channel in multiple ways, including the irretrievable loss of its confidential business

strategies, client information, and goodwill. Because Individual Defendants have used and

disclosed, and upon information and belief will inevitably continue to use and disclose Clear

Channel's confidential business information in their new employment at Citadel, injunctive relief

is plainly warranted.

**STATEMENT OF RELEVANT FACTS**

**A.    Clear Channel and Its Business**

Capstar Radio Operating Company  is a Delaware corporation and an indirect subsidiary

of Clear Channel Communications, Inc., with its corporate headquarters and principal place of

business in San Antonio, Texas (collectively "Clear Channel"). Clear Channel provides

entertainment, information products, and services to communities and effective solutions to

advertisers in those communities. (Declaration of Robert Williams dated March 20, 2008

("Williams Dec.") ¶ 2) attached to the Declaration of L. Lynnette Sarno ("Sarno Dec.") as

Exhibit K) Clear Channel's assets include radio stations and outdoor advertising formats, such

as signs and billboards, through which it sells advertising time and access to its customer base.

(Id.) Clear Channel has seven radio stations located in New York, New York. (Id.) Clear

Channel's sister companies reach more than 110 million listeners each week with over 1,100

locally-operated and locally-programmed radio stations in the U.S. (Id.) With its international

partners, Clear Channel operates more than 240 radio stations in Australia, Mexico, and New

Zealand. (Id.) Clear Channel's parent's Premiere Radio Networks unit syndicates more than 70

programs to more than 5,000 radio affiliates, including Rush Limbaugh, Dr. Laura, Jim Rome

and Carson Daly. (Id.)

**B.    Clear Channel's Confidential and Proprietary Information**

Clear Channel has invested substantial time and money gathering and developing

confidential and proprietary information concerning its markets, services, clients, and its clients'

customer base. Because of its vast presence in radio and outdoor advertising, Clear Channel's confidential and other proprietary information is unique and sets it apart from its competitors in the marketplace. (See Declaration of Steven Kritzman ("Kritzman Dec."), dated March 20, 2008, ¶ 2, and attached to Sarno Dec. as Ex. L.) The competitive nature of the radio and advertising industry is such that Clear Channel greatly depends on maintaining and preserving its confidential information and trade secrets to maintain its competitive edge. (Id.)

Clear Channel's confidential and proprietary information currently includes proprietary software systems called Radio Fusion and Best Rate, and, until November 2007, Tapscan. Radio Fusion is a program that manages and schedules all advertising for various radio stations by date, time, and listener base for up to a year. (Id. ¶ 3.) Radio Fusion contains information used by Clear Channel's Account Executives to create effective, market-based proposals targeting specific clients. (Id.) Such analysis includes client identity and contact information, historical purchases made by clients, products, benefits, pricing, advertising/marketing schedules, event sponsorships, promotional events, and television campaigns for the near future. (Id.) Radio Fusion provides detailed client profiles based upon historical data that defines the relationship between Clear Channel and its specific client base. (Id.)

Best Rate is a software program incorporated into Radio Fusion. (Id. ¶ 4.) Best Rate employs an algorithm to create a pricing system used by Clear Channel to sell advertising to its clients on the various radio stations it owns. (Id.) Best Rate incorporates historical information including, but not limited to, costs, product development, date and time of day, time slot and amount of time, historical data, and forecasting. (Id.) This software system not only determines the rates that should be charged, it alerts personnel to sales that are outside the desired

parameters or when actual sales are not aligned with sales targets.[1] (<u>Id.</u>) Clear Channel's pricing

strategy information is extremely valuable and directly effects its competitive position in the

marketplace. (<u>Id.</u>)

Tapscan was a scheduling program, utilized by Clear Channel until November 2007,

when it was replaced by Radio Fusion. (<u>Id.</u> ¶ 5.) Through Tapscan, Clear Channel's employees

could access scheduling information and various market rates and ad space scheduling for

particular clients of any of Clear Channel's six Chicago radio stations. (<u>Id.</u>)

In addition, Clear Channel's confidential and proprietary information also includes its

sales training programs, materials and methodology. Clear Channel has dedicated extensive

resources to its training programs that are provided through its exclusive training school, Clear

Channel University. One of the programs developed by Clear Channel University is its

"Solution Based Selling for Account Executives" ("SBSAE"). SBSAE is a customized training

program that is designed specifically for Clear Channel which is intended to sharpen the Account

Executive's sales skills, build better client relationships and achieve sales results. The SBSAE

includes comprehensive preparation assignments and a 3-day training workshop that is

exclusively for Clear Channel Account Executives. During this program, the participating

Account Executives are trained on Clear Channel's sales methods, target marketing techniques,

music and radio products, and sample scripts. Each Account Executive also receives pre-

workshop assignments which introduce the program and which are followed-up with unique

practice assignments to apply the training that they have received. (<u>Id.</u> ¶ 9.)

---

[1] Clear Channel also maintains information concerning Non Traditional Revenue ("NTR") sources. NTR includes
information on Clear Channel's internet capabilities and event marketing. This information is maintained on the
"N" Drive and is accessible only to individuals who need the information, such as Account Executives and higher-
ranking management officials. (Kritzman Dec. ¶ 6.)

### C.    Clear Channel Protects its Trade Secrets and other Confidential Information

Clear Channel has invested years, substantial dollars, and extensive resources gathering, developing, and analyzing its confidential, proprietary information concerning its customers. (Williams Dec. ¶ 3.)  This information is not available to the general public or to Clear Channel's competitors.  Clear Channel requires that such information be kept strictly confidential by its employees and restricts access to this information in the manner described below.  (See Jerez Dec. ¶ 2.)

Clear Channel uses a secure computer system to organize, maintain, secure, and access its confidential and proprietary information.  (See Declaration of Mirian Jerez ("Jerez Dec.") dated March 20, 2008, ¶ 2, attached to Sarno Dec. as Ex. M.)  The system is password-protected and includes strict rules concerning the protection of password secrecy.  (Id.)  In addition, Clear Channel takes other specific measures to preserve the confidentiality of its proprietary information, including:

a.    All applicants agree that, if they are hired, they will abide by Clear Channel's policies, rules, and procedures.  (See Jerez Dec. ¶ 3.)

b.    When they are first hired, all Clear Channel employees must agree to abide by the Clear Channel Employee Guide which provides that Clear Channel requires each employee to protect its confidential and proprietary information,[2]  including:

- Business promotion strategies and plans (these may be in writing, communicated orally, or exist as a matter of practice or custom).

- Proposals to clients or potential clients, including information compiled or prepared to assist with proposals to clients or potential clients.

- Client lists or prospective (e.g., "target") client lists.

---

[2] The Confidentiality Policy, incorporated into Clear Channel's Employee Guide, further states that Clear Channel prohibits the use of its competitor's confidential information.  (See Clear Channel Employee Guide at p. 17, attached to Sarno Dec. as Ex. A.)

- Client requests (whether presented orally or in writing) for information, proposals, promotional assistance, or other information, which relates to Clear Channel or to the client.

- Event or potential event information, including dates, locations, costs, ticket prices, on-sale information, ticket price determination formulas, methods, strategies, or variations.

- Information regarding other employees and their employment with Clear Channel, including personal information that employees learn in the course of their job duties.

- Information regarding the talents, skills, abilities, and work experience of other employees.

- Computer hardware, software, or computer-related information, whether purchased or created by or on behalf of Clear Channel, as used or applied to Clear Channel's business.

- Information, which pertains – directly or indirectly – to contemplated or actual business relationships between Clear Channel and businesses that engage in activities related to Clear Channel business, e.g., promoters, advertising or marketing firms, etc.

- The identity of consultants, vendors, or other third parties that provide or seek to provide services to Clear Channel, together with the nature of any such services.

- Personal information regarding non-employees, which is obtained through Clear Channel's promotional activities (such as information regarding Internet website visitors, contest winners, email newsletter subscribers, etc.)[3]

(See Jerez Dec. ¶ 3.)

c.    The Guide also contains a policy that prohibits the dissemination of Clear Channel's confidential and trade-secret information through use of electronic communications. That policy provides that:

Sending or posting confidential or sensitive material, trade secrets, or proprietary information outside Clear Channel is prohibited. This includes sending or posting messages or material that could damage Clear Channel's image or reputation (both from work or home, and during working or nonworking time).

---

[3] The Confidentiality Policy also states that "Clear Channel also may require you to sign a confidential information protection and nondisclosure agreement as consideration for your employment or continued employment. Any such agreement will only supplement this policy." (See Sarno Dec. Ex. A at p. 17.)

(See Jerez Dec. ¶ 4.)

   d.  All Clear Channel employees are also given a Clear Channel Communications, Inc. Code of Business Conduct and Ethics to read and acknowledge that they understand their responsibilities under the code. The Code of Conduct requires, among other things, employees to identify confidential and proprietary information and to keep it confidential:

> It is also important that you protect the confidentiality of company information. Confidential or proprietary information includes all information that is not generally known to the public and is helpful to the company, or would be helpful to competitors. Proprietary information should be marked accordingly, kept secure and access limited to those who have a need to know in order to do their jobs.

> Our business relations are built on trust, and our customers and suppliers count on that trust. If you learn information from them that is not otherwise public, you should keep that information confidential also.

(See Jerez Dec. ¶ 5.)

   e.  Clear Channel also requires all of its Account Executives to sign a Confidentiality Agreement, Trade Secrets And Non-Compete Agreement that defines the type of confidential and proprietary information they may be exposed to, specifically states that this information is the property of Clear Channel, and requires that Account Executives maintain the confidentiality of Clear Channel's information:

> During the term of this agreement, Employee will have access to and become familiar with various trade secrets and confidential information and techniques of Employer. Employee acknowledges that such confidential information and techniques, and trade secrets are owned and shall continue to be owned solely by Employer. **During the term of his/her employment, and after such employment terminates, Employee agrees not to use such information for any purpose whatsoever or to divulge such information to any person other than Employer or person to whom Employer has given its consent.** Under no circumstances shall Employee remove from Employer's office any of Employer's books, records, format materials, documents, or customer lists, or any copies of such documents without the written permission of Employer; nor shall employee make any copies of such books, records, materials, documents, or customer lists for use outside of Employer's office except as specifically authorized in writing by Employer.

(See Jerez Dec. ¶ 6.)

   f.  Every time an employee accesses any Clear Channel computer system, Clear Channel reminds the employee that the information stored on its computers are the property of Clear Channel through a warning message. Prior to accessing Clear Channel's computer systems, all employees must agree to abide by the following policy:

- 8 -

> All email, instant messaging, voice mail, internet traffic and computer files used, created, or stored on Clear Channel equipment is Company property and subject to monitoring by the Company.
>
> Clear Channel has the right to access and review your electronic files, messages, email, and Internet activity. We might need to do this for business reasons, or to make sure there is no misuse or violation of Company policy or any law. This may happen at any time and without notice to you. By accessing Clear Channel's email or Internet system, all employees knowingly and voluntarily consent to electronic monitoring, and acknowledge Clear Channel's right to conduct such monitoring.

(See Jerez Dec. ¶ 7.)

Clear Channel maintains the confidential nature of its proprietary business and customer information because such information provides Clear Channel with a competitive advantage in the marketplace from which Clear Channel derives economic value.

### D.    Individual Defendants' Employment with Clear Channel

Louis Carpino, Anthony Campbell, Adam Gross and Jose Torres (again, collectively, "Individual Defendants") were hired by Clear Channel as Account Executives. An Account Executive is responsible for meeting local business owners and advertising agency representatives, in order to build relationships, and selling all Clear Channel assets as marketing solutions to help clients meet their key business challenges. (Kritzman Dec. ¶ 10.) The essential duties of an Account Executive are to maintain existing business relationships while striving to increase billing and market share; attract new business accounts and sponsorships for the employee's home station, as well as Clear Channel; develop and maintain ongoing relationships with corporate, advertising, and public relations communities; develop presentations to corporations and agencies designed to sell marketing solutions; solicit funding for broadcast and non-broadcast projects, special events web-streaming, and other off-air projects; maintain ability

to analyze client marketing analysis, target consumer needs, benefits sought, assignments; and develop and sell new accounts. (<u>Id.</u>)

The Individual Defendants acknowledged that they each read and agreed to abide by Clear Channel's Employee Guide and its Code of Conduct, Business and Ethic Guide. (<u>See</u> Jerez Dec. ¶ 5.) In addition, as a condition of their employment, each of the Individual Defendants signed a non-compete agreement which provided:

> Employee agrees that in consideration of his/her employment or continued employment with Employer, training in Employer's techniques, access to confidential trade secrets or Employer's expenditure of money and energy in advertising, training, promoting or dissemination of information about Employee or various programs in which Employee may participate, **Employee does hereby agree that during his/her employment with Employer in the capacity above stated or otherwise and for a period of one hundred eighty (180) days thereafter, he/she shall neither engage directly or indirectly in the rendering of services ... with any radio or television station ... or firm or affiliated company owning or operating a radio or television station or cable system ...**
>
> *     *     *     *
>
> Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and good will of Employer and that a breach of those covenants will irreparably and continually damage Employer, for which money damages may not be adequate. ... Employee agrees that in the event he/she breaches ..., **Employer shall be entitled to both a preliminary or permanent injunction in order to prevent the continuation of such harm** and money damages insofar as they can be determined.

(<u>See</u> Jerez Dec. ¶ 8.) In consideration for signing the non-compete agreement, Clear Channel provided the Individual Defendants with their continued employment and were sent to attend Clear Channel University programs including the SBSAE training.

- Louis Carpino

Louis Carpino ("Carpino") was hired by Clear Channel on March 20, 2006 as an Account Executive with radio station WLTW. Immediately upon his hire, Carpino signed a Confidentiality, Trade Secrets and Non-Compete Agreement. (See Jerez Dec. ¶ 10.) In addition, Carpino received a copy of Clear Channel's Employee Guide (the "Guide"). Carpino acknowledged receipt of the Employee Handbook on March 20, 2006. (See Jerez Dec. ¶ 11.) Thereafter, Carpino also received Clear Channel's Code of Business Conduct and Ethics (the "Conduct of Conduct"). On September 15, 2006, Carpino acknowledged that he read and agreed to abide by the Code of Conduct and again confirmed receipt of the Guide. (See Jerez Dec. ¶ 12.) As consideration for agreeing to keep Clear Channel's confidences and signing his non-compete agreement, Carpino was invited to and attended Clear Channel University's SBSAE program in May 2006, which was held in Philadelphia, Pennsylvania.

Carpino, as well as the rest of the Individual Defendants, advised Clear Channel that they were leaving Clear Channel to join a competing radio station, WABC-AM, on March 5, 2008.

- Anthony Campbell

Anthony Campbell ("Campbell") was hired by Clear Channel on April 30, 2007 as an Account Executive with radio station WKTU. When he was hired, Campbell signed a Confidentiality, Trade Secrets and Non-Compete Agreement. (See Jerez Dec. ¶ 13.) In addition, Campbell received a copy of Clear Channel's Guide and the Conduct of Conduct. On April 26, 2007, Campbell acknowledged that he read and agreed to abide by the Guide and the Code of Conduct. (See Jerez Dec. ¶ 15.) As consideration for agreeing to keep Clear Channel's confidences and signing his non-compete agreement, Campbell was invited to and attended Clear Channel University's SBSAE program in July 2007, which was held in Weehawken, New Jersey.

- Adam Gross

Adam Gross ("Gross") was hired by Clear Channel on July 9, 2007 as an Account Executive with radio station, WKTU.  When he was hired, Gross signed a Confidentiality, Trade Secrets and Non-Compete Agreement.  (See Jerez Dec. ¶ 16.)  In addition, Gross received a copy of Clear Channel's Guide and the Conduct of Conduct.  On June 29, 2007, Gross acknowledged that he read and agreed to abide by the Guide and the Code of Conduct.  (See Jerez Dec. ¶ 18.)  As consideration for agreeing to keep Clear Channel's confidences and signing his non-compete agreement, Gross was invited to and attended Clear Channel University's SBSAE program in February 2008, which was held in Weehawken, New Jersey.  Gross attended the SBSAE program less than a month prior to his resignation.  (See Kritzman Dec. ¶ 14.)

- Jose Torres

Jose Torres ("Torres") was hired by Clear Channel on July 9, 2007 as an Account Executive with radio station WKTU.  When he was hired, Torres signed a Confidentiality, Trade Secrets and Non-Compete Agreement.  (See Jerez Dec. ¶ 19.)  In addition, Torres received a copy of Clear Channel's Guide and the Conduct of Conduct.  On June 29, 2007, Torres acknowledged that he read and agreed to abide by the Guide and the Code of Conduct.  (See Jerez Dec. ¶ 22.)  As consideration for agreeing to keep Clear Channel's confidences and signing his non-compete agreement, Torres was invited to and attended Clear Channel University's SBSAE program in February 2008, which was held in Weehawken, New Jersey.  Torres attended the SBSAE program less than a month prior to his resignation.  (See Kritzman Dec. at ¶ 15.)

E.    **Events Giving Rise to This Action**

As noted above, the Individual Defendants informed Clear Channel that they were collectively going to be working at a competing station, WABC-AM, and resigned on March 5, 2008.  (See Kritzman Dec. ¶ 16.)  WABC-AM is owned by Defendant Citadel.  At WABC-AM,

- 12 -

the Individual Defendants joined the former Local Sales Manager of Clear Channel's WKTU, Jonathan Mason ("Mason"). Upon information and belief, Mason is now a Sales Manager at WABC-AM. (See Kritzman Dec. ¶ 18.) WABC-AM is direct competitor of WLTW and WKTU, as they are in the same Metropolitan Statistical Area, the same radio market, and compete for the same radio advertising clientele. (See Kritzman Dec. ¶ 19.)

Despite their non-compete agreements, Clear Channel has learned that the Individual Defendants joined Citadel's WABC-AM as sales account managers, and are selling advertising for WABC-AM. (See Kritzman Dec. ¶¶ 16- 20.) Moreover, Clear Channel has verified that since the Individual Defendants' departure, Citadel's WABC-AM has reached out to Clear Channel's clients and solicited their business. (See Declaration of Bernhard Weiss ("Weiss Dec."), dated March 20, 2008, ¶¶ 4-18, attached to Sarno Dec. as Exhibit N.) It has been merely days since the Individual Defendants left their employment and several Clear Channel's clients have already advised it that WABC-AM has contacted them. (See Weiss Dec.¶¶ 4-5; see also Declaration of Leon Bart-Williams ("Bart-Williams Dec."), dated March 20, 2008, ¶ ¶ 4-8, attached to Sarno Dec. as Exhibit O.) Specifically, Clear Channel has learned that Carpino has contacted at least six of the client contacts of Clear Channel on behalf Citadel's WABC-AM. (Id.) Indeed, Carpino even called the Clear Channel Account Executive that took over one of his prior accounts, Leon Bart-Williams, from the client's office, thus, overtly confirming that he is competing with Clear Channel. In addition, Carpino attended an event sponsored by a Clear Channel client, even though he had no relationship with this client prior to his employment with Clear Channel. (See Weiss Dec. ¶¶ 9-11.) Surprisingly, Carpino has even reached out to Bart-Williams seeking introductions to other clients for his sales efforts at WABC-AM. (See Bart-

Williams Dec. ¶ 8.) Bart-Williams, recognizing that Carpino is competing with Clear Channel, declined to assist Carpino. (See Bart-Williams Dec. ¶ 8.)

Most egregious, however, Clear Channel has also learned that since March 5, 2008, a Citadel station has used a Clear Channel sales program and adopted it for its own use. It appears that the Citadel station simply took Clear Channel's PowerPoint presentation on Clear Channel's "Ask the Expert" program, reconfigured it slightly, placed a Citadel station's name on it, and sold it under the Citadel station's name.

Clear Channel's "Ask the Expert" program was developed by the Clear Channel sales team and required a significant expenditure of company resources. Moreover, the PowerPoint presentation created to introduce the client to this product was developed over time and, again, required a significant investment of time and money.

The Individual Defendants were never given any authority to use or disclose Clear Channel's confidential and proprietary information for any purpose other than for a legitimate Clear Channel business purpose. (Kritzman Dec. ¶ 23.)

Clear Channel's confidential and proprietary information is of tremendous value to Clear Channel and could provide (and has provided) an unfair competitive advantage to any one of its competitors who acquired that information, including Citadel. A competitor, such as Citadel, could use Clear Channel's confidential information, including its secret process of determining pricing information for advertisement values, product information, business plans, and marketing strategies, to develop competing products, adjust its marketing strategies, unfairly price its products, or otherwise move business away from Clear Channel. (Kritzman Dec. ¶ 15.)

F.    Citadel's Pattern of Soliciting Business from Clear Channel's Clients

In addition to the four Individual Defendants, within the last few months, Citadel has hired two Account Executives in its Chicago market, as well. (Williams Dec. ¶ 6.) Similar to

the case here, Clear Channel has learned that Citadel improperly has solicited the business of Clear Channel's clients in Chicago. (Id.)

## ARGUMENT

**I.**  **CLEAR CHANNEL IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

**A.**  **Legal Standard For Issuance of a Temporary Restraining Order and a Preliminary Injunction**

Under the well-known standard of this Circuit, Clear Channel is entitled to a preliminary injunction if it can establish: (1) irreparable harm; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of the hardships weighs in its favor. Pashaian v. Eccelston Props., 88 F.3d 77, 85 (2d Cir. 1996); Johnson Controls, Inc. v. A.P.T. Critical Sys., 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004).

**1.**  **Clear Channel Will Likely Succeed on the Merits of Its Claims.**

The facts sufficiently demonstrate that there is a reasonable likelihood that Clear Channel will succeed on its claims against each of the Defendants. Indeed, Clear Channel need not show that success is an absolute certainty, but only "that the probability of [its] prevailing is better than fifty percent." Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991). Moreover, "[w]here . . . the balance of hardships tips strongly in [the movant's] favor, the required showing of the probability of its success is reduced. It is enough that [the movant's] chances are better than negligible." Id. (quotations omitted); see also Johnson Controls, 323 F. Supp. 2d at 531. Clear Channel is likely to succeed on the merits of each of its claims.

a.    <u>Clear Channel will succeed on the merits of its claims for breach of contract.</u>

The undisputable facts in this case establish that the Individual Defendants violated their Non-Compete Agreements by seeking and retaining employment from a competitor in violation of their non-compete agreements with Clear Channel, by utilizing or disclosing confidential information belonging to Clear Channel in their new employment with a competing business and by soliciting the business of Clear Channel's clients.  Such client contact was only possible by using the confidential client information of Clear Channel.

Further, the manner in which the Individual Defendants orchestrated their departure from Clear Channel, en masse, further suggests that their intent in doing so was to use Clear Channel's confidential information to collectively gain a competitive advantage in the marketplace.

Each of the Individual Defendants signed restrictive covenants which included Confidentiality, Trade Secrets and Non-Compete Agreements (Non-Compete Agreement").  Under the Non-Compete Agreements, Individual Defendants agreed that during their period of employment (and for a period of 180 days thereafter) not to be employed by any radio station, television station (including any cable organization or supplier) or any firm or affiliated company owning or operating a radio station, television station or cable system, with an office located in New York, New York.  Despite these express restrictions, after learning Clear Channel's training and pricing techniques, and being provided use of and access to Clear Channel's confidential and proprietary information, Individual Defendants joined Citadel, a direct competitor, whose offices and operations are located in New York, New York.

Moreover, in order to ensure the confidentiality of Clear Channel's trade secrets and to prevent any unfair competition by Individual Defendants, they agreed not to disclose or misuse Clear Channel's confidential information, techniques and trade secrets to which they had access to "for any purpose whatsoever."  (<u>See</u> Non-Compete Agreements which are attached to the

Sarno Dec.)  Individual Defendants further breached their Agreement when they disclosed and misused Clear Channel's confidential client information, and misappropriated its sales materials and programs.

Under New York law, the narrowly tailored provisions in the Employment Agreements are enforceable as reasonable and necessary for Clear Channel's protection.  See John Hancock Mut. Life Ins. Co. v. Austin, 916 F. Supp. 158, 163 (N.D.N.Y. 1996) (finding that agreement prohibiting competing employment within district where employee worked for a two-year period was reasonable); Datatype Int'l, Inc. v. Puzia, 797 F. Supp. 274, 285 (S.D.N.Y. 1992) (former employee enjoined for two years from soliciting "those particular specific individuals with whom he has previously dealt"); H. B. Fuller Co. v. Hagen, 363 F. Supp. 1325, 1333 (W.D.N.Y. 1973) (enjoining defendants from violating employment contract, using confidential information or soliciting customers for a two-year period); Gelder Med. Group v. Webber, 41 N.Y.2d 680, 685, 394 N.Y.S.2d 867, 871 (1977) (agreement prohibiting competing employment within thirty miles of previous employer for five-year period found reasonable); Stanley Tulchin Assocs., Inc. v. Vignola, 186 A.D.2d 183, 186, 587 N.Y.S.2d 761, 763 (2d Dep't 1992) (covenant restricting defendant from using employer's client lists for three years was upheld); Mallory Factor, Inc. v. Jicka, 168 A.D.2d 344, 344, 562 N.Y.S.2d 666, 667 (1st Dep't 1990) (affirming injunction prohibiting defendant employee for two years from "performing services for any client with whom defendant had dealt while an employee of plaintiff"); Mallory Factor, Inc. v. Schwartz, 146 A.D.2d 465, 467-68, 536 N.Y.S.2d 752, 753-54 (1st Dep't 1989) (upholding eighteen-month non-solicitation clause reasonably designed to insure against defendant's misappropriation of plaintiff's trade secrets and goodwill); Borne Chem. Co. v. Dictrow, 85 A.D.2d 646, 649, 445

N.Y.S.2d 406, 412 (2d Dep't 1981) (upholding covenant prohibiting competing employment within 150 miles of previous employer's office held reasonable).

In analyzing whether restrictive covenants are reasonable and therefore enforceable, courts look, in particular, at the following four factors: (1) the time and geographical scope of the restriction must be reasonable; (2) the burden on the employee must not be unreasonable; (3) the general public must not be harmed; and (4) the restriction must be necessary for the employer's protection. ABC v. Wolf, 52 N.Y.2d 394, 403-04, 438 N.Y.S.2d 482, 486-87 (1981); Schwartz, 146 A.D.2d at 467, 536 N.Y.S.2d at 753. Applying these four factors to this case, there is no doubt that the provisions here are reasonable and enforceable against each of the Individual Defendants.

First, the time and scope of the restrictive provisions – which is limited to 180 days – are clearly reasonable in light of the Individual Defendants' broad access to Clear Channel's client contacts and confidential information, the time and resources expended by Clear Channel in developing and cultivating its client relationships, proprietary software and the extensive training afforded to Individual Defendants at the expense of Clear Channel. See Webcraft Techs., Inc. v. McCaw, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987) (two-year period found to be reasonable); Jicka, 168 A.D.2d at 344, 562 N.Y.S.2d at 667 (same); Service Sys. Corp. v. Harris, 41 A.D.2d 20, 24, 341 N.Y.S.2d 702, 706 (4th Dep't 1973) (enjoining defendant for three years from soliciting accounts which he developed or which he may have serviced while working for plaintiff).

Second, the burden upon Individual Defendants is reasonable. Indeed, the restrictive covenants do not prevent Individual Defendants from gaining employment in sales in another industry or with a competitor of Clear Channel outside a narrow geographic region, nor do they

prevent them from earning a livelihood. Rather, the restrictive covenants are for a short 180 day duration and limited to employment in the radio cable industry in the New York area. Hence, the restrictive covenants are narrowly tailored to merely protect Clear Channel from having its Account Executives unjustly enriched at the expense of Clear Channel's years of goodwill and effort by misappropriating its trade secrets, soliciting its clients for their own benefit or that of others. Significantly, Individual Defendants agreed that the provisions were "necessary to protect Employer from unfair competition" and that compliance "is necessary to protect the business and goodwill of Employer and that a breach of those covenants will irreparably and continually damage Employer." (See Non-Compete Agreement, as attached to Sarno Dec.) Individual Defendants further acknowledged and agreed that in the event their employment should terminate for any reason they would be able to "earn a livelihood without violating the foregoing restrictions" and  critically, that the "ability to earn a livelihood without violating such restrictions is a material condition to his/her employment."

Finally, the restrictions are obviously necessary for Clear Channel's protection, particularly in light of Individual Defendants' demonstrated bad faith and willingness to disregard their obligations under the Employment Agreement not to misuse Clear Channel's trade secrets and confidential information and unfairly compete with Clear Channel. Further, it is also reasonable to infer that Individual Defendants have engaged in numerous other breaches of their common-law and contractual obligations to Clear Channel beyond that which has been discovered to date by virtue of their employment with Clear Channel's competitor, Citadel. Clear Channel, therefore, has shown a likelihood of success on the merits of its claims, or in the alternative, clearly presented sufficiently serious questions going to the merits to make them a fair ground for litigation.

b.    <u>Clear Channel will likely succeed on its misappropriation of trade secrets claim.</u>

Defendants should be enjoined from misappropriating Clear Channel's trade secrets and confidential information and unfairly competing with Clear Channel.  Under New York law, trade secrets are defined as any compilation of information which is used in one's business and which gives it an opportunity to obtain an advantage over competitors who did not know or use it.  <u>Anacomp, Inc. v. Shell Knob Servs., Inc.</u>, No. 93 Civ. 4003 (PKL), 1994 WL 9681, at *6 (S.D.N.Y. Jan. 10, 1994) (copy attached at Tab A to the accompanying Compendium of Unreported Cases in Support of Clear Channel's Motion for a Temporary Restraining Order, Preliminary Injunction and Expedited Discovery (the "Compendium")); <u>Restatement (Third) of Unfair Competition</u> § 39 & cmt. b (1995); <u>Restatement of Torts</u> § 757 cmt. b (1939).

Customer lists are trade secrets to the extent that the lists include specific contact information for individuals who are employed by those customers that is not readily available to individuals making normal business inquiries to those customers.  <u>B.U.S.A. Corp. v. Ecogloves, Inc.</u>, No. 05 CIV. 9988 (SCR), 2006 WL 3302841, at *3 (S.D.N.Y. Jan. 31, 2006) (Compendium Tab B).  <u>See also Ecolab</u>, 753 F. Supp. at 1112 (client information that is not readily ascertainable and is acquired "through the cultivation and monitoring" of customers are protectable trade secrets); <u>Webcraft Techs.</u>, 674 F. Supp. at 1046 (holding that company was likely to succeed on merits in demonstrating that customer lists qualify as trade secret information because they "took enormous time and effort to develop"); <u>Giffords Oil Co. v. Wild</u>, 106 A.D.2d 610, 611, 483 N.Y.S.2d 104, 106 (2d Dep't 1984) (customer list entitled to protection).  New York law imposes a duty upon employees, even after employment is terminated, to "keep . . . secret and retain [customer lists and trade secrets] in the strictest confidence" thereby precluding their use of that confidential information for the benefit of a competitor business.  <u>North Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 48 (2d Cir. 1999).

Similarly, confidential financial information or other business information (such as Clear Channel's marketing and business strategies) is routinely protected. See Inflight Newspapers v. Magazines In-Flight, L.L.C., 990 F. Supp. 119, 126-27 (E.D.N.Y. 1997) (finding that information relating to pricing, customer preferences, terms of particular agreements, and similar information were trade secrets and warranted preliminary injunction and enforcement of non-disclosure and non-competition provisions); Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 630 (E.D.N.Y. 1996) (confidential data about products, pricing, income, company objectives, financial information, and profit margins were protectable trade secrets); Bausch & Lomb, Inc. v. Smith, 630 F. Supp. 262, 265 (W.D.N.Y. 1986) (sensitive product strategies were protectable secrets); DoubleClick Inc. v. Henderson, No. 116914/97, 1997 WL 731413, at *5 (Sup. Ct. N.Y. Cty. Nov. 7, 1997) (revenue projections, pricing and product strategies, and information about customers were trade secrets) (Compendium Tab C); Eastern Artificial Insemination Coop. v. La Bare, 210 A.D.2d 609, 610-11, 619 N.Y.S.2d 858, 859-60 (3d Dep't 1994) (deeming pricing and marketing strategies protectable trade secrets).

It is also black-letter law that employees who have been entrusted with confidential information pertaining to the conduct and clientele of their employer's business "may not subsequently use that information to further [their] own ends." Churchill Commc'ns Corp. v. Demyanovich, 668 F. Supp. 207, 212 (S.D.N.Y. 1987) (quotations omitted). Indeed, employees have an affirmative duty "not only not to purloin such material or copy it or even commit it to memory with the intention of using it for their own gain," but also "to respect this confidentiality and utilize it in no way in their own behalf." Fortune Personnel Agency, Inc. v. Livingston, 102 Misc. 2d 369, 370, 423 N.Y.S.2d 360, 360 (Sup. Ct. N.Y. Cty. 1979); see also Panther Sys. II, Ltd. v. Panther Computer Sys., Inc., 783 F. Supp. 53, 66 (E.D.N.Y. 1991) ("[E]ven if defendants

have not physically appropriated such a [customer] list, a former employee may not solicit the customers of his former employer if they would be unknown to the employee but for information obtained during his prior employment.") (quotations omitted). That obligation is present even in the absence of an express non-disclosure provision — it is even more obvious where, as here, Individual Defendants were contractually obligated to maintain the confidentiality of Clear Channel's confidential information. See, e.g., B.U.S.A. Corp., 2006 WL 3302841, at *6 (defendant can misappropriate a trade secret without having entered into a confidentiality agreement).

As set forth above, Clear Channel expends a significant amount of time and resources to the development of its sales programs and marketing materials. Clear Channel's sales programs include proprietary information that is intended to be used exclusively by Clear Channel Account Executives in soliciting its clients. Clear Channel has learned that a Citadel radio station has misappropriated one of its sales programs, called "Ask the Expert." The "Ask the Expert" sales program was developed by Clear Channel personnel and was launched approximately a year ago. This program offers Clear Channel clients a unique way to advertise and includes specific objectives, strategies, formats and methods.

On March 19, 2008, Clear Channel learned that a Citadel station has taken Clear Channel's PowerPoint presentation on its "Ask the Expert" sales program, altered it slightly, called it "Talking with the Experts" and introduced it as a Citadel product. The content of the PowerPoint presentation that was misappropriated by Citadel is nearly identical to the presentation which was created and used by Clear Channel. Indeed, the similarity in the presentations is so remarkable that it was a Clear Channel client that recognized the similarity and called it to Clear Channel's attention.

- 22 -

In addition, Clear Channel has expended substantial time and effort to compile its confidential information which it uses to effectively compete in the marketplace, grow its business. Clear Channel developed a proprietary database and software to give it a competitive edge in the market and pricing structure. Clear Channel's efforts are necessary to succeed because continuing relationships and repeat business for advertising on radio with established clients is critical. The information sought to be protected by Clear Channel is not open to the general public and as such, certainly constitutes trade secrets, or at least, confidential information worthy of legal protection.

Clear Channel entrusted the Individual Defendants with broad access to its confidential information because it believed that they would respect Clear Channel's confidentiality and not subsequently misappropriate that information to further their own ends. Indeed, Individual Defendants acknowledged the confidentiality of Clear Channel's trade secrets and their duty to safeguard such trade secrets. However, as set out above, Individual Defendants blatantly misappropriated that information and breached Clear Channel's confidence, en masse, by using Clear Channel's confidential information to pursue the business of Clear Channel's clients directly to their new employer Citadel. Accordingly, Clear Channel clearly establishes its likelihood of success on its misappropriation of trade secrets claim.

c.    Clear Channel is likely to succeed on its unfair competition claim

Clear Channel is also likely to succeed on its unfair competition claims for the same reasons. The essence of unfair competition in contravention of New York common law "is that the defendant has misappropriated the labors and expenditures of another." Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980). Unfair competition clearly exists where a former employee misappropriates confidential information belonging to his former employer in abuse of his relationship of trust. DoubleClick, 1997 WL 731413, at *7.

- 23 -

While the claim of unfair competition usually involves some misappropriation, courts have recognized that this tort can encompass a broad range of conduct. See Roy Export Co. Establishment v. CBS, 672 F.2d 1095, 1105 (2d Cir. 1982) ("New York courts have noted the 'incalculable variety' of illegal practices falling within the unfair competition rubric, calling it a 'broad and flexible doctrine.'") (citation omitted); see also Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 568, 190 N.Y.S.2d 977, 986-87 (1959) ("'The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use.'"). Indeed, courts have noted that the tort can be applied to just about "'any form of commercial immorality.'" Coors Brewing Co. v. Anheuser-Busch Cos., 802 F. Supp. 965, 975 (S.D.N.Y. 1992) (citation omitted). Here, Individual Defendants' breach of their restrictive covenants by copying its sales programs, providing services to a competitor and their soliciting of Clear Channel's clients for the benefit of Citadel, are precisely the types of "commercial immorality" that this cause of action was intended to prevent. Moreover, the fact that the Individual Defendants departed on the same date, can only suggest that their departure was encouraged and solicited by Citadel. Accordingly, injunctive relief is amply warranted to protect Clear Channel against Defendants' misappropriation of its trade secrets and confidential information and the resulting unfair competition. See Webcraft, 674 F. Supp. at 1045-46.

    d.    Clear Channel will likely succeed on its breach of fiduciary duty claim.

Clear Channel will also likely succeed on its claim that Individual Defendants breached their fiduciary duties to Clear Channel. "It is a firmly established principle in the law of [New York] that, [a]n employee is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 88,

474 N.Y.S.2d 281, 285 (1st Dep't 1984) (quotations omitted); accord DoubleClick, 1997 WL

731413, at *6.  Individual Defendants' duties of good faith and loyalty to Clear Channel,

requiring them to refrain from improperly using the information that they learned about Clear

Channel's clients and business while employed there, remain in effect even after they left Clear

Channel. Anacomp, 1994 WL 9681, at *14.

    "It is implied in every contract of employment that the employee will hold sacred any

trade secrets or other confidential information which he acquires in the course of his

employment. This is a duty that the employee assumes not only during his employment but after

its termination." L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431, 435 (Sup. Ct. N.Y. Cty.

1948) (citations omitted).  The Second Circuit made this fundamental tenet absolutely clear in

North Atlantic Instruments, where the court determined that an injunction was appropriate where

the defendant competed with his former employer by specifically targeting its client list.  There,

the court held that the defendant's conduct violated the confidentiality provisions of the

employment agreement, and further emphasized that the defendant's actions also breached his

implied common-law duties to the former employer, because the employment agreement merely

"makes explicit an employee's implied duties under New York law with respect to confidential

information." Id., 188 F.3d at 48.

    Indeed, with or without an express agreement, it is well settled under New York law that

"an agent has a duty 'not to use confidential knowledge acquired in his employment in

competition with his principal.'" ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988,

994 (2d Cir. 1983) (citation omitted); see also 7th Sense v. Liu, 220 A.D.2d 215, 216, 631

N.Y.S.2d 835, 836 (1st Dep't 1995) (issuing broad injunction against a former employee using

prior employer's client information, and noting that former employee could not evade his

fiduciary obligations to his former employer by resigning his post and taking a job elsewhere); Arnold's Ice Cream Co. v. Carlson, 330 F. Supp. 1185, 1188 (E.D.N.Y. 1971) (enjoining defendant from competing against former employer where defendant violated fiduciary duties by actively soliciting former employer's clients prior to resignation).

In the instant case, Individual Defendants were equally bound by the common-law duties of good faith and loyalty not to use their knowledge of Clear Channel's confidential client and business information to contact and solicit clients. Their actions are a clear breach of their fiduciary duties and warrant the immediate issuance of an injunction to prevent Clear Channel from suffering irreparable harm.

     e.    Clear Channel is likely to succeed on its claim for tortious interference with contractual relations.

Citadel has tortiously interfered with the employment contracts of the Individual Defendants by hiring them and permitting them to work in sales of radio adverting, knowing that they had non-compete agreement with Clear Channel. See Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954) (raid of employees by competing employer held compensable); B-S Indus. Contrs. v. Burns Bros. Contrs., 256 A.D.2d 963, 681 N.Y.S.2d 897 (3d Dep't 1998) (denying defendant's motion to dismiss claim of tortious interference with contract where defendant lured away three employees from competitor); American Para Prof'l Sys. v. Examination Mgmt. Servs., 214 A.D.2d 413, 625 N.Y.S.2d 33 (1st Dep't 1995) (enjoining defendants from entering into or inducing the breach of any contractual agreements with persons presently under contract with plaintiff). It is well recognized that such employee raiding is precisely the form of "commercial piracy" that will not be countenanced by the courts.

Under these circumstances, Clear Channel easily satisfies its burden of showing a likelihood of success on this claim. See American Para, 214 A.D.2d at 414, 625 N.Y.S.2d at 34

(enjoining defendants from entering into or inducing the breach of any contractual agreements with persons under contract with plaintiff). As such, a temporary restraining order and preliminary injunction should be issued to prevent not only any further raiding by Clear Channel, but also tampering with Clear Channel's existing contractual relationships with its clients.

## II.    CLEAR CHANNEL WILL CONTINUE TO SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT INJUNCTIVE RELIEF.

New York courts uniformly hold that irreparable harm can be presumed where defendants, such as here, are competing while in possession of a plaintiff's confidential and proprietary information, or where exploitation of such information is imminent. See Wenner Media LLC v. Northern & Shell N. Am. Ltd., No. 05 Civ. 1286 (CSH), 2005 WL 323727, at *4 (S.D.N.Y. Feb. 8, 2005) (Compendium Tab D); Johnson Controls, 323 F. Supp. 2d at 532 ("Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 471 (S.D.N.Y. 2001) (holding that because plaintiff bargained for a contract provision allowing it 120 day period after employee's termination to gain client's trust, plaintiff would be irreparably harmed if it did not receive the benefit of its bargain).

Clear Channel's loss of its trade secrets and confidential information cannot be measured in money damages, because "'[a] trade secret once lost is, of course, lost forever.'" Lumex, Inc., 919 F. Supp. at 628 (quoting FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984)); see also Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1247 (Fed. Cir. 1989) (enjoining defendant's continuing use of trade secrets, the court stated, "a misappropriator of trade secrets has no authorization of right to continue to reap the benefits of its wrongful acts"); Textron, Inc. v. Teleoperator Sys. Corp., 554 F. Supp. 315, 327 (E.D.N.Y. 1983) (defendant's appropriation of plaintiff's trade secret to defendant's own use for competitive purposes

constitutes irreparable harm); <u>North Atl. Instruments</u>, 188 F.3d at 49 (finding that defendants' use of trade secrets violated New York law and employment agreement, and would likely cause irreparable harm). With every day Individual Defendants remain employed by or provide services to Citadel in breach of their employment agreements, Clear Channel is exposed to further loss of its trade secrets, including, but not limited to, loss of its ability to control the use and disclosure of such secrets, loss of business opportunities and client accounts, and harm to the reputation and goodwill Clear Channel has established at great effort and expense.

Indeed, Defendants are evidently competing while in possession of Clear Channel's confidential, proprietary and trade secret information because they are known to have directly solicited Clear Channel's customers. The Defendants have acted as predators feeding off of Clear Channel's reputation and goodwill in ways not fully compensable by money. <u>See</u> <u>Velo-Bind, Inc. v. Scheck</u>, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) (harm to plaintiff's "good will built up over the years" constitutes irreparable harm that is not "monetarily ascertainable"); <u>accord</u> <u>Ecolab</u>, 753 F. Supp. at 1110 ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages."); <u>Churchill</u>, 668 F. Supp. at 214-15 (use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm); <u>Stanley Tulchin</u>, 186 A.D.2d at 185, 587 N.Y.S.2d at 763 ("[M]isappropriation of STA's client lists threatened the type of irreparable injury warranting injunctive relief."). Clear Channel need not at this juncture demonstrate that Defendants have in fact used the stolen information, only that there is a risk of inevitable disclosure. <u>Estee Lauder Cos. v. Batra</u>, 430 F. Supp. 2d 158, 179 (S.D.N.Y. 2006).

Also, Individual Defendants acknowledged in writing that temporary and permanent injunctive relief would be appropriate remedies against actual or even threatened breaches of

their restrictive covenants, particularly their duty to safeguard Clear Channel's trade secrets. Such acknowledgments have been relied upon in determining irreparable injury for purposes of upholding a grant of injunctive relief.  See Estee Lauder, 430 F. Supp. 2d at 174 (holding that employees' concession that in the event of breach of post-employment obligations, employer is entitled to injunctive relief, amounts to an admission of irreparable harm); North Atl. Instruments, 188 F.3d at 49 (upholding grant of injunctive relief where defendant acknowledged in his employment agreement that a breach of confidentiality clause would cause "irreparable injury") (citing Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999)); see also Markovits v. Venture Info Capital, Inc., 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001).

If the Defendants are permitted to continue their wrongful conduct, Clear Channel will be faced with the permanent and irretrievable loss of its confidential information and its goodwill, as well as the interference with its hard-earned client relationships.  It is exceedingly difficult, to predict Clear Channel's loss if Defendants are permitted to exploit either the relationships that Clear Channel has formed with its clients or its confidential trade secret information.  If Defendants are allowed to proceed with their unlawful misconduct, Defendants will continue to profit from Clear Channel's proprietary information and good will, and its business will be substantially, irreparably and incalculably harmed.  Therefore, only an immediate injunction against the Defendants will ensure that they will not cause any more irreparable damage to Clear Channel's business.

## III.    A BALANCE OF HARDSHIPS WEIGH IN CLEAR CHANNEL'S FAVOR.

In addition to Clear Channel's strong showing of a likelihood of success on the merits and irreparable harm, it is also evident that the balance of hardships weighs decidedly in Clear Channel's favor.  As set out above and in their restrictive covenants, Clear Channel is not seeking to prevent Individual Defendants from earning a livelihood.  Rather, Clear Channel is

simply seeking to prevent them from *unfairly* competing against it — i.e., by misappropriating and using its trade secrets and confidential information, by or joining a competitor within a narrow geographic range and time period, by soliciting Clear Channel's clients, and by misusing Clear Channel 's name and reputation in an effort to divert business to Citadel, all in accordance with a restriction that they agreed to. Natsource, 151 F. Supp. 2d at 469 (holding that plaintiff would be irreparably harmed if it did not receive the benefit of the restriction it bargained for).

If the Court does not issue a temporary restraining order and preliminary injunction here, Clear Channel will be placed at risk of losing the following: the confidentiality of its trade secrets and other proprietary information, the benefit of its bargain in its Confidentiality, Trade Secrets and Non-Compete Agreements, and its relationships with its longstanding clients. Clearly, the balance of hardships, therefore, clearly weighs in favor of injunctive relief. It is beyond dispute that the balance of equities favors Clear Channel, where the use of its proprietary information and resulting diversion of business continues to cause real harm. Furthermore, Defendants cannot demonstrate that Clear Channel has acted tortiously against them or is otherwise without "clean hands." See DoubleClick, 1997 WL 731413, at *7.

"By contrast, equity does not favor the employee who seeks to breach his fiduciary duties to his former employer." DoubleClick, 1997 WL 731413, at *7 (citing Kaufman v. IBM, 97 A.D.2d 925, 926, 470 N.Y.S.2d 720, 722 (3d Dep't 1983), aff'd, 61 N.Y.2d 930, 474 N.Y.S.2d 721 (1984)). Here, evidence already exists to support the finding that Individual Defendants joined a competing company in violation of their restrictive covenants, and Defendants (1) have disclosed and used Clear Channel's confidential and proprietary information; and (2) have solicited Clear Channel's clients. As such, Clear Channel respectfully requests that this Court should immediately issue a preliminary injunction to prevent further harm to Clear Channel.

## IV.    INJUNCTIVE RELIEF SHOULD RUN FROM THE DATE OF THIS COURT'S ORDER.

Clear Channel respectfully submits that the injunctive relief issued by the Court should run from the date of the Court's order. In this case, equity favors enjoining Defendants for a full one hundred and eighty (180) day period beginning from the date of the Court's order. If the restrictive covenants are merely enforced from the date of the Individual Defendants' en masse resignation, Defendants will have wrongfully achieved time to unfairly compete, and would, in effect, be rewarded for their breaches. See, e.g., Roanoke Eng'g Sales Co. v. Rosenbaum, 290 S.E.2d 882, 886-87 (Va. 1982). In the past, New York courts, in the interests of equity, have extended the time period of a non-competition agreement in order to give one party an opportunity to regain the customers that it lost when the other party breached the agreement. See, e.g., Levitt Corp. v. Levitt, 593 F.2d 463, 469 (2d Cir. 1979).

## V.    CLEAR CHANNEL SHOULD BE GRANTED EXPEDITED DISCOVERY.

While Federal Rule of Civil Procedure 34 generally provides that a party upon whom a document request is served must respond within thirty days, the rule specifically permits that "[a] shorter . . . time may be . . . ordered by the court." Fed. R. Civ. P. 34(b). In addition, Federal Rule of Civil Procedure 26 "provides very broad discovery and gives the trial court wide discretion to manage the process." New York v. United States Metals Ref. Co., 771 F.2d 796, 805 (3d Cir. 1985).

Courts have interpreted these provisions to permit expedited discovery when, as here, the movant shows: (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. See Advanced Portfolio

- 31 -

Techs., Inc. v. Advanced Portfolio Techs., Ltd., No. 94 Civ. 5620 (JFK), 1994 WL 719696, at *3

(S.D.N.Y. Dec. 28, 1994) (citing cases) (Compendium Tab E).

Numerous courts in this and other circuits have recognized the need for and granted

expedited discovery in advance of a preliminary injunction hearing.  See, e.g., Dial Info. Servs.

Corp. v. Thornburgh, 938 F.2d 1535, 1539 (2d Cir. 1991); United States Naval Inst. v. Charter

Commc'ns, Inc., 875 F.2d 1044, 1046 (2d Cir. 1989); Ikon Office Solutions, Inc. v. Leichtnam,

No. 02-CV-0721E(SC), 2003 WL 251954, at *3 (W.D.N.Y. Jan. 3, 2003) (granting expedited

discovery in aid of hearing on preliminary injunction) (Compendium Tab F); Delphine Software

Int'l v. Electronic Arts, Inc., No. 99 Civ. 4454 (AGS), 1999 WL 627413, at *3 (S.D.N.Y. Aug.

18, 1999) (in misappropriation of trade secrets case, granting motion for expedited discovery

based upon finding that plaintiff "is entitled to substantial discovery to enable it to proceed with

a preliminary injunction hearing") (Compendium Tab G); Advanced Portfolio, 1994 WL

719696, at *3 ("Expedited deposition discovery is made available by Rule[] 30(a) of the Federal

Rules of Civil Procedure. . . . [and] is often available in cases where preliminary relief is

sought."); Educational Comm'n for Foreign Sch. Med. Graduates v. Repik, No. Civ. A. 99-1381,

1999 WL 317052, at *3 (E.D. Pa. May 17, 1999) (in trade secret misappropriation and copyright

infringement case, since "[e]xpedited discovery in connection with a preliminary injunction is

appropriate, [t]he court will permit the parties a reasonable period of time to conduct discovery

relevant to the motion for preliminary injunction, after which a hearing will be scheduled if

necessary") (citation omitted) (Compendium Tab H); Ellsworth Assocs., Inc. v. United States,

917 F. Supp. 841, 844 (D.D.C. 1996) ("Expedited discovery is particularly appropriate when a

plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings.");

Onan Corp. v. United States, 476 F. Supp. 428, 434 (D. Minn. 1979) ("[T]he court grants

plaintiff's motion for limited discovery to prepare for a possible preliminary injunction motion.").

Expedited discovery is needed in this case for Clear Channel to be able to provide a full evidentiary case at the preliminary injunction hearing. At this stage in the proceedings, Clear Channel knows that Individual Defendants continue to solicit its clients and to the Defendants have used the trade secrets and confidential information of Clear Channel. Clear Channel, does not however, know the full extent to which the Defendants are misusing its trade secrets and confidential information and name. There is no prejudice resulting to the Defendants if expedited discovery is granted.

Furthermore, Defendants must be ordered to immediately preserve and not alter, and Clear Channel must be permitted to inspect and image, all computers and other electronic devices, including, but not limited to, computers, hard disk drives, floppy disk drives, removable storage devices (e.g., thumb drives), CDs, DVDs, pda's, cell phones, blackberries and/or all other similar electronic storage devices belonging to, under the control of, accessible to, or operated by Individual Defendants on which Clear Channel information of any kind resides or may have resided so that Clear Channel can understand the full extent of Defendants' misappropriation of, and whether Defendants have further disseminated, Clear Channel's trade secrets. This includes preservation and inspection of the Individual Defendants' email accounts, including, but not limited to, their e-mail account at Citadel.

## CONCLUSION

For all the foregoing reasons, Clear Channel respectfully requests that this Court issue a temporary restraining order, an order permitting discovery to proceed by Clear Channel on an expedited basis, and a preliminary injunction.

Dated:  New York, New York
        March 21, 2008

                                    Respectfully submitted,

                                    SEYFARTH SHAW LLP

                                    By: _____
                                        L. Lynnette Sarno, Esq.
                                        Gloria Galant, Esq.
                                    620 Eighth Avenue
                                    New York, New York  10018
                                    (212) 218-5500
                                    Email: lsarno@seyfarth.com
                                           ggalant@seyfarth.com

                                    Attorneys for Plaintiff
                                    Capstar Radio Operating Company