UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

Capstar Radio Operating Company, a Delaware Corporation,

Plaintiff,

v.

Anthony Campbell; Louis Carpino; Adam Gross; Jose Luis Torres; Citadel Broadcasting Corporation, a Nevada Corporation; and John Does 1-10,

Defendants.

-----------------------------------------------------------------x

**COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Dated: New York, New York
March 21, 2008

L. Lynnette Sarno (LS-2421)
Gloria Galant (GG-2818)

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Plaintiff Capstar Radio Operating Company

For the convenience of the Court, Plaintiff Capstar Radio Operating Company provides herewith copies of unreported cases cited in the accompanying Plaintiff's Memorandum of Law in Support of It's Motion for a Temporary Restraining Order, a Preliminary Injunction and Expedited Discovery.

**CASES**

**Tab**

Anacomp, Inc. v. Shell Knob Servs., Inc.,
No. 93 Civ. 4003 (PKL), 1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) .................................. A

B.U.S.A. Corp. v. Ecogloves, Inc.,
No. 05 CIV. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan. 31, 2006) .......................... B

DoubleClick Inc. v. Henderson,
No. 116914/97, 1997 WL 731413 (Sup. Ct. N.Y. Cty. Nov. 7, 1997) .............................. C

Wenner Media LLC v. Northern & Shell N. Am. Ltd.,
No. 05 Civ. 1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) .............................. D

Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.,
No. 94 Civ. 5620 (JFK), 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ............................. E

Ikon Office Solutions, Inc. v. Leichtnam,
No. 02-CV-0721E(SC), 2003 WL 251954 (W.D.N.Y. Jan. 3, 2003) ................................ F

Delphine Software Int'l v. Electronic Arts, Inc.,
No. 99 Civ. 4454 (AGS), 1999 WL 627413 (S.D.N.Y. Aug. 18, 1999) ........................... G

Educational Comm'n for Foreign Sch. Med. Graduates v. Repik,
No. Civ. A. 99-1381, 1999 WL 317052 (E.D. Pa. May 17, 1999) .................................... H

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT A

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Westlaw.
Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

Anacomp, Inc. v. Shell Knob Services, Inc.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ANACOMP, INC., Plaintiff,
v.
SHELL KNOB SERVICES, INC. and Frederick J. Lennen, Defendants.
**No. 93 CIV. 4003 (PKL).**

Jan. 10, 1994.

Cadwalader, Wickersham & Taft, New York City (Jeffrey Q. Smith, Marcia T. Mascaro, Stacey J. Smith, of counsel), for plaintiff.
Simoni & Laino, Mineola, N.Y. (William P. Laino, of counsel), for defendants.

OPINION AND ORDER

LEISURE, District Judge.
*1 Anacomp, Inc. ("Anacomp") brings this action against Shell Knob Services, Inc. ("SKSI") and Frederick J. Lennen ("Lennen") for defendants' alleged misappropriation and misuse of plaintiff's trade secrets and proprietary business information. The materials at issue are certain documents and information including manuals and diagnostic computer software ("Proprietary Materials"), used to maintain and service computer output microfilm recorders ("COM recorders" or "COM equipment") which plaintiff manufactures and sells.

On June 7, 1993, Anacomp filed a summons and complaint in the Supreme Court of the State of New York, County of New York, seeking relief on the grounds that defendants were improperly using Anacomp's Proprietary Materials to service X-series COM recorders without any authorization from Anacomp. Plaintiff has asserted several claims against the defendants including: (1) misappropriation and misuse of trade secrets and proprietary business information; (2) unfair trade practices; (3) alleged breach of contract and breach of a fiduciary duty; (4) conversion and (5) unjust enrichment.

On June 8, 1993, the Supreme Court of the State of New York, County of New York, issued a temporary restraining order ("TRO") prohibiting defendants from possessing, using, reproducing, transferring, distributing, or otherwise making unauthorized use of plaintiff's proprietary materials and trade secrets. The action was then removed to this Court, after which the parties stipulated to extend the TRO until this Court decides plaintiff's motion for a preliminary injunction.[FN1]

Plaintiff has moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65 seeking, *inter alia,* to enjoin defendants from using the Anacomp Proprietary Materials and requiring defendants to deliver to plaintiff's counsel, all such materials, including any duplicates or reproductions, as well as any documents or software created from or by reference to the proprietary and trade secret information.

In deciding this motion this Court reviewed extensive written submissions received from the parties, and held a preliminary injunction hearing on August 18, 1993.[FN2] Following oral argument, this Court reserved decision, indicating that pursuant to Fed.R.Civ.P. 52(a) the Court would issue this Order and Opinion containing the Court's findings of fact and conclusions of law.

For the reasons set forth below, that plaintiff's motion for a preliminary injunction is hereby GRANTED.

BACKGROUND

I. ANACOMP'S BUSINESS

Anacomp is engaged in the business of manufacturing and selling sophisticated computer graphics equipment and supplies, including COM equipment and related software. COM equipment is used in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

data storage. This equipment allows users to produce and develop a micro-image of data records on microfilm or microfiche, directly from computer output. The users of COM recorders are able to transfer large volumes of information created by data processing, directly from electronic form on to microfilm-a time efficient and cost effective method of data storage. Among the types of equipment that Anacomp manufactures and maintains, is the X-series line of COM recorders. In addition to manufacturing and selling the COM equipment, Anacomp's business involves servicing, repairing, and maintaining COM equipment.

*2 In order to provide maintenance service for its X-series COM recorders, Anacomp and its predecessor company, DatagraphiX, Inc. ("DatagraphiX"), have developed service manuals and diagnostic computer software. Affidavit of George C. Gaskin in support of Plaintiff's Reply, sworn to on July 2, 1993 ("Gaskin Reply Affidavit") at ¶ 4. It is this documentation that is the subject of this action.

Initial versions of the COM equipment were first developed as early as 1975 by DatagraphiX. The X-series COM recorders were manufactured and marketed by DatagraphiX in 1985 or before 1985 under the model names XL, XC, and XR. Affidavit of Thomas W. Murrel in support of Plaintiff's Reply, sworn to on July 2, 1993 ("Murrel Reply Affidavit") at ¶ 4; *See*, Affidavit of Frederick J. Lennen in Opposition to Plaintiff's Motion for a Preliminary Injunction, sworn to on June 25, 1993 ("Lennen Affidavit"), at ¶ 16.

In 1987 the Anacomp corporation acquired all of the stock of DatagraphiX for approximately $128 million. Through this transaction, Anacomp acquired the rights to manufacture and service the X-series COM recorders as well as all the rights to the DatagraphiX maintenance documentation and diagnostic software. Gaskin Reply Affidavit at ¶ 6. Included in the acquisition of DatagraphiX, were all the ownership interests in any trade secrets which were possessed by DatagraphiX. *Id.* After the acquisition of DatagraphiX, Anacomp continued to manufacture the X-series recorders under the DatagraphiX name. This was done because DatagraphiX had cultivated substantial amounts of goodwill and developed a strong reputation throughout the industry.

Prior to Anacomp's acquisition of DatagraphiX, DatagraphiX maintained a practice of placing a legend on its maintenance and service materials. The legend read as follows:

This document contains information of DatagraphiX, Inc. It is loaned to the recipient in confidence solely to facilitate maintenance of the DatagraphiX equipment described therein. No other use, direct or indirect, of this document or of any information derived therefrom is authorized. No copies of any part of this document shall be made without written approval by DatagraphiX. This document shall be returned upon request to DatagraphiX.

*Id.*; *See* Lennen Affidavit at Exhibit I.

DatagraphiX distributed some copies of these materials to a limited and controlled group of customers. The materials which were distributed were to be stored at the customer's facilities, specifically for the convenience of and for the exclusive use by the DatagraphiX service personnel. The Proprietary Materials were not freely disseminated to competitors, to the public or to customers. As the Corporate Counsel of Anacomp noted:

Other than DatagraphiX' parent, General Dynamics, no customer of DatagraphiX ever self-maintained X-series COM recorders prior to 1988. Rather, all maintenance service was performed by DatagraphiX personnel. To facilitate such maintenance, DatagraphiX loaned the relevant X-series documentation and software to customers on a confidential basis following their execution of a maintenance agreement. As a condition of receiving DatagraphiX maintenance service, customers were required to keep maintenance documentation for their particular X-series COM recorder on-site so that the DatagraphiX service personnel could have quick access to it in providing service. That is why the pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

prietary statement reads as it does.

*3 Gaskin Reply Affidavit, at ¶ 10.

Since its acquisition of DatagraphiX, Anacomp has made significant advances in technology and has enhanced the performance capabilities of the X-series recorders. Murrel Reply Affidavit at ¶ 5. Consistent with the technological improvements made to the X-series COM recorders, Anacomp has updated prior versions, and developed new versions of the maintenance documentation and diagnostic software. *Id.* at ¶ 6, 10; Gaskin Reply Affidavit at ¶ 4.

Anacomp has implemented extensive procedures in order to protect the secrecy of its maintenance manuals and diagnostic software. Anacomp places a proprietary information legend on every engineering document that constitutes proprietary information. *See* Woods Affidavit, at 7. While the precise language used in the legends by Anacomp has varied over the course of time, each version of the legend clearly conveys that the document contains "proprietary information," that the document "is loaned to the recipient in confidence solely for use beneficial to Anacomp," that no other use, direct or indirect, is authorized by Anacomp, and that no copies may be made without Anacomp's permission. *See* Affidavit of George C. Gaskin, sworn to on June 3, 1993 (Annexed to the Order to Show Cause For Temporary Restraining Order and Preliminary Injunction, dated June 3, 1993 ("Order to Show Cause")) ("Gaskin Affidavit"), at ¶ 13. On every maintenance manual, Anacomp places a statement that the information contained in the manual is proprietary material and that unauthorized used is prohibited. *Id.* at ¶ 7(c).[FN3] Additionally, on every page of Anacomp's proprietary maintenance manuals published since 1989, Anacomp has placed warnings that the information is proprietary and not to be duplicated. *Id.* at ¶ 7(b).

Anacomp also polices its employees' use of the materials. Anacomp assigns a serial number to each proprietary maintenance manual given to an employee and requires the employee to return that numbered manual to Anacomp upon termination of the employment. *Id.* at ¶ 7(d).[FN4] Anacomp also requires its employees to execute confidentiality agreements.

Anacomp has not provided the Proprietary Materials to anyone outside of Anacomp with the exception of those customers who enter licensing agreements with Anacomp. Wood Affidavit, at ¶ 8. More importantly, the licensing agreements contain a variety of requirements which are designed to maintain the Anacomp Proprietary Materials. *Id.* Specifically, the agreement contains a provision that licensees only disclose the Proprietary Materials to those employees who "need" to use them and have agreed to keep them confidential. *Id.*

II. DEFENDANT'S BUSINESS

Defendants SKSI and its president Frederick J. Lennen are engaged in the business of maintaining COM equipment, including X-series COM recorders manufactured by Anacomp. The Defendant corporation is headquartered in Missouri, and provides maintenance services nationwide through its branch offices and field representatives.

*4 Defendant Lennen was employed by DatagraphiX from 1966 to 1975 and again from 1976 to 1987. While employed at DatagraphiX, Lennen worked in various technical service positions. His responsibilities varied from those of a field service technician to those of a district service manager. As a supervisor of X-series COM recorder maintenance, Lennen became familiar with the DatagraphiX manuals, diagnostic software programs, and maintenance techniques. *See* Lennen Affidavit at ¶ 19. As a condition of his employment at DatagraphiX, defendant Lennen executed an agreement prohibiting the disclosure or use of DatagraphiX's "private and proprietary business information, trade secrets and other confidential data." *See* Private and Proprietary Information Agreement, dated August 5, 1976 (Annexed as Exhibit 1 to the Summons and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

Complaint, dated June 7, 1993) ("Proprietary Agreement"); Gaskin Affidavit, at ¶ 19.

In May of 1987, two months after Anacomp acquired DatagraphiX, Lennen left Anacomp and formed a computer service company called Data Technologies, Inc. ("DTI"). DTI owned DatagraphiX COM recorders. Using its COM equipment, DTI provided microfilm services to the banking industry. According to Lennen, DTI also repaired, refurbished and maintained DatagraphiX COM equipment owned by other parties and supported other maintenance providers such as TRW, Inc., Zytron Corporation and U.S. Data Corp.

In January of 1993, DTI was incorporated into SKSI, a company also controlled by Lennen. Lennen Affidavit at ¶ 22-24. *See* Affidavit of Bruce Thompson, sworn to on June 25, 1993, ("Thompson Affidavit") at ¶¶ 5-8. Sometime prior to June 25, 1993, principals of COM-Lease, an owner-lessor of computer equipment, acquired sixty percent of the stock of SKSI.

III. THE INFRINGEMENT

In or about February 1993, it came to Anacomp's attention that SKSI was in possession of proprietary information for which no license to use or posses had been granted to either Lennen or any company controlled by him. *See* Gaskin Affidavit, at ¶ 5. Anacomp then contacted Lennen, who denied that his company was using any proprietary information in servicing Anacomp or DatagraphiX COM recorders. *See* Gaskin Affidavit, at Exhibit B (Letter of Emory Melton, Esq., dated March 30, 1993).

On March 10, 1993, Anacomp was contacted by an SKSI employee, Mark L. Hotze. Mr. Hotze told Anacomp that SKSI was using Anacomp's Proprietary Materials to service and maintain COM recorders. As a result of Mr. Hotze's conversations with Anacomp, Mr. Hotze sent to Anacomp copies of materials that he claimed were being used by SKSI. All of the materials which Hotze sent to Anacomp contained confidential information and bore Anacomp's name and legend restricting their use. *See* Gaskin Affidavit, at ¶¶ 9-13; Affidavit of Mark L. Hotze, sworn to on May 6, 1993 ("Hotze Affidavit"), at ¶¶ 11-16.

Moreover, the defendants have begun to copy Anacomp's Proprietary Materials into their own manuals, Hotze Affidavit at ¶ 12, and Mr. Mewshaw, an employee of SKSI, has been creating SKSI's own service materials, plagiarizing directly from the Anacomp proprietary materials. *Id.* at ¶ 12.

DISCUSSION

I. JURISDICTION

*5 This action which was originally filed in the Supreme Court of the State of New York, in the County of New York, was removed to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. Since plaintiff and defendants are of diverse citizenship, and the amount in controversy exceeds $50,000, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332.

II. STANDARD FOR ISSUING A PRELIMINARY INJUNCTION

As the United States Court of Appeals for the Second Circuit ("Second Circuit") has often noted, the grant of a preliminary injunction is an extraordinary and drastic remedy which should not be routinely granted. *See, e.g., Borey v. National Union Fire Ins.*, 934 F.2d 30, 33 (2d Cir.1991); *Medical Soc'y of the State of N.Y. v. Toia*, 560 F.2d 535, 538 (2d Cir.1977). In order to prevail on a motion for a preliminary injunction, the party seeking the injunction must clearly demonstrate: (1) irreparable harm should the relief be denied; and (2) either: (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

of hardships tipping decidedly in the moving party's favor. *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir.1993); *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992); *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314-15 (2d Cir.1982). For the reasons set forth below, this Court finds that the defendants are using Anacomp's Proprietary Materials to compete directly with Anacomp, and thus plaintiff has demonstrated that Anacomp will suffer irreparable harm should defendants continue to utilize the Proprietary Materials in servicing, maintaining, and refurbishing COM recorders manufactured by Anacomp or its predecessor, DatagraphiX. Furthermore, the Court concludes that Anacomp has demonstrated that it is likely to prevail on the merits of its claims of misappropriation of trade secrets, unfair competition, and breach of fiduciary duty. Accordingly, Anacomp's motion for a preliminary injunction is GRANTED.

A. *Irreparable Harm*

A showing of irreparable harm is usually considered the single most important requirement in determining whether or not to issue a preliminary injunction. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *Computer Assoc. Int'l., Inc. v. Bryan*, 784 F.Supp. 982 (E.D.N.Y.1992). Thus, in order to demonstrate irreparable injury, a moving party must show that the injury is irreparable, real and imminent and not merely "remote or speculative." *Id.; Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir.1980).

The showing of irreparable harm by the moving party must be more than the mere "possibility" of irreparable harm. In order to succeed, the moving party must demonstrate "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990) (emphasis in original). An irreparable injury is one that cannot be redressed through a monetary award. *Id.* The Second Circuit has held that the loss of a trade secret is not measurable in terms of money damages because "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) (per curiam). Furthermore, it has been held that "the potential loss of an industry leader's present market and loss of the advantage of being the pioneer in [a] field and [a] market leader, may constitute irreparable harm." *Computer Assoc. International, Inc. v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992).

*6 Anacomp has presented sufficient evidence to support its allegations that defendants "willfully and maliciously used or disclosed, and will continue to use or disclose, Anacomp's trade secret information,"*see* Complaint, dated June 7, 1993, at ¶ 32, thus causing irreparable harm to Anacomp through the loss of a trade secret. Furthermore, if defendants are permitted to continue to use the proprietary information to maintain, refurbish and service Anacomp and DatagraphiX X-series COM recorders, Anacomp will loose its leadership position in the maintenance of its own equipment. This loss of market leadership, like the loss of a trade secret, could not be compensated through money damages. *See, e.g., JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d at 79; *FMC Corp.*, 730 F.2d at 63; *Natural Organics, Inc. v. Proteins Plus, Inc.*, 724 F.Supp. 50, 54 (E.D.N.Y.1989); *Computer Assoc. Int'l.*, 784 F.Supp. at 986. Accordingly, Anacomp has sufficiently demonstrated that it is likely to suffer irreparable harm if the equitable relief sought is not granted.

Upon determining that Anacomp's proprietary materials constitute trade secrets, this Court concludes that for the purposes of this motion Anacomp has made a sufficient showing that the defendants are disclosing Anacomp's trade secrets, and are also taking serious steps towards eliminating Anacomp's position as a leader in the industry, both of which constitute irreparable harm. *See, e.g., FMC Corp.*, 730 F.2d at 63; *Natural Organics*, 724 F.Supp. at 54; *Computer Assoc. Int'l.*, 784 F.Supp. at 986.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

B. Likelihood of Success on the Merits

To satisfy the second prong of the preliminary injunction standard by showing a likelihood of success on the merits, the movant "need not show that success is an absolute certainty. It need only be shown that the probability of the movant prevailing is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *Computer Assoc. Int'l., Inc. v. Bryan,* 784 F.Supp. 982 (E.D.N.Y.1992).

1. *MISAPPROPRIATION OF TRADE SECRETS*

To succeed on its claim for the misappropriation of trade secrets under New York law, Anacomp must demonstrate the following: (a) that it possessed a trade secret and (b) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means. *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993); *Integrated Cash Management Services, Inc. v. Digital Transactions,* 920 F.2d 171, 173 (2d Cir.1990).

(a) *Anacomp Possesses a Valid Trade Secret*

Under New York law, a trade secret is defined, in pertinent part, as follows: "a trade secret 'may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.' " *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993) (quoting Restatement of Torts § 757 cmt. b (1939)); *Integrated Cash Management Serv.,* 920 F.2d at 173; *Delta Filter Corp. v. Morin,* 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3d Dep't 1985); *Minnesota Mining & Manufacturing Co. v. Technical Tape Corp.,* 23 Misc.2d 671, 192 N.Y.S.2d 102, 112-13 (Sup.Ct. Westchester Co.1959), *aff'd,*15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dep't 1962).

*7 In determining whether a plaintiff possesses a trade secret, courts have considered the following six factors to be relevant:

(1) the extent to which the information is known outside of the [plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitor; (5) the amount of effort or money expended in developing the information; and, (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Hudson Hotels Corp.,* 995 F.2d at 1177 n. 1 (quoting *Restatement of Torts* § 757, comment b). *Accord, Integrated Cash Management,* 920 F.2d at 173; *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 803-04, 453 N.Y.S.2d 470, 472 (4th Dep't 1982) (quotation omitted). Applying these factors to the instant case, this Court finds that Anacomp has demonstrated that the Proprietary Materials do, in fact, constitute trade secrets.

(1) *The Extent to Which the Information is Known Outside of the Micrographic Industry*

According to Anacomp's president and chief operating officer, the Proprietary Materials at issue, consisting of written manuals and diagnostic software used to maintain and service the X-series COM recorders, "have been created exclusively by Anacomp, are kept confidential by Anacomp, and are considered Anacomp's proprietary information." Affidavit of J. Mark Woods, sworn to on June 3, 1993 (Annexed to the Order to Show Cause) ("Woods Affidavit"), at ¶ 5. It is plaintiff's position that the information contained in the materials is not widely disseminated throughout the industry, let alone outside of the industry.

Defendants, SKSI and Lennen, do not dispute the claim that the information is not well known outside of the micrographic industry. Accordingly, the first factor, which addresses the scope of the dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

closure or the proprietary information outside of the industry, clearly weighs in favor of finding a trade secret.

(2) *The Extent to Which the Information is Known by Anacomp Employees and Others Involved in the Industry*

Anacomp has submitted substantial evidence supporting its position that the Proprietary Materials consist of confidential information that is not generally available throughout the micrographic industry. Murrel Affidavit, at ¶¶ 4-14. Except for licensees who are contractually bound to maintain the confidentiality of the information, Anacomp has not released any confidential information to anyone outside of Anacomp. Furthermore, when Anacomp has licensed its material, Anacomp has permitted licensees to disclose the materials only to those employees of the licensees who actually "need" to see the information. Those employees who are permitted access to the materials must agree to keep the information confidential. *Id.; See,* Woods Affidavit, at ¶¶ 6, 8.

*8 In his affidavit to this Court, Mark J. Hotze declared that neither he, nor anyone else at SKSI, had sufficient knowledge independent of the Anacomp materials to repair and maintain the COM recorders. Hotze Affidavit at ¶ 6. Hotze's statement supports the position that the information at issue was not generally known throughout the industry.

It is defendants' contention that some of the material was in the public domain. To support this proposition, defendants introduce a published advertisement wherein a vendor offers to sell replacement parts for DatagraphiX COM recorders. *See Micrographic Newsletter* (Annexed as Exhibit B to the Lennen Affidavit). The advertisement only offers the sale of parts, and not the information required to diagnose and service X-series COM recorders. Thus, this advertisement carries little, if any, weight. The fact that parts for DatagraphiX COM recorders are available from independent suppliers does not undermine Anacomp's position that the proprietary materials were kept confidential.

Defendants also claim that U.S. Data Corp., Zytron Corporation and TRW, Inc. self-maintained their own X-series COM equipment. Defendants' argument implies that since these corporations were able to self-maintain their COM equipment, the information necessary to maintain the equipment must be widely known and in the public domain. Defendants, however, fail to show that these companies were not under the aforementioned contractual duty to keep the information secret. If they were under such an obligation, the existence of such a duty would buttress plaintiff's argument that Anacomp took substantial steps to keep the information secret.

Finally, the Court notes that defendants' allegation that the materials are available on the open market is inconsistent with evidence submitted by Anacomp that defendants attempted to solicit copies of the materials from Anacomp employees. *See* Affidavit of Ronald Lickteig in further support of injunctive relief, sworn to on June 17, 1993 ("Lickteig Affidavit") at ¶¶ 8-9. If the information truly were as available on the open market as defendants suggest, then they would not have attempted to get the information from Anacomp's employees.

However, even assuming *arguendo,* that some of the information contained in the Proprietary Materials were in the public domain, this fact alone would not preclude this Court from finding that the proprietary materials constitute a trade secret. While it is the case that matters of public knowledge or of general knowledge in an industry cannot be categorized as trade secrets, *Computer Assoc. Int'l., Inc. v. Bryan,* 784 F.Supp. 982 (E.D.N.Y.1992) (citing, *Minnesota Mining and Mfg. Co.,* 192 N.Y.S.2d at 113), a compilation of the public information which incorporates the information in a unique way is, nonetheless, protectable as a trade secret. *Integrated Cash Management Serv.,* 920 F.2d at 174. As stated by the Second Circuit, " '[a] trade secret can exist

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 8

in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable [trade] secret.' " *Integrated Cash Management Serv.*, 920 F.2d at 174 (quoting *Imperial Chem. Indus. Ltd. v. National Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965)). *See Computer Assoc. Int'l Inc. v. Bryan*, 784 F.Supp. 982, 988 (E.D.N.Y.1992); *Q-Co Industries, Inc. v. Hoffman* 625 F.Supp. 608, 617 (S.D.N.Y.1985). Thus even assuming, that the information at issue were in the public domain, the non-secret nature of the individual components would not prevent the combination of components from comprising a trade secret.

*9 Anacomp has presented compelling evidence suggesting that the information contained in the Proprietary Materials is not well-known in the industry and furthermore, the information is complied in a unique manner affording Anacomp a competitive advantage. Accordingly, this factor weighs in favor of finding a trade secret.

(3) *The Extent of Measures Taken by the Owner to Guard the Secrecy of the Information*

The single most important factor in determining whether particular information is a trade secret is whether the information is secret. *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir.1986). Absolute secrecy, however, is not required. *A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 16 (2d Cir.), *cert. denied*,393 U.S. 835 (1968); *Q-Co. Industries Inc.*, 625 F.Supp. at 617 (citing *Fairchild Engine and Airplane Corp. v. Cox*, 50 N.Y.S.2d 643 (Sup.Ct. New York Co.1944)). Instead, "[t]he rule is only that a 'substantial element of secrecy must exist and this means so much that' except by use of improper means, there would be difficulty in acquiring the information.' " *Q-Co Indus.*, 625 F.Supp at 617 (quoting *A.H. Emery Co.*, 389 F.2d at 16.) Whether specified information constitutes a trade secret:

depends in part on whether or not the owner took "reasonable measures to protect [the] secrecy" of the [information] and the ease or difficulty with which the information could properly be obtained from other sources.

*A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991). *See e.g.*,Restatement of Torts § 757 Comment (b). The Second Circuit has held, that among the factors to be considered in determining whether a secret has been protected, is the extent to which employers have taken appropriate precautions to alert employees of the need to maintain the confidentiality of the information. *A.F.A. Tours Inc.*, 937 F.2d at 89.[FN5]

Anacomp has provided compelling evidence that extensive steps have been implemented to protect the secrecy of its maintenance manuals and diagnostic and software, and that employees are aware of the need for secrecy. First, Anacomp places a Proprietary Information legend on each document that constitutes proprietary information. *See* Woods Affidavit, at 7; Gaskin Affidavit, at ¶ 13.[FN6] Second, on every page of Anacomp's proprietary maintenance manuals published since 1989, Anacomp has placed warnings that the information is proprietary and not to be duplicated. *Id.* at ¶ 7(b). Third, on every maintenance manual, Anacomp places a statement that the information contained in the manual is proprietary material and that unauthorized use is prohibited. *Id.* at ¶ 7(c). Fourth, Anacomp also polices its employees use of the materials. *Id.* at ¶ 7(d). Moreover, the evidence indicates that Anacomp monitors the use of the information by employees and requires its employees to execute confidentiality agreements.[FN7]

*10 Additionally, the Proprietary Materials are not provided to anyone outside of Anacomp with the exception of those customers who enter licensing agreements with Anacomp. Wood Affidavit, at ¶ 8. Even then, they are provided only to those employees who "need" to use them and have agreed to keep them confidential. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 9

Defendants argue that "it was not until after acquiring Datagraphix, that Anacomp began a campaign to try to control the Datagraphix documentation it had inherited." Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, dated June 25, 1993, ("Opposition Memorandum") at 15, and that some DatagraphiX documentation in defendants' possession bears no legend restricting use. *See,* Opposition Memorandum at 15.[FN8]

However, even assuming that some of the earlier manuals and fiche had no legend on them, for purposes of this motion, plaintiff has made a sufficient evidentiary showing that it took reasonable measures to protect the secrecy of the information and that the ease or difficulty with which the information could properly be obtained from other sources weighs in Anacomp's favor. *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d at 89.[FN9] Accordingly, based on the substantial evidence presented, the third factor clearly weighs in plaintiff's favor.

(4) *The Value of the Information to the Owner and to His Competitor*

The extent to which a compilation of information is considered a trade secret, also depends on the value of the information to the owner and to his competitor. In assessing the value of certain information, "an aggrieved plaintiff need not show that the information it seeks to protect is vital to its business, but only that the information would provide the unauthorized user of it with an unfair competitive advantage which it would not otherwise have enjoyed." *Computer Assoc. Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 987-88 (E.D.N.Y.1992) (quoting *Ecolab, Inc. v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y.1991) (citing *Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc.,* 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983))).

The record indicates that Anacomp has obtained a position of leadership in the micrographic industry as a result of its substantial investment in research and development. The written documentation and diagnostic computer software developed to maintain Anacomp COM recorders is one such investment made by Anacomp. This material is integral for the proper maintenance of X-series COM recorders and thus is of utmost importance to Anacomp and others who hope to compete in the maintenance and servicing of Anacomp-DatagraphiX COM recorders. *See* Woods Affidavit, at ¶ 5, Hotze Affidavit at ¶ 6. The unauthorized use of these materials by a competitor puts the competitor at an unfair advantage because he was not required to expend resources in developing the Proprietary Materials. Based on the potential loss of business to Anacomp, and corresponding gain to its competitors, if the Proprietary Materials were unprotected, this Court concludes that this element supports the finding of a trade secret.

(5) *The Amount of Effort or Money Expended in Developing the Information*

*11 Anacomp has spent a total of approximately $4.8 million to develop, maintain, update, and "de-bug" the diagnostic software; to create maintenance and repair manuals; and to update the documentation to reflect technological advancements and design changes. Woods Affidavit, at ¶ 9. *See* Murriel Reply Affidavit at ¶ 10.[FN10] Since Anacomp's acquisition in 1987 the nature of the technology used in the computer graphics system has improved greatly. Plaintiff has expended considerable effort and resources in order to insure that the Anacomp service materials kept pace with improving technology. Defendants have not offered any evidence to the contrary. Accordingly, this factor supports plaintiff's contention that the Proprietary Materials should be considered trade secrets.

(6) *The Ease or Difficulty with which the Information Could be Properly Acquired or Duplicated by Others*

Defendants argue that the Proprietary Materials are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 10

not trade secrets because the information can easily be gleaned through reverse engineering.[FN11] *See* Affidavit of John Patrick Mewshaw, sworn to on June 25, 1993 ("Mewshaw Affidavit"), at ¶ 11. Defendants claim that since Mewshaw, an SKSI employee, is preparing X-series COM recorder service documentation through the process of reverse engineering, this Court should find that the materials at issue are too easily duplicated to constitute trade secrets. The Court finds this claim unpersuasive.

Even assuming that the information could be obtainable through reverse engineering without a base of prior knowledge gleaned from the proprietary materials, defendants' argument fails in two respects. First, "[t]he *possibility* of discovery by 'fair and honest methods' does not preclude the finding of a trade secret." *Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 232-33 (S.D.N.Y.1988) (emphasis in original) (finding that discovery through reverse engineering does not preclude trade secret status, and that the term reverse engineering is not a talisman that may immunize the theft of trade secrets). Second, the proper inquiry is not whether defendants alleged trade secret *can be* discovered by reverse engineering, but whether in fact it has been. *Id.* at 233.

Here, the Court finds that the proprietary materials have not been discovered through fair and honest reverse engineering. Mewshaw states that he is rewriting and updating DatagraphiX service publications. Mewshaw Affidavit, at ¶ 11. Mewshaw statements indicate that his starting point for this "reverse engineering" was the DatagraphiX manuals, the rights to which Anacomp acquired through its 1987 acquisition of DatagraphiX. Moreover, Mewshaw is a former employee of DatagraphiX who had access to the Proprietary Materials during in his former employment. This Court finds that there is no indication that he would have been able to perform reverse engineering on the DatagraphiX-Anacomp COM recorders without the knowledge he obtained through his employment at DatagraphiX. Thus, the Court cannot conclude, based upon the Mewshaw affidavit, that the Proprietary Materials may be easily obtained through reverse engineering.

*12 Accordingly, applying the trade secret factors, delineated by the Second Circuit in *Hudson Hotels,* to the instant case, it is clear that Anacomp's proprietary materials constitute trade secrets.

(b) *Breach of an Agreement, Duty of Confidential Relationship or Discovery by Improper Means*

The second prong of the analysis that plaintiff must satisfy in order to support a claim of misappropriation of trade secrets is that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means. *Hudson Hotels Corp. v. Choice Hotels Int'l,* at 3902-03; *Integrated Cash Management Serv.,* 920 F.2d at 173.

Lennen executed a privacy agreement promising not to disclose private information or to "utilize such information, secrets, or data in [his] own behalf, for [his] own gain or benefit, or for the gain or benefit of another." Proprietary Agreement.[FN12]

Lennen argues that the confidentiality agreement is inoperative because it did not describe with particularity the information that he was obligated to keep secret. His argument fails however, because the terms of the agreement are reasonable in scope, are reasonably necessary to protect Anacomp's interests, and are not unreasonably burdensome on Lennen. *See, e.g., Chevron U.S.A. Inc. v. Roxen Service Inc.* 813 F.2d 26, 28-29 (2d Cir.1987); *American Broadcasting Companies, Inc. v. Wolf,* 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 486, 420 N.E.2d 363 (1981). Similar nondisclosure agreements have been held to be enforceable even when the agreement did not list the particular information considered secret. *See, e.g., Integrated Cash Management Serv.,* 920 F.2d at 172 (finding misappropriation of trade secrets where employees agreed simply "not to disclose or use *any* confidential or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 11

proprietary information of [employer] upon leaving the employ.") (emphasis added). Accordingly, Lennen's use of confidential information obtained while employed by DatagraphiX constitutes a breach of Lennen's contractual duty of confidentiality.

Additionally, any Proprietary Materials obtained by Mewshaw while he was a DatagraphiX employee and later utilized by SKSI were also used in breach of a duty. Even though there is no evidence that Mewshaw executed a proprietary information agreement with DatagraphiX, employees in his position have been held to owe an implicit obligation of good faith and fair dealing to their employer. *Kaufman v. International Business Machines Corp.*, 470 N.Y.S.2d 720, 723 (3d Dep't 1983), *aff'd*,474 N.Y.S.2d 721 (1984). *See, Computer Assoc Int'l Inc.*, 784 F.Supp at 988 ("a former employee can be prohibited from taking trade secrets from his former employer whether or not there exists an employment contract which prohibits competition"); *Hecht Foods, Inc. v. Sherman*, 351 N.Y.S.2d 711, 714 (2d Dep't 1974).

Moreover, even information obtained subsequent to the individual defendant's employment was improperly obtained. Discovery by improper means does not require that the defendant himself breach a duty. Instead,

*13 One who discloses or uses another's trade secret, without a privilege to do so, is liable to another if ... (c) he learned the secret from a third person with notice of the fact that it was secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to another.

*Computer Assoc. International, Inc. v. Altai Inc.*, 982 F.2d 693 (2d Cir.1992) (quoting *Restatement of Torts* § 757)

Anacomp has produced evidence by way of affidavit that it never sends maintenance documentation to anyone without a valid self-maintenance agreement in place. These self maintenance agreements contain provisions that licensees only disclose the Proprietary Materials to those employees who "need" to use them and have agreed to keep them confidential. Wood affidavit at ¶ 8. As former employees of Anacomp, Lennen and Mewshaw were aware of the existence and content of the confidentiality agreements. Thus, defendants were aware that any acquisition of the Proprietary Materials by SKSI or Lennen from licensees or from the so-called open market, would have been in breach of the licensee's agreement with Anacomp. Anacomp has also shown that defendants have attempted to persuade Anacomp employees to give or sell them copies of proprietary manuals. Gaskin Reply Affidavit, at 9-10; Lickteig Affidavit at ¶ 8. An acquisition of this type would also constitute a breach of duty owed to Anacomp by its employees. Any Proprietary Materials obtained by defendants were obtained with the knowledge that the disclosure of such materials violated a duty owed to Anacomp and/or DatagraphiX.[FN13] *See, Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 164 (3d Cir.1982).

Accordingly, the Court finds that Anacomp has provided a sufficient evidentiary showing that plaintiff is likely to succeed in its claim for misappropriation and misuse of trade secrets.

2. *Unfair Competition*

"Although at one time the law of unfair competition was limited to claims that one party had attempted to pass off his goods as those of another party, unfair competition is now held to encompass a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir.1979)cert. denied, 445 U.S. 951 (1980). *Accord Talk To Me Products Inc. v. Lariami Corp.*, 992 F.2d 469 (2d Cir.1993); *Murphy Door Bed Co. Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95 (2d. Cir.1989). "[E]ven where the information would not otherwise rise to the level of a trade secret, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 12

unauthorized physical taking and exploitation of internal company documents ... by an employee for use in his future business or employment is to be enjoined as unfair competition." *Ecolab Inc. v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y.1991); *accord, Advanced Magnification Instruments, Ltd. v. Minuteman Optical Corp.,* 522 N.Y.S.2d. 287, 290 (3d Dep't 1987) ("an employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition"); *Allan Dampf P.C. v. Bloom,* 512 N.Y.S.2d 116, 117 (2d Dep't 1987) (defendant had engaged in unfair competition by misappropriating and exploiting former employer confidential information and improperly using the information to solicit plaintiff's patients). Additionally, New York courts have included, within the tort of unfair competition, the misappropriation of a property right belonging to another for one's own commercial advantage. *See Roy Export Co. Estab. of Vaduz v. Columbia Broadcasting Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir.) (Newman, J.), *cert. denied,*459 U.S. 826 (1982) (*citing Electrolux Corp. v. Val-Worth, Inc.,* 190 N.Y.S.2d 977, 986 (1959)); *Velo-Bind, Inc. v. Scheck,* 485 F.Supp. 102, 103 (S.D.N.Y.1979).

***14** Defendants claim that Anacomp is unlikely to succeed on its unfair competition claim because there is no evidence that defendants were "palming off" their products as plaintiff's products. This Court need not find that the defendants were attempting to pass off plaintiff's manuals and software as their own in order to find a likelihood of success on a claim of unfair competition. Instead plaintiff must merely show that the defendants have misappropriated the labors and expenditures of Anacomp. This Court, having examined the facts of this case in accordance with the applicable standard, finds that Anacomp has demonstrated a likelihood of success on its claim for unfair trade practices.

3. *Breach of Fiduciary Duty*

This Court now turns to plaintiff's third claim, that of Breach of a fiduciary duty. "Trade secret claims often are grounded upon a defendant's breach of duty of trust or confidence to the plaintiff through improper disclosure of confidential material." *Computer Associates International, Inc. v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992) (citation omitted). As a former employee of Anacomp and DatagraphiX, Lennen had access to the proprietary materials which are at issue in this case. *See* Gaskin affidavit at ¶ 19. Plaintiff has presented significant evidence to support the proposition that Lennen knew the materials were to be kept confidential, including Lennen's Proprietary Agreement.[FN14] Accordingly, any use of confidential information obtained by Lennen while employed by DatagraphiX or Anacomp would constitute a breach of the Proprietary Agreement. *See Integrated Cash Management Serv.,* 920 F.2d at 172.

Moreover, even if there were no privacy agreement, Lennen could still be liable on a theory of breach of a fiduciary duty. *See Kaufman v. International Business Machines,* 470 N.Y.S.2d at 723. *See also, Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 569 (S.D.N.Y.1984), *aff'd,*761 F.2d 93 (2d Cir.1985) (stating that it cannot be disputed that an employee has a fiduciary duty, that exists independent of any contract between the parties, to refrain from misappropriating and disclosing confidential information in certain circumstances). While it is generally true that a former employee is not barred from competing with his former employer, a former employee such as Lennen can not use his employer's confidential trade secrets in his own behalf, in order to compete with his employer. *Velo-Bind, Inc.,* 485 F.Supp. at 103 (S.D.N.Y.1979) (where the court held that the defendant, a former employee breached the fiduciary obligation inherent in her relationship of employment with plaintiff by making use of plaintiff's trade secret). Considering the fact that Lennen was aware the proprietary materials were confidential, he had and breached a fiduciary duty owed to his former employer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 13

Defendant Lennen had both a contractual duty and a fiduciary duty not to use or disclose the proprietary materials. Any use by Lennen or SKSI of the information contained in the proprietary materials would be in contravention of these duties. Accordingly, this Court finds that Anacomp has shown a likelihood of success on its claim against Lennen for breach of contract and for breach of a fiduciary duty.

III. FORM AND SCOPE OF THE PRELIMINARY INJUNCTION

***15** Having considered the submitted materials and the arguments of counsel at the August 18, 1993 hearing, this Court finds that the issuance of a preliminary injunction is warranted. In accordance with Rule 65(d) of the Federal Rules of Civil Procedure, the form and scope of the preliminary injunction has been set forth by this Court, and are contained in a separate Order issued by this Court on January 7, 1994

IV. SECURITY

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must determine the amount of security that the applicant must post. The amount should reflect "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Under the circumstances of the instant case, the Court orders that plaintiff post bond in the amount of $125,000 by January 21, 1994.

CONCLUSION

For the reasons set forth above, plaintiff has demonstrated irreparable harm and a likelihood of success on the merits as to its claims for misappropriation of trade secrets, unfair competition, and a breach of fiduciary duty. The Court has issued a preliminary injunction in the terms specified in a Separate Order. All parties to this action shall appear before the Court for a pretrial status conference on February 4, 1994.

SO ORDERED.

FN1. Defendants originally cross-moved to dismiss the action for improper venue or, in the alternative, to transfer the action pursuant to 18 U.S.C. §§ 1391 and 1404 to the Western District of Missouri. Defendants, however, have withdrawn their motions to dismiss and for a change of venue. *See* Letter from Defendants' Attorney to the Court, dated July 13, 1993. Accordingly, the only issue before the Court is plaintiff's motion for a preliminary injunction.

FN2. This Court has heard oral argument from counsel on both sides, and has reviewed over 500 pages of documents submitted by the parties. In a letter submitted to this Court in response to plaintiff's proposed order, defendants requested an evidentiary hearing in this matter. This Court however, declined to hold such a hearing. It has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue. *Drywall Tapers, Local 1974 v. Operative Plasters*, 537 F.2d 669 (2d. Cir 1976) (holding that no hearing was required where the court issued relief after careful consideration of the voluminous documents); *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir.1982); 11 C. Wright & A. Miller, *Federal Practice and Procedures* § 2949 (1973 & Supp.1993). *See e.g., Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.), amended, 890 F.2d 569 (2d Cir.), cert. dismissed, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 14

(1989) (holding that "[t]he voluminous and comprehensive record in [the] case provided a more that adequate source for [the district judge's] factual findings."). This Court finds that based on the extensive written documentation submitted to the Court, the central issues in this case would not be subject to materially greater elucidation by live testimony.

FN3. The warnings contained on the Proprietary Materials distributed Anacomp state either that:

This document contains proprietary information of ANACOMP. It is loaned to the recipient in confidence solely for use beneficial to ANACOMP. No other use, direct or indirect, of this document or any information derived therefrom is authorized. No copies of any part of this document shall be made without written approval by ANACOMP. The document shall be returned upon request to ANACOMP.

or:

This document contains proprietary information of Anacomp, Inc.; Anacomp retains the ownership of this proprietary information. This document is loaned to all users under the following conditions: * You *may not* make copies in whole or in part, by any process, of this document. * You *may not* distribute, rent sub-license, or lease this document. * You *may not* alter, modify, or adapt this document; including, but not limited to, translating, decompiling, disassembling, or creating derivatives. Your right to use this document automatically terminates if you fail to comply with the above statement. This document shall be returned upon request to Anacomp. Anacomp retains all rights not expressly granted. Nothing in this statement constitutes a waiver of Anacomp's rights under the U.S. copyright laws or any other Federal or State law.

June 3, 1993, Gaskin Affidavit, at ¶ 13 (emphasis in original).

FN4. Although defendants dispute that such serial numbers have been inscribed on each and every manual, the Court finds for the purpose of its factual findings, that the evidence relating to security measures is sufficient to demonstrate that these policing mechanisms were instituted on a regular basis.

FN5. New York courts have held that in order to keep a trade secret, "it is not requisite that only the proprietor of a business know it. He may, without loosing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy." *Minnesota Mining and Mfg. Co., Inc. v. Technical Tape Corp.*, 192 N.Y.S.2d at 113. *See also, Mixing Equipment Co. v. Philadelphia Gear, Inc.*, 312 F.Supp. 1269, 1274 (E.D.Pa.1970) (applying New York substantive law).

FN6. The warnings on the Proprietary Materials distributed by Anacomp state either that:

This document contains proprietary information of ANACOMP. It is loaned to the recipient in confidence solely for use beneficial to ANACOMP. No other use, direct or indirect, of this document or any information derived therefrom is authorized. No copies of any part of this document shall be made without written approval by ANACOMP. The document shall be returned upon request to ANACOMP.

or:

This document contains proprietary information of Anacomp, Inc.; Anacomp retains the ownership of this proprietary information. This document is loaned to all users under the following conditions: * You *may not* make copies in whole or in part, by any process, of this document. * You *may not* distribute, rent sub-license, or lease this document. * You *may not* alter, modify, or adapt this document; including, but not limited to, translating, decompiling, disassembling, or creating derivatives. Your right to use this document automatically terminates

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 15

if you fail to comply with the above statement. This document shall be returned upon request to Anacomp. Anacomp retains all rights not expressly granted. Nothing in this statement constitutes a waiver of Anacomp's rights under the U.S. copyright laws or any other Federal or State law.
June 3, 1993, Gaskin Affidavit, at ¶ 13 (emphasis in original).

FN7. Although defendants dispute plaintiff's contention that serial numbers are provided on each manual for the purpose of providing security by tracking the documents, the Court finds that the evidence relating to other measures taken by Anacomp is sufficient to demonstrate that this factor weighs strongly in plaintiff's favor.

FN8. Defendants also claim that DatagraphiX supplied the Proprietary Materials to foreign distributors and failed to require the return of the documents after the terms of licenses expired. *See* Lennen Affidavit, at ¶ 21. However, plaintiff notes that DatagraphiX only supplied oversees suppliers who were under an obligation to maintain the confidentiality of the documentation. *See* Gaskin Reply Affidavit, at ¶¶ 10-12; Murrel Affidavit at ¶¶ 17-18.

FN9. Storing service manuals on premises of customers with the explicit provision that the manuals are loaned in confidence to facilitate maintenance by DatagraphiX service personnel, would certainly not be the type of action which would be considered as freely disseminating materials to customers. Subsequent to the 1987 acquisition of DatagraphiX virtually all of the DatagraphiX materials were substantially modified by Anacomp. Thus, even assuming, *arguendo,* that the DatagraphiX materials had been unprotected, the materials have been modified to such an extent that they have become Anacomp's protected trade secrets. In *Metallurgical Indus. Inc. v. Fourtek, Inc.,* 790 F.2d 1195 (5th Cir.1986), the Fifth Circuit held that, modifications to a basic production process, even one that has been published, can, nonetheless, constitute a protectable trade secret. *Id.* at 1199-1201 (applying the trade secret law of Texas, which, like New York law, defines a trade secret according to section 757 comment b of the Restatement of Torts). *See,*Restatement of Torts § 757 (1939). *See also, Integrated Cash Mgmt. Serv.,* 920 F.2d at 174 (where despite the public nature of the component parts of plaintiff's information, the court found the presence of a trade secret based on the unique combination of the information, stating "the architecture of ICM's product, or the 'way in which [ICM's] various components fit together as building blocks in order to form a unique whole' was secret." *Id.* quoting *Integrated Cash Mgmt. Serv. Digital Transactions,* 732 F.Supp. 370, 374 (S.D.N.Y.1989)).

FN10. Since Anacomp acquired DatagraphiX in 1987, it has invested over $500,000 merely to revise the DatagraphiX X-series maintenance manuals and software. Murriel Reply Affidavit at ¶ 10.

FN11. Defendants contend that the Proprietary Materials should not be protected because certain types of maintenance of the X-series COM equipment can be performed without the materials. Lennen explains that much of the maintenance performed by DTI can be accomplished through a process of circuit board replacement, whereby DTI technicians, using trial and error, replace faulty circuit boards with circuit boards that are known to work. Defendants' argument, however, is irrelevant to the motion before this Court. The issue is whether defendants should be enjoined

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**Page 16**

from using the Proprietary Materials. The fact that defendants can perform some basic maintenance without the Proprietary Materials is of no moment.

FN12. The issue typically surrounding such a confidentiality agreement is the tension between the need to protect the secrecy of proprietary materials and the need not to unduly restrict a former employee from using his general skills and knowledge which were developed while working for the company. *See, Integrated Cash Mgmt.*, 732 F.Supp at 377. This problem does not exist in the present case because the issue at hand surrounds DTI's and Lennen's copying and use of Anacomp's trade secrets, secrets which Lennen agreed not to use or disclose. Here the nondisclosure agreement put Lennen on notice that the materials were considered trade secrets. *See, e.g., Id. (citing Aries Information Systems, Inc. v. Pacific Management Systems Corp.*, 366 N.W.2d 366, 369 (Minn.App.1985) (confidentiality agreement put employees on notice that information contained in computer program was considered a trade secret)).

FN13. In their attempt to argue that Anacomp did not adequately protect the Proprietary materials, defendants claimed that they were able to copy the proprietary materials off of the hard drives of X-series COM recorders which SKSI was storing for Anacomp. *See* Lennen Affidavit at ¶ 24-26. Assuming that Anacomp employees had not deleted the hard drives of the recorders as was company's practice, such an acquisition by SKSI, which does not suffice to support a showing that Anacomp did not adequately protect their trade secrets, tends to show that SKSI acquired the materials by improper means. Taking the information off the hard drives of machines which SKSI was storing, would constitute an improper acquisition.

FN14. While plaintiff need not rely on the provisions contained in the written contract in order to sustain a cause of action against Lennen, the fact that such an express contract was executed certainly fortifies plaintiff's position that the parties understood the value plaintiff attached to the secrecy of the materials.

S.D.N.Y.,1994.
Anacomp, Inc. v. Shell Knob Services, Inc.
Not Reported in F.Supp., 1994 WL 9681 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT B

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**



B.U.S.A. Corp. v. Ecogloves, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
B.U.S.A. CORP. and Robert Temkin Associates, Plaintiffs,
v.
ECOGLOVES, INC. and Lynn Riley, Defendants.
No. 05 CIV. 9988(SCR).

Jan. 31, 2006.

Matthew Clifton Wagner, Collen IP, Ossining, NY, for Plaintiffs.
Charlotte Gilda Swift, Jason & Nesson, LLP, Chestnut Ridge, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER**

STEPHEN C. ROBINSON, District Judge.
*1 Plaintiffs ask this Court for a preliminary injunction against Defendants. For the reasons set forth below, Plaintiffs' motion is granted.[FN1]

FN1. The following findings of fact and conclusions of law are made on the current state of the record and are limited to this motion.

***I. Background***

B.U.S.A. Corp. ("BUSA") and Robert Temkin Associates ("RTA") (collectively "Plaintiffs") engage in the creation and distribution of inserts and accessories, primarily instruction manuals, applicators, gloves, brushes, and other items that are designed to help consumers apply a particular cosmetic product, including hair dye.[FN2] Plaintiffs gain customers through a bidding process. After a potential customer gives Plaintiffs specifications for a product, Plaintiffs develop a bid by consulting their cost specifications/price formulae, which include profit margins and shipping, manufacturing, and labor costs. Once a customer chooses Plaintiffs to provide the product, Plaintiffs turn to outside manufacturers to produce the product. Plaintiffs also improve existing products and develop additional products for current and potential customers.

FN2. Robert Temkin owns Plaintiffs.

Defendant Lynn Riley worked for RTA for approximately five years in a management position. At least part of her responsibilities at RTA involved actively managing Plaintiffs' accounts.[FN3] As a result, she was aware of Plaintiffs' pricing structures and bidding information and was engaged in customer development.

FN3. Ms. Riley was involved, at least in part, with Plaintiffs' accessory and hair coloration industry accounts.

Ms. Riley resigned from her position at RTA on June 6, 2005. The next day, she formed Defendant Ecogloves, Inc. ("Ecogloves") (collectively "Defendants"), a business, like Plaintiffs, that engages in the creation and distribution of inserts and accessories. While Ms. Riley formed Ecogloves on June 7, 2005, she registered the domain name "www.ecogloves.com" on August 14, 2004, almost one year earlier. Not only are Defendants in the same industry as Plaintiffs, and, therefore, directly compete with them, but Defendants advised Plaintiffs' contacts at Plaintiffs' customers that Defendants were interested in bidding on various opportunities. For example, while working for Plaintiffs, Ms. Riley was involved with the development of a brush for L'Oreal, and on or prior to June 14, 2005, Ms. Riley began to solicit bidding on that same brush for her newly established company, Ecogloves.

Plaintiffs now seek a preliminary injunction preventing Defendants from engaging in particular acts and ordering Defendants to return Plaintiffs' property.[FN4]

FN4. The parties dispute whether Ms. Ri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ley is in possession of any of Plaintiffs' property.

### *II. Discussion*

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor."*Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir.2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000)).

### A. The Merits of Plaintiffs' Claims

*2 Plaintiffs allege that they are likely to succeed on at least two of their claims: (1) misappropriation of trade secrets; and (2) tortious interference with a contract.[FN5] This Court finds that Plaintiffs have shown sufficiently serious questions going to the merits to make these claims a fair ground for litigation plus a balance of hardships in Plaintiffs' favor.

> FN5. Plaintiffs also argue that they are likely to succeed on their claim that Defendants violated the Computer Fraud and Abuse Act (CFAA).18 U.S.C. § 1030. While the CFAA is a criminal statute, it provides for a civil right of action. 18 U.S.C. § 1030(g). Because section 1030(g) limits civil actions to conduct that involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of section 1030(a)(5)(B), this Court cannot grant a preliminary injunction based on Plaintiffs' claims under sections 1030(a)(2)(C) and (a)(4). Thus, Plaintiffs' only viable claim is under subsection 1030(a)(5)(B)(i). However, damages for a violation of subsection 1030(a)(5)(B)(i) are limited to economic damages.*Id.* Because Plaintiffs' recovery is limited to economic damages, this Court cannot grant injunctive relief. *See Moore v. Consol. Edison Co.,* 409 F.3d 506, 510 (2d Cir.2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.").

#### *1. Misappropriation of Trade Secrets*

"To succeed on a claim for the misappropriation of trade secrets under New York law,[FN6] a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."*North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 43-44 (2d Cir.1999) (citing *Hudson Hotels Corp. v. Choice Hotels, Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993), *abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.,* 208 F.3d 368 (2nd Cir.2000)).

> FN6. The parties agree that this Court must apply New York law in adjudicating Plaintiffs' state law claims.

##### *a. Trade Secrets*

A trade secret "is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.' " *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.,* 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts § 757 cmt. b (1939)). To determine what information constitutes a trade secret, New York courts consider:
'(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'

*North Atlantic Instruments, Inc.*, 188 F.3d at 44 (quoting *Ashland Management, Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993)).

Plaintiffs allege Defendants misappropriated three different types of trade secrets: (1) cost structures and bidding information; (2) customer lists and customer information; and (3) prototypes and particular products. This Court finds that Plaintiffs' cost structures, bidding information, and customer lists are trade secrets.

i. Cost Structures and Bidding Information

Plaintiffs argue that their cost structures and bidding information meet the six factor test described above. They assert that both types of information are "the product of revisions and refinements over many years of hard work at considerable expense."(Pl.'s Mem. at 17.)

According to Plaintiffs, their cost structures are a "sophisticated calculation" that includes the costs of overhead, development, freight, and other anticipated costs. *Id.* Plaintiffs further allege that if a customer knew about the cost structure it could demand lower prices and if a competitor knew about the cost structure it could slightly underbid Plaintiffs. Accordingly, Plaintiffs argue, they have "undertaken substantial effort to conceal the cost structure" and most individuals within Plaintiffs' business do not know the cost structure for each product. *Id.* at 18.By using its cost structure, Plaintiffs are able to prepare individual bids for each customer. Plaintiffs do not generally publish their bids-only Plaintiffs and the customer who received a bid know about the bid.

*3 Defendants argue, however, that most of Plaintiffs' cost structures did not "radically" differ from those used by competitors. (Def.'s Mem. at 4.) They further argue that Plaintiffs' have not identified specific efforts that they have taken to conceal their cost structures. Finally, Defendants assert that bids are "not 'the product of revisions and refinements over many years of hard work'" as each bid is prepared on a project-byproject basis. *Id.* at 5 (quoting Pl.'s Mem. at 17).

Plaintiffs have sufficiently established that their cost structures and bidding information are a trade secret. Not only do customers and others outside Plaintiffs' businesses not know the cost structures and bidding information, but many of Plaintiffs' employees are not privy to such information. While the customer receiving the bid knows about the bid, it is still not aware of the cost structure and other confidential information used to develop the bid. Plaintiffs sufficiently protect their cost structures and bidding information as they limit the number of employees that have access to such information. Each cost structure and piece of bidding information is valuable to Plaintiffs as it enables them to realize a reasonable return on their investment while providing customers with a service and price that are acceptable to them. If a customer were to learn the details of Plaintiffs' cost structure or bidding information for a certain product, customers could use such information to demand concessions, reducing Plaintiffs' profit. Further, Plaintiffs have expended significant effort in developing a cost structure and bidding information for each product. While each individual bid may not have taken years to develop, certainly some of the information that informed the development of Plaintiffs' cost structure and of each bid has been cultivated over years of work. Finally, it would be difficult for anyone other than Plaintiffs or specific employees of Plaintiffs to duplicate a particular cost structure or bidding information as a variety of factors are involved, many of which only Plaintiffs or specific employees of Plaintiffs would have access to. *See Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, 278 (E.D.N.Y.2002) (finding, after considering the six factors, that "knowledge of a customer's needs and specifications and the prices

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

charged to that customer" is a trade secret).

ii. Customer Lists and Customer Information

Plaintiffs next argue that their customer lists and information about customers' specifications and preferences are trade secrets. Defendants argue that Plaintiffs' customer lists are not trade secrets because anyone could easily go to one of Plaintiffs' customer's websites and determine how to become a vendor. Defendants further argue that Plaintiffs' have not identified specific efforts that they have taken to conceal their customer lists.

This Court finds that Plaintiffs' customer lists are trade secrets to the extent that the lists include specific contact information for individuals who are employed by Plaintiffs' customers that is not readily available to individuals making normal business inquiries to Plaintiffs' customers. The identities of Plaintiffs' customers, however, are not trade secrets. Further, information about a customer's specifications and preferences is not a trade secret.

*4 " 'A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable.' " *North Atlantic Instruments, Inc.*, 188 F.3d at 44 (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.1985). When, however, customers are readily ascertainable "as prospective users or consumers of the ... services or products, trade secret protection will not attach...." *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 (1972).

For the purposes of this preliminary injunction motion, this Court finds that the names of Plaintiffs' customers, which are all companies, are not a trade secret, however, the names of the specific contacts at those companies are trade secrets. *See North Atlantic Instruments*, 188 F.3d at 44-45 (upholding a magistrate judge's finding, for the purposes of a preliminary injunction, that the plaintiff's customer list was not a trade secret to the extent that contained the names of companies, but the identities of the individual contact people at those companies was a trade secret because the information on the specific contact people was not readily available to others in the industry; the plaintiff took numerous measures to protect that information; and the defendant could only reproduce the client list with great difficulty). The names of Plaintiffs' customers, including Proctor & Gamble, L'Oreal, and Clairol, are not a trade secret as these companies are readily ascertainable as prospective users of Plaintiffs' and Defendants' products and services. *See Leo Silfen, Inc.*, 29 N.Y.2d at 392. However, the contacts at those companies are a trade secret as this information meets the six factor test. First, the identity of the contacts who work for Plaintiffs' clients is not common knowledge and the relationships with those individuals have been developed over many years.[FN7] Second, such contact information is not commonly known to all of Plaintiffs' employees. Third, Plaintiffs took appropriate measures, such as locking files and using computer passwords, to protect the contact information. Fourth, the identity of their clients' contacts is valuable as they have used substantial resources to develop relationships with the particular contacts. Finally, contrary to Defendants' assertions that appropriate contacts can be found on the customers' websites, the identities of the individual contacts are not on the websites and cannot be easily acquired or duplicated by others. Thus, Plaintiffs have demonstrated that their customer list is a trade secret to the extent it contains the identities of the individual contact people who work for Plaintiffs' customers, but not to the extent that it contains the names of the companies.

FN7. Defendants conceded this at oral argument. (Tr. at 13.)

Even if Ms. Riley has such contact information committed to memory-Defendants assert that she does not have a written list while Plaintiffs assert

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that she does-the information about the contacts who work for Plaintiffs' customers is still a trade secret. Whether information is part of a person's casual memory is not determinative of whether something is a trade secret.[FN8] In *North Atlantic Instruments*, the Second Circuit noted that *Leo Silfen, Inc.* "suggest[s] that one factor in analyzing a trade secret claim against an employee who has solicited a former employer's customers is whether the solicitation was merely 'the product of casual memory.' "[FN9] 188 F.3d at 46 (quoting *Leo Silfen, Inc.*, 29 N.Y.2d at 391). The court expressly noted that that *Leo Silfen* does not "describe a broad rule dictating that anything an employee remembers casually is not a trade secret." *Id.* at 46-47; *see also* Roger M. Milgrim, 4-15A Milgrim on Trade Secrets 1 (2005) ("The weight of authority is that an appropriation by memory will be proscribed under the same circumstances as would a similar appropriation via a more tangible means.").

FN8. At this stage of the proceedings and on the current state of the record, this Court cannot determine whether this information, if it is memorized, is a part of Ms. Riley's casual memory.

FN9. In *Leo Silfen, Inc.*, the New York Court of Appeals held that no trade secret protection was warranted where the plaintiff's customers were likely users of the merchandise and engaged in business at advertised locations. 29 N.Y.2d at 388.

*5 Defendants argue that if a customer list is a product of casual memory, a former employee can use that list in the absence of a restrictive covenant and cite *Metal & Salvage Ass'n, Inc. v. Siegel*, 121 A.D.2d 200 (N.Y.A.D.1986), a one-page opinion from the New York Appellate Division for support. Defendants, however, misread the case and rely entirely on one misleading sentence. In *Metal Salvage*, the court found that the defendants could solicit the plaintiff's customers because the customer list was not a trade secret, it was a part of defendants' casual memory, and there were no restrictive covenants. *Id.* at 201. Thus, the case comports with the uncontroversial proposition that a defendant can use a customer list that is not a trade secret unless the parties have entered into a restrictive covenant. *See Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (N.Y.App.Div.1985) ("It is basic law that absent a covenant not to compete ..., an employee is free to compete with his or her former employer unless trade secrets are involved....").

Plaintiffs also argue that information about a customer's preferences and specifications is a trade secret. Defendants, however, argue that customers' specifications are not trade secrets because each company provides its specifications to obtain as many bids as possible during the bidding process.

Plaintiffs have not established that information about a customer's preferences and specifications is a trade secret. Plaintiffs only assert that the customers seek to keep such information confidential from the customers' competitors. Thus, Plaintiffs have not set forth sufficient information to meet the six factor test.

iii. Prototypes and Particular Products

Finally, Plaintiffs argue that they have developed certain products and business methods-for example, folding the user manual around the latex glove to reduce costs and increase efficiency-that are trade secrets. On the current state of the record, Plaintiffs do not meet the six factor test. Thus, they have not established that their prototypes and particular products are trade secrets.

*b. Confidential Relationship*

As discussed above, to prevail, Plaintiffs must establish that (1) that it possessed a trade secret, and (2) "that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc.*, 188 F.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 43-44. "Both this Circuit and numerous New York courts have held 'that an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal.' " *Id.* at 47.Moreover, this duty "exists as well after the employment is terminated as during its continuance." *Id.* (quoting *ABKCO Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983)). Thus, under New York law, a former employee cannot use trade secrets in competition with his or her former employer. *Id.* at 49.

***6** Ms. Riley worked for RTA for approximately five years. The day after resigning from RTA, Ms. Riley formed Ecogloves, Inc. "to develop and create variations of [the types of packaging sold by RTA] for items used in several industries."(Def.'s Aff. at 3.) Because Ms. Riley is in direct competition with Plaintiffs, she cannot use any trade secrets she learned while working for RTA to further Defendants' interests.

Plaintiffs argue that Ms. Riley used the above trade secrets to compete directly with Plaintiffs. Specifically, they allege that she has submitted lower bids to previous customers of Plaintiffs and used Plaintiffs' customer lists to contact Plaintiffs suppliers and customers.

Defendants only respond by arguing that Ms. Riley did not enter into any non-compete agreements or otherwise restrict her ability to compete with Plaintiffs. Defendants' argument is unavailing. As noted above, a plaintiff can establish that a defendant "used that trade secret in breach of an agreement, confidential relationship *or* duty, or as a result of discovery by improper means."*North Atlantic Instruments, Inc.*, 188 F.3d at 43-44 (emphasis added). The use of the word "or" means that a defendant can misappropriate a trade secret without having entered into a confidentiality agreement. Moreover, Defendants conceded at oral argument that Ms. Riley owed a fiduciary duty to Plaintiffs. (Tr. at 12-13.)

This Court finds for the purposes of this motion that Plaintiffs have established serious questions going to the merits of Plaintiffs' claim that Defendants misappropriated Plaintiffs' trade secrets. Defendants are in direct competition with Plaintiffs and have approached some of Plaintiffs' customers. Further, during oral argument, Defendants conceded that Ms. Riley used contact information for Plaintiffs' customers that she acquired while working at RTA. (Tr. at 13.)

*2. Tortious Interference with a Contract*

Not only are there serious questions going to the merits of Plaintiffs' claim that Defendants misappropriated trade secrets, there are also serious questions as to whether Defendants are liable for tortious interference with a contract.

There are four elements of tortious interference claim under New York law: "(a) that a valid contract exists; (b) that a third party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."*Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001).

Plaintiffs argue that they meet the requirements of a tortious interference claim. First, Plaintiffs assert that they had a contract with Clairol to provide accessories and inserts to Clairol's Nice and Easy Products. Second, Plaintiffs assert that Ms. Riley knew about the contract because she was the account manager for the contract. Third, Plaintiffs allege that Clairol sought a price adjustment and lead time guarantee from Plaintiffs, but Ms. Riley refused to lower the price or guarantee a lead time. Plaintiffs claim that had Ms. Riley notified them, they would have accommodated Clairol's request. Plaintiffs further allege that Ms. Riley refused the price adjustment or guaranteed lead time so that her soon to be established company, Ecogloves, could bid on that business. Fourth, Plaintiffs assert that as a result of Ms. Riley's refusal, Clairol put the contract out for rebidding. Plaintiffs claim that they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lost the income from the account, and their reputation and goodwill was damaged.

*7 Defendants do not address any element of this claim.

Plaintiffs have established that there are at least serious questions going to the merits of their tortious interference claim. Plaintiffs had a contract with Clairol, and Ms. Riley was in charge of the contract. Ms. Riley had a fiduciary duty to Plaintiffs to act in their best interests while she dealt with Clairol. By acting in the best interests of Ecogloves, and not in Plaintiffs, Ms. Riley arguably became a third party who intentionally and inappropriately procured the breach of Plaintiffs' contract with Clairol. After Ms. Riley left RTA, Clairol sought bids to replace Plaintiffs. Defendants then submitted a bid to Clairol. After the bidding, Plaintiffs did not retain their contract with Clairol. Moreover, in their answer, Defendants admitted that "[a]s a result of Defendant Riley's actions, Plaintiffs were unable to retain their client account with [Clairol]." (Pl.'s Compl. ¶ 68; Def.'s Answer ¶ 68.) This series of events and Defendants' admission raise, at minimum, serious questions as to whether Ms. Riley intentionally procured the breach of Plaintiffs' contract with Clairol and, therefore, tortiously interfered with the contract.

**B. Irreparable Injury**

"To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)).

Plaintiffs argue that they have established irreparable injury because they have shown that Defendants have misappropriated trade secrets. Defendants, however, do not address whether Plaintiffs will suffer irreparable harm.

This Court finds that Plaintiffs will suffer irreparable harm from the misappropriation of trade secrets. The Second Circuit has held that " 'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever.' " *North Atlantic Instruments, Inc.*, 188 F.3d at 49 (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) (per curiam)); *see also Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 628 (E.D.N.Y.1996) ("It is clear that irreparable harm is presumed where a trade secret has been misappropriated.").

**C. Balance of Hardships**

Because this Court has determined that there are serious questions going to the merits of two of Plaintiffs' claims, it must also determine whether the balance of hardships favors Plaintiffs or Defendants.

In balancing Plaintiffs' harm from the denial of a preliminary injunction against any harm Defendants may suffer from granting the injunction, this Court finds that the balance favors issuing the injunction. This injunction will prevent Defendants from misappropriating trade secrets or destroying Plaintiffs' property, which they cannot do regardless of the injunction. In fact, during oral argument, Defendants conceded that they would agree to all but one of the provisions of the preliminary injunction. The only provision that would put any measurable burden on Defendants-the only provision that Defendants objected to-is the prohibition on Defendants from soliciting business regarding any accounts held by Plaintiffs with L'Oreal and/or Proctor & Gamble involving gloves, inserts, or other hair color accessories. While this does prevent Defendants from soliciting some business, Defendants are still able to approach L'Oreal and Proctor & Gamble for other products. Defendants are also free to approach other companies for any product, including the gloves, inserts, or other hair color accessories. On the other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hand, if this Court did not grant the preliminary injunction, the harm to Plaintiffs would be irreparable as Defendants would be allowed to unfairly compete with Plaintiffs.

### *III. Conclusion*

*8 For the reasons discussed above, Plaintiffs' motion for a preliminary injunction is granted. Accordingly, Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them are hereby enjoined and restrained from:

(1) discussing or disclosing any details concerning Lynn Riley's employment with the Plaintiffs, including, but not limited to, the identity of Plaintiffs' suppliers, the cost structure of Plaintiffs' goods, the specifications of Plaintiffs' goods, and the prices for Plaintiffs' goods;[FN10]

FN10. At oral argument, Defendants conceded to this provision. (Tr. at 15-16.)

(2) misappropriating or using any of Plaintiffs' trade secrets as set forth above,[FN11] and to prevent potential misappropriation, soliciting business regarding any accounts held by Plaintiffs with L'Oreal and/or Proctor & Gamble involving gloves, inserts, or other hair color accessories;

FN11. At oral argument, Defendants conceded to this provision without conceding what Plaintiffs' trade secrets were. (Tr. at 16-17.) As discussed at oral argument, subject to the remainder of the preliminary injunction, Defendants may contact Plaintiffs' customers by using the channels that someone without knowledge of Plaintiffs' contacts would use. Defendants must document what they do and who they contact. If Defendants, through this process, end up speaking to one or more of Plaintiffs' contacts, Defendants will not violate this Order. (Tr. at 20-21.)

(3) misrepresenting that Defendants have access to and can use Shengda and Poseidon, two of Plaintiffs' suppliers located in China, for production of goods or Plaintiffs' manufacturing processes and, if Defendants have access to either supplier, misrepresenting for what purpose Defendants have access to and can use Shengda and Poseidon;[FN12] and

FN12. At oral argument, Defendants conceded to this provision. (Tr. at 17.)

(4) destroying, altering, or removing any of Plaintiffs' books and records, including, but not limited to, invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, and tax returns, including all records stored on computer disks or tapes or within computer terminals, hard drives, servers, or other computer storage devices, which contain any information whatsoever concerning the business or finances of any of Plaintiffs' or otherwise reflect transactions of any kind involving the sale of Plaintiffs' goods or goods colorably similar to Plaintiffs' goods.[FN13]

FN13. At oral argument, Defendants conceded to this provision. (Tr. at 17.)

Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them are further ordered to return to Plaintiffs any items given by Plaintiffs to Lynn Riley during her employment by Plaintiffs and any items within Defendants' possession, custody, or control regarding, concerning, referring to, or discussion Lynn Riley's employment by Plaintiffs, including but not limited to, any prototypes, compact disks, computers, emails (printed or in digital form), business cards, correspondence, files, contact information, memoranda, reports, invoices, and product samples within five (5) days of this order by sending such materials via Federal Express to Matthew C. Wagner, 80 South Highland Avenue, Ossining, N.Y. 10562.[FN14]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN14. At oral argument, Defendants conceded to this provision. (Tr. at 17.)

Additionally, Plaintiffs are granted expedited discovery. Thus, discovery may commence upon execution of this Order. Notice to any Defendant of her/its deposition on four (4) business days notice shall be deemed reasonable notice and responses to any duly served interrogatories or document requests under Rule 33 or 34 shall be made within fifteen (15) business days, rather than the thirty (30) days set forth under each Rule.

*9 Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs shall file a bond with the Clerk of the Court in the amount of one hundred thousand dollars ($100,000.00) that will be given to Defendants should it be determined that Plaintiffs are not entitled to the relief set forth in this Order.

IT IS SO ORDERED.

S.D.N.Y.,2006.
B.U.S.A. Corp. v. Ecogloves, Inc.
Slip Copy, 2006 WL 3302841 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT C

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**



Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**
Page 1

Doubleclick, Inc. v. Henderson
N.Y.Co.Ct.,1997
Only the Westlaw citation is currently available.

NOT APPROVED BY REPORTER OF DECISIONS FOR REPORTING IN STATE REPORTS. NOT REPORTED IN N.Y.S.2d.

Supreme Court, New York County, New York.
DOUBLECLICK, INC.,
v.
David HENDERSON, Jr., Jeffrey A. Dickey, and Alliance Interactive Networks, Defendants.
**No. 116914/97.**

Nov. 7, 1997.

Orrick, Herrington & Sutcliffe, LLP (Michael Carlinsky, Anthony Carabba, Jr., René Kathawala, of counsel), New York City, for plaintiff.
Pollack & Greene LLP (Kennard M. Goodman, Michael E. Green, of counsel), New York City, for defendant.
DeGRASSE, J.:
*1 In this action alleging, *inter alia*, misappropriation of trade secrets, unfair competition, and breach of employees' duty of loyalty, plaintiff DoubleClick, Inc. ("DoubleClick") moves for a preliminary injunction to bar its former employees, defendants David Henderson, Jr. ("Henderson") and Jeffrey A. Dickey ("Dickey") from engaging in business activities in competition with DoubleClick.

FACTS

A. *The Parties*

DoubleClick is engaged in the relatively new and fast-growing business of selling advertising on the Internet. Headquartered in New York City, DoubleClick was formed in 1996 from the merger of two entities engaged in Internet advertising, a division, known as DoubleClick, of the advertising agency Bozell, Jacobs, Kenyon & Eckhardt, Inc. ("Bozell"), and a company known as the Internet Advertising Network.

DoubleClick has two sets of clients: web sits and advertisers. It has entered into agreements with a network of approximately 75 popular web sites to sell advertising space on the sites. DoubleClick and the web sites split the advertising revenue generated by DoubleClick's efforts.

Advertisers also pay DoubleClick for access to its network of web sites. By negotiating a single contract with DoubleClick an advertiser can have its ad shown on all of the web sites in the DoubleClick network without having to enter into negotiations with each web site. Advertisers may also choose to focus their advertisements on certain web sites in the DoubleClick network.

Advertisements at web sites frequently appear as "banners" which a viewer may "click on" to learn about a product. A banner is a link to a web site maintained by the company selling the product. For example, when an individual visits a web site devoted to fly fishing, perhaps to seek out information on local fishing conditions, she would likely pass through pages in the web site that included banners for companies making rods, reels, and other paraphernalia associated with the sport, as well as banners for non-fishing products, such as sport utility vehicles, aimed at a larger group of which fly fishers are a subset. If this person so chose, she could then click on the banner for a given company to learn more about its products.

Among the services that DoubleClick has developed are a proprietary advertisement delivery system that distributes advertisements to web sites in its network in a matter of milliseconds, a system that causes certain ads to appear when a user uses certain search terms, and a number of technologies

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Page 2

designed to gauge the effectiveness of the advertisements. DoubleClick also claims a competitive advantage by virtue of the quality of its network, which it claims includes a number of the most-visited web sites.

DoubleClick claims to have generated significant proprietary information concerning its sales and marketing strategies, financial projections and results, requirements of its advertisers, and the success of its clients' ads. It also generated a business plan in 1996 that sets forth its long-term goals and strategies ("DoubleClick 1996 Business Plan"). This document was shown to venture capital firms. DoubleClick contends that these various categories of information are all trade secrets.

*2 There is evidence in the record that the Internet advertising business is an extremely competitive one, with a variety of companies using different software and sales techniques to maximize the effectiveness of its clients' advertising.

Defendant Dickey was hired in October 1995 by Poppe, Tyson, a subsidiary of Bozell, to work for the original DoubleClick. As Vice President of Business Development Dickey worked on a variety of matters for DoubleClick out of its California offices. Dickey was sufficiently senior that he had access to most of the information that DoubleClick claims herein is confidential, including its 1996 Business Plan, its revenue projections, plans for future projects, pricing and product strategies, and its various databases with information concerning DoubleClick's clients. When he was hired Dickey entered into an agreement with Bozell to maintain the confidentiality of information provided by its clients, and a covenant not to compete for Bozell's clients for one year after leaving Bozell. The parties dispute whether either agreement is applicable to the events described in the complaint.

Defendant Henderson came to DoubleClick in March 1996, partly on Dickey's recommendation, as Vice President of North American Advertising Sales. Based in DoubleClick's headquarters in New York City, he was responsible for hiring, training and managing DoubleClick's sales force. Henderson was a member of DoubleClick's management team and the company's highest paid employee. Henderson had access to all the allegedly confidential company information that Dickey was privy to, and in addition was given highly confidential documents when he attended DoubleClick's management and Board of Directors meetings. These documents were distributed to DoubleClick's top managers at the beginning of the meetings and then collected at the end. They concerned, *inter alia*, summaries of operations, revenue and expense analyses, analytical summaries of financial indicators, and other highly confidential information. Like Dickey, Henderson entered into a confidentiality agreement with Bozell upon his employment. Henderson did not enter into a covenant not to compete.

B. *Henderson's and Dickey's Plans to Leave DoubleClick and Start Their Own Internet Advertising Business*

Henderson alleges in his affidavit that he gradually became dissatisfied with the way that DoubleClick was run, and that his dissatisfaction came to a head when he was offered a job in early 1997 by America Online ("AOL"), an on-line service. Henderson took AOL's offer of employment to DoubleClick's CEO, Kevin O'Connor, who made a counter-offer which Henderson accepted. Henderson alleges that DoubleClick failed to comply with the terms of their agreement. By the "early summer" of 1997, Henderson "came to the conclusion that DoubleClick was not going to provide me with the long-term career opportunities I had expected when I joined the company the previous year." (Affidavit of David Henderson ["Henderson Aff."], sworn to October 3, 1997, ¶ 42.)

*3 In July 1997 Henderson and Dickey both attended an industry-wide trade conference in Colorado. At the conference they discussed their dissatisfaction with DoubleClick's direction and resolved to start their own company, Alliance Interactive Net-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
(Cite as: Not Reported in N.Y.S.2d)
Page 3

work ("Alliance"). Upon their return to their respective offices, Dickey and Henderson began to take steps to make their company a reality, including drafting a business plan, seeking out investors and customers, and entering into discussions with at least one other DoubleClick employee.

According to his affidavit, Kevin Ryan, DoubleClick's President, received a tip on September 2, 1997 that Henderson and Dickey were planning on leaving DoubleClick to start their own Internet advertising company. Ryan and O'Connor went to Henderson's office the next day and confronted him with this allegation, which Henderson did not deny. Ryan and O'Connor fired Henderson on the spot and instructed him to remove his personal property from the office.

Ryan confiscated Henderson's laptop computer. Information retrieved from this laptop's hard drive, including saved e-mail messages, a draft of Alliance's business plan, and other strategic documents, provides much of the evidence offered in support of plaintiff's motion.[FN1]

FN1. DoubleClick personnel also confiscated Dickey's laptop. Plaintiff contends that it was unable to access any files from this computer because Dickey "booby-trapped" it to delete files if someone tried to access the files without the proper password. Dickey contends that the laptop was simply a "lemon" that had crashed several times before, and that DoubleClick personnel could have easily forestalled the erasure of files caused by the machine's malfunction.

DISCUSSION

In order to demonstrate that it is entitled to a preliminary injunction DoubleClick must show a probability of success on the merits, danger of irreparable injury in the absence of a preliminary injunction and a balance of the equities in its favor. (*Aetna Ins. Co. v. Capasso,* 75 N.Y.2d 860; CPLR .) The Legislature added a new subdivision (c) to CPLR 6312 effective January 1, 1997, to make clear that the existence of an issue of fact on a motion for a preliminary injunction is not, standing alone, a sufficient basis for denying a preliminary injunction. This amendment was designed to overcome the language of several judicial opinions that held that a preliminary injunction must be denied whenever the party opposing the motion demonstrates that the facts are in "sharp dispute." (*Cf. BR Ambulance Service, Inc. v. Nationwide Nassau Ambulance,* 150 A.D.2d 745.)

A. *Likelihood of Success on the Merits*

DoubleClick has asserted numerous claims against the defendants. In arguing that it is likely to succeed on the merits DoubleClick leads with its claims that defendants misappropriated trade secrets, engaged in unfair competition, and breached their duty of loyalty. As discussed below, DoubleClick has demonstrated that it is likely to succeed on these three claims, and it is therefore unnecessary to consider plaintiff's remaining claims.

1. Misappropriation of Trade Secrets

The elements of a cause of action for misappropriation of trade secrets are that 1) plaintiff possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. (*See Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173.)

*4 The parties agree that the courts of this state have adopted the definition of trade secret set forth in the Restatement of Torts: "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." (Restatement of Torts, § 757, comment b; *see Ashland Management v. Janien,* 82 N.Y.2d 395, 407.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Page 4

The Restatement lists several factors to be considered in evaluating a claim of trade secrecy:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

(Restatement of Torts § 757, comment b.)

As top executives at DoubleClick, Dickey and particularly Henderson had access to highly sensitive information regarding the company, including its revenue projections, plans for future projects, pricing and product strategies, and databases containing information collected by DoubleClick concerning its clients. defendants do not seriously dispute that they had access to this array of information, nor that the information could be of great use to any competitor of DoubleClick.

Defendants argue instead that the information that DoubleClick seeks to protect is not kept confidential by DoubleClick and is actually published on DoubleClick's own web site. Therefore, defendants argue, the information cannot qualify as a trade secret. This assertion is not borne out by the record. The web site describes DoubleClick's business in generalities; it does not contain the proprietary information generated by DoubleClick specified in plaintiff's papers as trade secrets.

For example, information concerning the quantity and quality of visits to advertisements posted on the various web sites that make up DoubleClick's network is not provided by DoubleClick's own web sites. Nor is information concerning DoubleClick's actual financial arrangements with its clients provided. Defendants make much of the fact that DoubleClick's "rate card", i.e. prices charged to advertisers, is posted on the web site. However, DoubleClick states that pricing in the Internet advertising business is "deal driven" and tailored to the needs of individual clients. Defendants' own business plan for Alliance supports this assertion. (Affidavit of Wenda Harris Millard, sworn to October 14, 1997 at ¶¶ 27-30, Exh. A.)

There is substantial evidence in the record that defendants misappropriated DoubleClick's trade secret information in derogation of their duties as DoubleClick employees.[FN2]

FN2. As employees of DoubleClick defendants owed their employer a duty not to divulge confidential information, therefore it is not necessary to determine the viability of the confidentiality agreements and Dickey's covenant not to compete. "Even in the absence of a contract restriction, a former employee is not entitled to solicit customers by fraudulent means, the use of trade secrets, or confidential information." (*Support Systems Assocs., Inc. v. Tavolacci,* 135 A.D.2d 704, 706.)

If any event these agreements do not on their face unambiguously apply to the events at issue herein. The agreements were with DoubleClick's former corporate home, Bozell, and Bozell's subsidiaries. It is not clear that the parties intended DoubleClick to succeed in Bozell's interest once it became independent of Bozell. Indeed, DoubleClick admits that it had circulated new confidentiality agreements to its employees once it became independent of Bozell. Dickey and Henderson had not signed their new confidentiality agreements when they were fired. (Affidavit of Kevin Ryan, sworn to September 18, 1997, 26.) Additionally, the confidentiality agreements protect only information designated as confidential by Bozell's clients, not information generated by Bozell.

*5 Dickey and Henderson were privy to the actual rates charged DoubleClick's clients. A document copied from Henderson's computer, titled "Stakeholder Positioning Analysis," gives rise to a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Page 5

strong inference that Dickey and Henderson were prepared to use this confidential information to compete directly for DoubleClick's web site clients. This document refers to DoubleClick's "margin" also known as "site share", which is the percentage shares that DoubleClick and a client web site split from advertising revenues. The Stakeholder Positioning Analysis indicates that defendants intended to advise Alta Vista, DoubleClick's largest client, that DoubleClick's percentage share of advertising revenues generated at the Alta Vista web site is too high. (*See* Affidavit of Kevin O'Connor, sworn to September 18, 1997 ("O'Connor Aff.") Exhibit 9.

In his affidavit, Henderson states that the Stakeholder Positioning Analysis was merely a strategic exercise, and that he and Dickey had decided not to pursue such an aggressive strategy in wooing DoubleClick's clients. However, Henderson states only "that I agreed to take the high road by not making disparaging remarks about DoubleClick." (Henderson Aff. ¶ 54.) Tellingly, he does not state in his affidavit that he will not use DoubleClick's margin information. At the least, the Stakeholder Positioning Analysis demonstrates that defendants have sensitive proprietary information regarding DoubleClick's pricing, and have at least contemplated using such information to compete against their former employer.

Additionally, the draft Alliance business plan found on Henderson's computer discloses the number of visits to various web sites in the DoubleClick Network and the current sales for each site. Plaintiff claims that this information is confidential, and defendants have brought fourth no evidence to refute this claim. Defendants do not assert that this information is published on DoubleClick's web site or made public in any way. It is undisputed that the draft Alliance business plan was e-mailed to a person whom plaintiff characterizes, without contradiction from defendants, as "an industry consultant with ties to DoubleClick's competitors." (O'Connor Aff. ¶ 18.)

DoubleClick's confidential information about its pricing and customers constitutes trade secrets. Based on evidence of actual misappropriation of this information, DoubleClick has adequately demonstrated likelihood of success on the merits on its misappropriation of trade secrets claim. (*E.g. Support Systems Assocs., Inc. v. Tavolacci,* 135 A.D.2d 704, 706; *Advanced Magnification Systems of Oneonta, N.Y. Ltd. v. Minuteman Optical Corp.,* 135 A.D.2d 889; *Webcraft Technologies, Inc. v. McCaw,* 674 F Supp 1039.) [FN3]

FN3. DoubleClick offers an e-mail message off of Henderson's computer in which Henderson states that he "cut and pasted" DoubleClick's 1996 Business Plan to create Alliance's draft business plan. (O'Connor Aff., Exh. 1.) The parties spend a good deal of time arguing whether DoubleClick's 1996 Business Plan should be considered a trade secret. The extent to which the DoubleClick Plan was distributed to its employees and potential investors, and hence whether the document was kept sufficiently confidential by DoubleClick to qualify as a trade secret, cannot be resolved on the record before the court. Moreover, even if the DoubleClick Plan *does* qualify as a trade secret the record is unclear as to whether the plan was actually misappropriated by defendants. Henderson states that he only used the "format" of the DoubleClick plan, implying that he did not crib its substance. (Henderson Aff. ¶ 55.)

This finding is bolstered by the fact that there is a high probability of "inevitable disclosure" of trade secrets in this case. Injunctive relief may issue where a former employee's new job function will inevitably lead her to rely on trade secrets belonging to a former employer. In *Lumex Inc. v. Highsmith* (919 F Supp 624 [EDNY 1996] ) the court granted an injunction preventing a management representative from working with a competitor of plaintiff. The court held that the former employee

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Page 6

would likely disclose plaintiff's trade secrets "to aid his new employer and his own future.... [Defendant] was privy to the top secret Cybex product, business and financial information. He cannot eradicate these secrets from his mind." (*Id.* at 631; *PepsiCo Inc. v. Redmond,* 54 F.3d 1262, 1269.)

*6 In the instant case it appears to the court that the defendants will inevitably use DoubleClick's trade secrets. Like the executive in *Lumex,* the centrality of Henderson and Dickey in DoubleClick's operations makes it unlikely that they could "eradicate [DoubleClick's] secrets from [their] mind." (*Lumex supra,* 919 F Supp at 631.) Moreover, the actual use of DoubleClick's trade secrets described above, and other actions discussed below, demonstrate defendants' cavalier attitude toward their duties to their former employer. This gives rise to a reasonable inference that they would use DoubleClick's confidential information against it.

For the above-stated reasons, DoubleClick has demonstrated that it is likely to succeed on its misappropriation of trade secrets claim.

1. Duty of Loyalty

It is well-established in the law of this state that an employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." (*Lamdin v. Broadway Surface Adv. Corp.,* 272 N.Y. 133.) While an employee may secretly incorporate a competitive business prior to his departure, he must not "use his principal's time, facilities or proprietary secrets to build the competing business." (*Maritime Fish Products Inc. v. World Wide Fish Products, Inc.,* 100 A.D.2d 81, 88,*appeal dismissed*63 N.Y.2d 675; *see 7th Sense, Inc. v. Liu,* 220 A.D.2d 215.)

While Henderson tries to minimize his use of DoubleClick's facilities and time by stating that he did much of his work for Alliance while on vacation in August, it is clear that he used the company computer and e-mail service to build Alliance. While the parties dispute which portions of the DoubleClick 1996 Business Plan were used in drafting Alliance's business plan, defendants do not deny that they used this DoubleClick document, even if it was only for formatting purposes, to further their own plans to launch Alliance. There is also evidence that defendants used DoubleClick's spread sheets to draft projected spreadsheets for Alliance. Additionally, Henderson does not deny that he engaged in some Alliance-related activities during company time.

Henderson admits that he and Dickey met with a potential client on behalf of DoubleClick and after making a presentation on behalf of DoubleClick then made a presentation regarding Alliance. (Henderson Aff. ¶ 58.) The solicitation of an employee's planned competitive business constitutes a breach of the duty of loyalty. (*E.g. Maritime Fish,* 100 A.D.2d at 89-90.)

Additionally, plaintiff has offered e-mail dated September 2, 1997, from Henderson's computer that demonstrates that Henderson solicited financing for Alliance from Match Logic, one of DoubleClick's competitors, in exchange for 2000 hours of "consulting time" from Alliance. While the precise content of this proposed "consulting" is not clear from the record, it is problematic that Henderson and Dickey would begin advising a DoubleClick competitor so soon after leaving DoubleClick given defendants' access to, and use of, DoubleClick's trade secrets. The e-mail indicates that Match Logic was sufficiently worried about defendants' activities to require that they indemnify Match Logic as part of the deal. (O'Connor Aff. Exh. 5.)

*7 These facts demonstrate that plaintiff is likely to succeed on the merits of its claim sounding in breach of the duty of loyalty.

3. Unfair Competition

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
(Cite as: Not Reported in N.Y.S.2d)

Page 7

A claim of unfair competition will lie where a former employee misappropriates and exploits confidential information belonging to her former employer in abuse of her relationship of trust. (*E.g. Comprehensive Community Development Corp. v. Lehach,* 223 A.D.2d 399; *Advanced Magnification Instruments, supra,* 135 A.D.2d 889.) The facts recited above that tend to show that Dickey and Henderson engaged in misappropriation of trade secrets and breached their duty of loyalty to DoubleClick also show that plaintiff is likely to succeed on the merits of this claim as well.

B. *Irreparable Harm*

Irreparable harm is presumed, where, as here, trade secrets have been misappropriated. (*Lumex, supra,* 919 F Supp at 628.) Defendants have offered nothing to rebut this presumption.

Even absent the presumption, plaintiff has demonstrated that they have no compunction against using DoubleClick's business information to compete against it. The damage that could be inflicted upon DoubleClick by defendants' exploitation of their intimate knowledge of DoubleClick's proprietary information is impossible to quantify in dollar terms. Accordingly, an injunction is the appropriate remedy.

C. *Balance of Equities*

Plaintiff had demonstrated that the balance of equities tips in its favor. DoubleClick operates in a competitive and fast-changing business environment where the use of its proprietary information could cause it real harm. Defendants have not demonstrated that DoubleClick has acted tortiously against them or is otherwise without "clean hands."

By contrast, equity does not favor the employee who seeks to breach his fiduciary duties to his former employer. (*See Kaufman v. International Business Machines Corp.,* 97 A.D.2d 925, 926,*aff'd*61 N.Y.2d 930.) Here, there is substantial evidence that defendants 1) used DoubleClick's proprietary information to prepare for the launch of Alliance and to position it to compete with DoubleClick, 2) worked on their plans for their new company during working hours at DoubleClick and used resources given to them by DoubleClick to do so, and 3) sought customers and financing for Alliance without regard to their duties to their current employer. Plaintiff has been able to marshall these facts without the benefit of discovery.

Dickey and Henderson are correct that the broad preliminary injunction sought in the complaint would effectively bar them from working in any capacity selling or placing advertising on the Internet, or from even working for a company that engaged in a marginal way in the Internet advertising business. However, apart from references to the fact that Dickey and Henderson are apparently the only bread winners in single-income families, defendants have done nothing to demonstrate what financial hardship they would suffer if the injunction were imposed.

*8 In any event, the injunction set forth below is more narrowly drawn than the preliminary injunction sought in the complaint.

REMEDY

The parties spend little time in their papers discussing the tailoring of a preliminary injunction. In its reply papers plaintiff scales back its proposed injunction to one "enjoining defendants for a period of at least twelve months from launching a competitive business or from working for a direct competitor of DoubleClick." (Plaintiff's Reply Memorandum of Law at 2.) This language is not sufficiently tailored. Both defendants have previously worked for companies placing advertisements in other media. Plaintiff's proposed injunction would prevent Dickey and Henderson for working for such a company if it engaged in Internet advertising even as a marginal part of its business. There can be no objection to defendants working for compan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Page 8

ies that engage in advertising in an array of media, including the Internet, so long as they do not get involved in the company's Internet advertising projects.

Moreover, the one-year period sought by plaintiff is too long. Given the speed with which the Internet advertising industry apparently changes, defendants' knowledge of DoubleClick's operation will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before the year is up. Accordingly, the preliminary injunction issued below shall expire after six months from the date of this opinion. Plaintiff may for good cause move to extend the life of the preliminary injunction.

It is hereby ORDERED that:

Defendants are enjoined, for a period of six months from the date of this opinion, from launching any company, or taking employment with any company, which competes with DoubleClick, where defendants' job description(s) or functions at said company or companies include providing any advice or information concerning any aspect of advertising on the Internet. A company shall be presumed to compete with DoubleClick if it provides advertising software, advertising services, or a mix of advertising software and advertising services, to any entity seeking to advertise on the Internet, or to any web site seeking advertisers.

Nothing herein shall be construed to prevent defendants from working for any employer that competes with DoubleClick, so long as defendants' job description(s) or functions with such employer do not include providing advice or information concerning any aspect of advertising on the Internet.

Defendants are also enjoined, for a period of six months from the date of this opinion, from providing any advice or information concerning any aspect of advertising on the Internet to any third parties who 1) work for defendants' employer(s), or 2) provide or promise to provide any of the defendants with valuable consideration for the advice or information, or 3) share or promise to share any financial interest with any of the defendants.

The parties shall agree to an expedited discovery schedule that shall provide for, *inter alia,* the completion of depositions of Henderson and Dickey, and of two representatives of plaintiff chosen by defendants, within 60 days of the date of this opinion. Other depositions and discovery shall be completed within 5 months of the date of this opinion.

*9 The foregoing constitutes the decision and order of the court.

N.Y.Co.Ct.,1997
DoubleClick Inc. v. Henderson
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT D

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**



Not Reported in F.Supp.2d
Page 1
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Wenner Media LLC v. Northern & Shell North America Ltd.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
WENNER MEDIA LLC, Plaintiff,
v.
NORTHERN & SHELL NORTH AMERICA LIMITED, Northern & Shell PLC, Northern & Shell Media, and Nicola McCarthy Evans, Defendants.
**No. 05 Civ. 1286(CSH).**

Feb. 8, 2005.

Andrew Hayes, Boies, Schiller & Flexner, LLP, Armonk, NY, Jonathan Zachary King, Ronald William Meister, Cowan, Liebowitz & Latman, P.C., New York, NY for Nicola McCarthy Evans, Northern & Shell Media, Northern & Shell North America Limited, and Northern & Shell PLC.
Brian S. Kaplan and Daniel Turninsky, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, for Wenner Media LLC.

*MEMORANDUM OPINION*

HAIGHT, Senior J.
*1 This action was removed by defendants from New York State Supreme Court to this Court on the basis of diversity of citizenship, which is sufficiently alleged in the pleadings and confirmed by the representations of counsel for the parties during the hearing described *infra.*

I. PROCEDURAL HISTORY

Plaintiff Wenner Media LLC ("Wenner"), which publishes a magazine, seeks a preliminary injunction which principally would enjoin its former employee, the individual defendant Nicola McCarthy Evans (referred to as "McCarthy" in the pleadings and herein), from accepting employment with the corporate defendant Northern & Shell North America Limited ("N & S America"), which intends to publish a competing magazine, during the balance of McCarthy's two-year employment contract as executive editor of Wenner's magazine.

Wenner moved for a temporary restraining order ("TRO") pursuant to Fed.R.Civ.P., Rule 65(b). Counsel for Wenner and counsel for the defendants FN1 had been in contact with each other and exchanged correspondence before Wenner made that motion. Wenner's counsel gave counsel for defendants notice of their intention to apply for a TRO.

FN1. The same law firm represents the three corporate defendants and the individual defendant.

Counsel for the parties appeared before this Court for a hearing on February 3, 2005. They produced affidavits of witnesses with knowledge of the events and documentary exhibits, from which counsel for Wenner argued that a TRO should issue and counsel for defendants argued that it should not.

Having heard the submissions of counsel and examined the relevant documents, the Court granted Wenner's motion and signed a TRO which directed defendant McCarthy "to comply with paragraphs 6 and 7 of the written employment agreement she entered into with Wenner Media, dated April 1, 2004"; enjoined her from "working for a competing magazine in the United States" until April 25, 2006; FN2 enjoined the corporate defendants (collectively "Northern Shell") from employing McCarthy "at a competing publication" until that date; enjoined the defendants from "directly or indirectly soliciting any employees" of Wenner to leave Wenner until that date; enjoined defendants from using or disclosing Wenner's "confidential, proprietary and trade secret information"; and directed defendants "to immediately return" any Wenner property.

FN2. That is the end date of McCarthy's two-year employment contract with Wen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

ner.

This opinion sets forth the Court's preliminary findings of fact and its conclusions of law which constitute the grounds of these actions.

II. FINDINGS OF FACT

On the basis of the affidavits, exhibits, and oral submissions of counsel at the February 3, 2005 hearing, the Court makes the following preliminary findings of fact.[FN3]

FN3. These findings are characterized as "preliminary" because a more complete record will be developed at the evidentiary hearing on plaintiff's motion for a preliminary injunction. They are set forth in this opinion to satisfy Rule 52(a), Fed.R.Civ.P., which provides in pertinent part that "in granting or refusing interlocutory injunctions the court ... shall set forth the findings of fact and conclusions of law which constitute the grounds of its action."Arguably the phrase "interlocutory injunctions" includes both preliminary injunctions and temporary restraining orders. It should further be noted that since Wenner's motion was on notice to defendants and a hearing was held before the Court signed the February 3 order, under the law of this circuit the Court's February 3, 2005 order may be regarded for Rule 65 purposes not as a TRO but instead as a preliminary injunction "for the abbreviated interval" between the date of the order "and the date of a hearing on a preliminary injunction,"*Ir Re: Criminal Contempt Proceedings Against Crawford and Warren,* 329 F.3d 131, 137 n. 5 (2d Cir.2003).

Wenner publishes in the United States a magazine called *Us Weekly. Us Weekly* is the sort of magazine known to the publishing trade as a "celebrity magazine." As the phrase would suggest, a celebrity magazine is devoted to articles and photographs about individuals who have attained the status of a celebrity, most often in the worlds of film, television, and other performing arts. A recent example may be found in the coverage of the movie celebrities Brad Pitt and Jennifer Aniston.

*2 By written contract dated as of March 26, 2004, Ex. A to Affidavit of Pamela Fox ("Fox Affidavit"), Wenner and McCarthy agreed that Wenner would employ McCarthy as the executive editor of the magazine *Us Weekly* for a two-year term beginning on April 25, 2004 and expiring on April 25, 2006. Para. 3. The contract referred to McCarthy as "the Employee." Para. 6 provides that

in the event that the Employee resigns or otherwise terminates her own employment other than for Good Reason prior to the expiration of the [two-year] Term, for an additional period equal to (i) the remainder of the Term or (ii) one (1) year, whichever is later, the Employee shall not, anywhere in the United States, directly or indirectly, provide any services to, own, manage or participate in, any business, entity or individual that publishes or distributes any competing publication of the [*Us Weekly* ] Magazine. For purposes hereof, a "competing publication" shall be defined as any publication (whether in print, electronic or online format) whose primary purpose is covering celebrities.

Para 7(a) contains broad definitions of "Confidential Information," "Trade Secrets," and "Company Documents." Para. 7(b) provides that "[at] all times, both during employment by the Company [Wenner] and after its termination, the Employee agrees to keep in confidence and trust all information referenced" in para. 7(a), and "shall not use or disclose any such information to any party without the written consent of the Company," except as may be necessary in performing the Company's business. These quoted provisions in para. 7 of the employment contract reflect the fact that McCarthy's position as executive editor was, as the job title would suggest, from Wenner's point of view

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

one of trust and confidence.

On January 26, 2005, well before the end of the first year of her two-year term of employment by Wenner, McCarthy sent an e-mail to the staff of *Us Weekly* magazine. The first paragraph read:
You will know by now (especially the pod!) that I have today resigned my position as Executive Editor of Us Weekly. I have been appointed Ed-in-Chief of the U.S. version of OK! Magazine, which will launch late this year.

Ex. C to Fox Affidavit. McCarthy concluded her e-mail with expressions of gratitude and affection, which one may safely infer her former colleagues at *Us Weekly* did not reciprocate.

*OK!* magazine, to which McCarthy's e-mail referred, will be published in the United States by defendant N & S America. While at the hearing counsel for defendants initially contested the issue, it is readily apparent that *OK!* magazine will be a "competing publication" to *Us Weekly,* as that phrase is defined in para. 6. That is because the record shows that *OK!'* s "primary focus" will be "covering celebrities," para. 6's definition of a "competing publication." That finding is based in part upon an exchange of e-mails in December 2004 between McCarthy and Paul Ashford, an officer of the corporate defendants, resident in London.[FN4] David S. Ha, the information technology manager at Wenner, had succeeded in retrieving these e-mails from the Wenner system despite McCarthy's apparent efforts to delete them before leaving the Wenner offices. An e-mail sent on December 21, 2004 by Ashford to McCarthy attached a draft employment contract between N & S America and McCarthy, pursuant to which McCarthy would serve "as the Editor of OK! Magazine in the United States of America."An appendix to the contract describing the "services of the executive" (McCarthy) concluded by stating:

FN4. Defendants' counsel stated in the notice of removal of the action from the state court that all three corporate defendants are organized under the laws of the United Kingdom.

*3 The parties acknowledge that they are working together to develop the North American edition of OK! Magazine into the best selling *celebrity magazine* in North America.
Ex. A to affidavit of David S. Ha (emphasis added).FN5

FN5. The reader will recall that in text *supra,* I referred to stories about Brad Pitt and Jennifer Aniston as examples of what "celebrity magazines" publish. As it happens, the website for *OK* magazine's U.K. publisher, under the caption "OK! First for Celebrity News," summarizes the last six issues of the magazine. Two of them, the issues dated January 18, 2005 and February 1, 2005, headline stories about Pitt and Aniston. *See* www.ok-magazine.com, visited February 7, 2005.

The evidence submitted at the hearing on plaintiff's motion for a TRO compels the preliminary findings of fact, which I make, that (1) McCarthy breached her contract of employment with Wenner as executive editor of *Us Weekly* magazine by leaving the company before the agreed-upon two-year term; (2) she breached the agreement in para. 6 of the employment that prior to April 25, 2006 she would not accept employment with the publisher of a "competing publication"; and (3) during her employment with Wenner she became privy to and cognizant of the confidential information and material referred to in para. 7(a) of her contract with Wenner.

The evidence also supports the preliminary finding of fact, which I also make, that McCarthy acted in bad faith *vis-a-vis* Wenner when, while still working at Wenner's offices, she exchanged e-mails with Ashford looking toward an employment contract with N & S America as editor of a competing publication, and then attempted to delete those e-mails so that Wenner would never learn of them.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 4
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

III. CONCLUSIONS OF LAW

"To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor."*Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir.2004) (citation omitted)."The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical."*Spencer Trask Software and Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002).

To satisfy the threshold requirement of irreparable harm or injury, a movant need not demonstrate its certainty. *See, e.g., Reuters Ltd. v. United Press Int.l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) ("a showing of *probable* irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.") (citation and internal quotation marks omitted) (emphasis added)."Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages."*Reuters*, 903 F.2d at 907. The movant is required to establish not a mere *possibility* of irreparable harm, but that it is *"likely* to suffer irreparable harm if equitable relief is denied."*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990) (emphasis in original)."Likelihood sets, of course, a higher standard than 'possibility." ' *Id.*

Applying these familiar standards to the proof adduced at the hearing on plaintiff's motion for preliminary equitable relief, I conclude that plaintiff established its entitlement to the order the Court issued on February 3, 2005.

*4 As for irreparable harm, there is no question that during her employment at Wenner, McCarthy became privy to information and celebrity magazine publishing methodologies which were characterized as confidential trade secrets in para. 7 of the employment contract to which McCarthy agreed. When one views that fact together with the defendants' stated intention of hiring McCarthy to "launch" and edit a directly competing publication in the United States, I conclude that Wenner has made out a *prima facie* case of wrongful misappropriation and imminent exploitation of confidential information by McCarthy.[FN6] That circumstance is pertinent to an analysis of irreparable harm, since "[i]t is clear that irreparable harm is presumed where a trade secret has been misappropriated."*Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 628 (E.D.N.Y.1996). In *Lumex* the district court cited and quoted the Second Circuit's decision in *FMC Crp. v. Taiwan Tainan Giant Industrial Co., Ltd.*, 730 F.2d 61, 63 (2d Cir.1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages.... A trade secret once lost is, of course, lost forever.") (citations omitted).

FN6. A conscious awareness of wrongdoing on McCarthy's part may reasonably be inferred from her failed effort to delete from the Wenner communications systems her e-mailed exchanges with Paul Ashford about her employment by the Northern and Shell companies.

The presumption of irreparable harm is just in the circumstances of this case, at least as revealed by the present record, because, as the district court recognized in *Lumex*, when an individual in possession of a former employer's confidential information accepts employment with a competitor

there is a high risk that in the course of working on Life Circuit, or on other Life Fitness business, he will, perhaps inadvertently, disclose Cybex trade secrets, or Lumex pricing and profit structure or even the Cybex future prototypes. Highsmith [the employee] was privy to the top secret Cybex product, business and financial information. He cannot eradicate these trade secrets and this confidential information from his mind.

919 F.Supp. at 631. *See also Pepsico, Inc. v. Red-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)
Page 5

*mond,* 54 F.3d 1262, 1269 (7th Cir.1995) ("a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.") (citing Illinois cases). So I conclude that the plaintiff at bar has, on the present record, made a sufficient showing of likely irreparable harm if preliminary equitable relief was not granted.[FN7]

FN7. The case for Wenner is that the Northern & Shell companies deliberately inserted McCarthy as a Trojan horse within Wenner's commercial walls, with the purpose of installing her as editor of the competing American version of *OK* magazine after McCarthy had acquired confidential information about the publication and marketing of *Us Weekly.*If that were to be proved, then McCarthy's disclosures of Wenner's trade secrets and confidential information to N & S America could not be charitably characterized as "inadvertent" or unconsciously "inevitable." Rather, such disclosures would represent the culmination of a successful act of commercial piracy. However, I need not assess Wenner's prospects of proving that theory of the case in determining whether it is entitled to preliminary relief.

As for the merits, I am not prepared at present to conclude that plaintiff has satisfied the first prong: a showing of likelihood of success, at least in respect of its effort to enjoin McCarthy from accepting employment with N & S America. That is so, notwithstanding the observations I have just made with respect to irreparable harm. "It is well established that restrictive covenants contained in employment contracts that tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored in the law."*Lumex,* 919 F.Supp. at 628 (citing and quoting New York cases). However, certain circumstances may exist which overcome that disfavored status and justify enforcement of the covenant. At the February 3 hearing counsel for the parties debated at length whether or not such circumstances exist in the case at bar. A resolution of the issue must await a more complete evidentiary record and the briefs of counsel.

*5 But I do conclude without difficulty that by the end of the February 3 hearing, plaintiff had demonstrated sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in plaintiff's favor, thereby satisfying the second prong. On that last point, counsel for defendants expressed the view that the corporate defendants were likely to continue McCarthy on salary while the motion for a preliminary injunction goes forward, thereby avoiding any economic hardship to her. As for the corporate parties, plaintiff on the one hand and the three Northern & Shell companies on the other, on the present record the likelihood of hardship to plaintiff if McCarthy becomes employed by N & S America is of a greater degree of severity than any hardship discernible to the corporate defendants if McCarthy's employment by N & S America is delayed pending trial on the merits.

## IV. CONCLUSION

For the foregoing reasons, the Court signed its injunctive order on February 3, 2005.

Lest any party be unduly lifted up or cast down by this opinion, I reiterate that the findings in Part II which provide the factual predicate for this opinion and the Court's earlier order are preliminary in nature, and subject to change if an enlarged evidentiary hearing demonstrates that the justice of the cause requires that they be changed.

It is SO ORDERED.

S.D.N.Y.,2005.
Wenner Media LLC v. Northern & Shell North America Ltd.
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 323727 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT E

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Westlaw.
Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ADVANCED PORTFOLIO TECHNOLOGIES, INC., Plaintiff,
v.
ADVANCED PORTFOLIO TECHNOLOGIES LIMITED and Peter J. Ainsworth, Defendants.
**No. 94 CIV. 5620 (JFK).**

Dec. 28, 1994.

*MEMORANDUM OPINION AND ORDER*

KEENAN, District Judge:
***1** Plaintiff Advanced Portfolio Technologies, Inc. ("APT/NY") seeks leave to file a second amended complaint in this action and to conduct expedited discovery in advance of a motion for a preliminary injunction. Plaintiff also seeks leave to dismiss defendant Peter J. Ainsworth as a defendant without prejudice. Advanced Portfolio Technologies Limited ("APT/UK") opposes plaintiff's applications for leave to file a second amended complaint and for expedited discovery.

*BACKGROUND*

APT/NY and APT/UK entered into a license agreement in October 1990, whereby APT/UK became the exclusive licensee for the APT system in Europe (excluding France), South Africa, and the Mideast. The APT system is a computerized stock portfolio risk management system. APT/NY is suing APT/UK for APT/UK's alleged failure to pay royalties due to APT/NY under the license agreement.

*DISCUSSION*

As an initial matter, this Court grants the motion to dismiss Peter J. Ainsworth as a defendant without prejudice.

*I. The Proposed Second Amended Complaint*

The proposed second amended complaint does not seek to name any new defendants. Rather, it seeks to add additional causes of action for injunctive relief. The injunctive relief desired would seek to prevent APT/UK from transferring assets and to prevent APT/UK from "purloining" APT/NY's secret information for competitive uses.

APT/UK opposes the filing of the second amended complaint. APT/UK states that the Court should deny plaintiff leave to file the second amended complaint because the additional relief it seeks-the injunctions-would be futile because injunctive relief obtained in the United States is not enforceable in the United Kingdom.

A. *Standard for a Motion to Amend*

Fed.R.Civ.P. 15 governs the amendment of pleadings. Under Rule 15(a), leave to amend a pleading shall be freely granted when justice so requires, one purpose being to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities. *See Federal Practice and Procedure: Civil* § 1471. The Second Circuit, in construing Rule 15(a)'s test of "when justice so requires," has commented that reasons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and the resulting prejudice to the other side. *Richardson Greenshields Sec. Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (citing *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962))). The Second Circuit has more recently noted that neither delay, nor the necessity of further discovery, nor the expenditure of additional time

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

and resources in litigating the matters raised by the amendment, standing alone without a showing of bad faith or undue prejudice, will justify denial of leave to amend. *See Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)).

*2 Defendant claims that the amendments would be futile. Leave to amend should not be granted where the complaint as amended would not survive a motion to dismiss. *See Benfield v. Mocatta Metals Corp.,* No. 91 Civ. 8255 (LTF), 1992 WL 177154, at *1 (S.D.N.Y.); *Deem v. Lockheed Corp.* 749 F.Supp. 1230, 1235 (S.D.N.Y.1989). In deciding whether Plaintiff has a colorable ground for relief, an inquiry similar to a Fed.R.Civ.P. 12(b)(6) should be made. *See Ragin v. Harry MackLowe Real Estate Co.,* 126 F.R.D. 475, 478 (S.D.N.Y.1989); *see also Northwestern Nat'l Ins. Co. v. Alberts,* 717 F.Supp. 148, 153 (S.D.N.Y.1989). Accordingly, the Court must accept the allegations set forth in plaintiff's second amended complaint as true and construe them in the light most favorable to plaintiff. *See Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988); *Arbitron Co. v. Tropicana Prod. Sales, Inc.,* No. 91 Civ. 3697 (PKL), 1993 WL 138965, at *3 (S.D.N.Y.) (citing *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 113 S.Ct. 1387 (March 1, 1993)). Thus, the Court may only deny leave if it appears beyond doubt that plaintiff cannot prove any facts in support of its claim. Further, a trial court has discretion to grant a party leave to amend a complaint even where the amended pleading might ultimately be dismissed. *See Morse/Diesel, Inc.,* 715 F.Supp. at 581 (citing *S.S. Silberblatt Inc. v. East Harlem Pilot Block Bldg., 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42-43 (2d Cir.1979)).

B. *Analysis*

The Court grants APT/NY's application for leave to file a second amended complaint. Keeping in mind that leave to amend is freely granted, the Court finds that the question of ultimate enforceability of the injunctive relief does not preclude this Court from exercising its discretion to grant the application to amend. Defendant APT/UK does not specifically comment on the viability of the second amended complaint other than to argue that the injunctions, if issued, will not be enforceable in the United Kingdom. The Court notes that, in the license agreement, the parties explicitly submitted to this Court's jurisdiction. Accepting the facts alleged in the second amended complaint as true, the Court does not find that possible inability to enforce the injunctive relief is adequate reason to deny leave to amend.

*II. Expedited Discovery*

APT/NY additionally seeks expedited discovery in advance of a motion for a preliminary injunction. At a pre-trial conference on November 21, 1994, this Court gave APT/NY advance permission to make that motion in the event that the Court gave permission to file the second amended complaint. APT/NY claims it needs this expedited discovery for two reasons: 1) that APT/UK fraudulently converted the funds of APT/NY for its own use; and, 2) that APT/UK has used the confidential and proprietary information of APT/NY to develop a competing product.

*3 APT/NY seeks four expedited depositions. Specifically, plaintiffs seek to depose the following: APT/UK, by Peter J. Ainsworth; Timothy Wilding, an employee of either APT/UK or of Ainsworth's alleged new entity; Hans Erikson, an employee of DAIS Corp.[FN1]; and Robert Butman, CEO of DAIS Corp. APT/UK opposes this application.

A. *Standard for Expedited Discovery*

Expedited deposition discovery is made available by Rules 30(a) of the Federal Rules of Civil Procedure. Expedited discovery is often available in cases where preliminary relief is sought. *See e.g., United States Naval Inst. v. Charter Communica-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

*tions,* 875 F.2d 1044, 1046 (2d Cir.1989); *Tetra Sales (U.S.A.) v. T.F.H. Publication, Inc.*, 839 F.2d 881, 882 (2d Cir.1988); *Denny v. I.S. Lab., Inc.*, 737 F.Supp. 247, 248 (S.D.N.Y.1990). In order to be entitled to expedited discovery,

> ... the plaintiff must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y.1982).

B. *Analysis*

APT/NY has established that it is entitled to the expedited deposition discovery that it seeks. The two primary reasons APT/NY gives for needing expedited discovery to support a preliminary injunction are that APT/UK fraudulently converted the funds of APT/NY for its own use (apparently the basis for the deposition of APT/UK by Ainsworth and the deposition of Wilding) and that APT/UK has used the confidential and proprietary information of APT/NY to develop a competing product (apparently an additional basis for the depositions of Ainsworth and Wilding and also the basis for the depositions of Erikson and Butman).

As an initial matter, the Court does not find that APT/NY has established that APT/UK has purloined any assets or funds belonging to APT/NY. APT/NY states that APT/UK, through Ainsworth, authorized Ainsworth and his wife to each receive a salary of 30,000 pounds a month. APT/NY bases this contention on the previously suppressed recollection of a conversation that Jamie Ridyard, a former employee of APT/UK and current employee of APT/NY, allegedly overheard. This has been conclusively rebutted-Ainsworth and his wife were each receiving 30,000 pounds per year. APT/NY also makes a statement that "Ainsworth gave Ridyard the distinct impression that he [Ainsworth] had already taken royalty money out of APT/UK." The Court does not find that a "distinct impression" of an ex-employee whose recollection has already proved faulty at least once is adequate support for the expedited deposition discovery of Ainsworth and Wilding sought here. Therefore, APT/NY's contention that APT/UK through Ainsworth is fraudulently converting funds does not support the requested expedited discovery.

*4 On the other hand, APT/NY's contention that APT/UK has misused confidential or proprietary information does sufficiently support the requested expedited discovery. Ainsworth admits that he is pursuing the possibility of licensing DAIS Corp.'s "Worldtrack," a competitor of the APT system. APT/NY contends that DAIS Corp.'s system was developed using its confidential and proprietary information. While nothing in the license agreement prevents Ainsworth from competing with APT/NY, and licensing the product of a competitor does not prove a misuse of confidential or proprietary information belonging to APT/NY, APT/NY has produced evidence that the DAIS Corp. system is of very recent vintage and was developed remarkably rapidly for such a complex system. The Court finds that APT/NY has sufficiently supported its need for the expedited depositions of DAIS Corp. employees Erikson and Butman as well as those of Ainsworth and Wilding.

*CONCLUSION*

The application to file a second amended complaint is granted. The application to take four expedited depositions in advance of a motion for a preliminary injunction is granted.

SO ORDERED.

FN1. DAIS Corp. is a sublicensee of the APT system. DAIS Corp. has recently developed its own stock portfolio management system known as "Worldtrack" that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

> apparently will compete with the APT system. Ainsworth is now discussing doing business with DAIS Corp.

S.D.N.Y.,1994.
Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT F

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Ikon Office Solutions, Inc. v. Leichtnam
W.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
IKON OFFICE SOLUTIONS, INC., Plaintiff,
v.
Jeffrey LEICHTNAM and Doculegal, LLP, Defendants.
**No. 02-CV-0721E(SC).**

Jan. 3, 2003.

Former employer sued former employee and his new employer, alleging breach of noncompete agreement. Defendants moved to dismiss. The District Court, Elfvin, J., held that: (1) requirement of no contact with former clients for one year period was enforceable; (2) contract was enforceable, despite claim that former clients were readily identifiable through public sources; (3) claim of tortious interference with business relationships was stated; and (4) claim of trade secret misuse was stated.

Motion denied.

West Headnotes

**[1] Contracts 95 65.5**

95 Contracts
95I Requisites and Validity
95I(D) Consideration
95k65.5 k. Covenants Not to Compete. Most Cited Cases
(Formerly 95k65(2))
Employee under at-will employment relationship was subject to requirement that he refrain from contacting former customers for period of one year after termination, under New York law, despite no mention of any specific salary in noncompete agreement; continued employment was sufficient consideration for agreement.

**[2] Federal Civil Procedure 170A 1831**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1831 k. Fact Issues. Most Cited Cases
Under New York law, complaint against former employee, for violation of noncompete agreement barring contact with clients of employer for which he was responsible, made by company in document service business, presented fact issues that could not be decided on motion to dismiss.

**[3] Torts 379 241**

379 Torts
379III Tortious Interference
379III(B) Business or Contractual Relations
379III(B)2 Particular Cases
379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
(Formerly 379k10(3), 255k341 Master and Servant)
Employer engaged in document services business stated claim that former employee and new employer tortiously interfered with business relationships, under New York law, by alleging that they used wrongful means in soliciting employer's clients formerly serviced by former employer.

**[4] Antitrust and Trade Regulation 29T 420**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk420 k. Particular Cases, in General. Most Cited Cases
(Formerly 382k990 Trade Regulation, 379k10(5))
Employer engaged in document services business stated claim of trade secret misuse, under New York law, on part of former employee and new em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 251954 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

ployer, through allegations that secrets were used in soliciting employer's clients.

MEMORANDUM and ORDER [FN1]

FN1. This decision may be cited in whole or in any part.ELFVIN, J.

*1 Plaintiff Ikon filed this action October 9, 2002 against a former employee, Leichtnam, and his current employer, Doculegal, to enforce an employment agreement that purportedly prohibits Leichtnam from, *inter alia,* contacting Ikon customers. Ikon asserts claims for breach of contract, misappropriation of trade secrets, tortious interference with business relations, tortious interference with contractual relations,[FN2] and breach of duty of loyalty and fiduciary duty. On November 14, 2002 Ikon moved seeking (1) a preliminary injunction enjoining defendants from contacting Ikon customers and engaging in unfair competition and (2) leave to take immediate discovery [FN3] before the preliminary injunction hearing scheduled for January 31, 2003. Doculegal moved to dismiss the Complaint on November 15 and Leichtnam so moved on November 19. For the reasons discussed below, defendants' motions to dismiss will be denied and Ikon will be granted limited discovery as noted below. Leichtnam also cross-moved for denial of Ikon's motions for preliminary injunction and expedited discovery. Such will be denied without prejudice.[FN4]

FN2. The first page of the Complaint indicates that Ikon is asserting claims for tortious interference with contractual relations *and* tortious interference with contractual relations, although the subsequent counts only reference tortious interference with business relations. The Court assumes that Count IV is intended to encompass both claims.

FN3. This Court temporarily denied plaintiff's motion for expedited discovery in an oral ruling December 20, 2002. Inasmuch as defendants' motions to dismiss will be denied, this Court will grant Ikon limited discovery as detailed below.

FN4. The Court will deny without prejudice Leichtnam's motions seeking denial of Ikon's motions inasmuch as the appropriate vehicle to oppose Ikon's motions is an opposition or objection - as opposed to a formal motion. Accordingly, new opposition papers will be required from Leichtnam that solely address his opposition to the preliminary injunction - as opposed to his arguments advanced in support of his motion to dismiss the Complaint.

When ruling on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court must "accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor" - *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,*513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) - and cannot dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, this Court must not consider whether the claims will ultimately be successful, but merely "assess the legal feasibility of the complaint."*Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Moreover, when reviewing a motion to dismiss, this Court must of course limit its review to the face of the Complaint and documents incorporated therein that are properly subject to judicial notice. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996).

Ikon is engaged in the business of commercial copying and related document services; its customers include law firms, government agencies and private businesses. Ikon hired Leichtnam, who began working around May 22, 2000. Leichtnam

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 251954 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

was hired "out of college" and did not have prior experience in the document services industry. Ikon and Leichtnam entered an employment agreement dated May 23, 2000 (the "Employment Agreement") which provides, *inter alia,* that Leichtnam is prohibited - for a period of twelve months from the date of his termination - from contacting, causing to be contacted or communicating with "any specific accounts or customers for which [he] was responsible or with whom [he] had contact during" the twelve months before his termination. This no-contact or non-compete provision is limited to Erie County. The Employment Agreement also contained various confidentiality provisions concerning Ikon's proprietary information, which purportedly includes "customer lists or other information about [Ikon's] customers that has been obtained by or on behalf of [Ikon]." Leichtnam resigned from Ikon August 5, 2002 in order to accept employment with Doculegal, an Ikon competitor. On Doculegal's behalf, Leichtnam has allegedly contacted and/or obtained business from several Ikon customers whom Leichtnam serviced while at Ikon.

*2 [1] The defendants seek dismissal on several grounds, each of which the Court will discuss seriatim.[FN5] Defendants contend that the Employment Agreement is unenforceable on the ground that it is indefinite because it contains no compensation terms.[FN6] Defendants rely heavily on this Court's decision in *Buffalo Crushed Stone v. R.J. Corman R.R. Corp.,* 2001 WL 392075 (W.D.N.Y.2001).*Buffalo Crushed Stone,* however, is so far afield from the instant case that this Court declines even to address it here. Rather, this Court finds more persuasive case law holding that non-compete covenants and similar restrictive covenants are independently enforceable where an at-will employee receives continued employment as consideration.[FN7] Although Leichtnam was a party to the Employment Agreement, he nonetheless remained an at-will employee because he did not have a specified term of employment. Indeed, under New York law, "unless the duration of an employment contract is set forth explicitly, the employment is at-will and can be terminated by either party at any time."*Wright v. Cayan,* 817 F.2d 999, 1002 (2d Cir.), *cert. denied,*484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987). Accordingly, Leichtnam's employment with Ikon was on an at-will basis inasmuch as there was no duration specified in the Employment Agreement.FN8 Likewise, in *Int'l Paper Co. v. Suwyn,* 951 F.Supp. 445, 448 (S.D.N.Y.1997), a former high-level executive was deemed an at-will employee -despite the fact that he had signed a non-compete agreement - because his offer letter did not contain a specified duration of employment.

FN5. Although Leichtnam and Doculegal filed separate motions to dismiss, Leichtnam incorporated arguments verbatim from Doculegal's brief. *See* Leichtnam Mem. of Law., at 13 n. 1. Accordingly, for purposes of convenience, this Court will address the arguments as having been made by both defendants unless otherwise noted. This Court notes that Leichtnam's brief violated Rule 7.1(f) of the Local Rules of Civil Procedure, which prohibits the filing of briefs in excess of 25 pages without permission of the Court. Accordingly, this Court will not consider anything beyond page 25.

FN6. The Court does not address whether Leichtnam is estopped from contending that the Employment Agreement is not enforceable on the ground that it lacked terms concerning compensation in that Leichtnam labored under the Employment Agreement without complaint for over two years.

FN7.*See e.g., Zellner v. Conrad,* 183 A.D.2d 250, 589 N.Y.S.2d 903, 906-907 (2d Dep't 1992) (holding that forbearance of the right to terminate an at-will employee is sufficient consideration to support a non-compete agreement).

FN8. Indeed, the fact that Leichtnam

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 251954 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

resigned abruptly further evidences the at-will nature of the employment relationship that existed.

Inasmuch as Leichtnam was an at-will employee, the fact that the Employment Agreement did not contain compensation terms is irrelevant because it is an enforceable non-compete contract. Indeed, New York law recognizes that the continued employment of an at-will employee is adequate consideration for restrictive covenants such as those alleged here. *See Int'l Paper*, at 448 (finding that employment continued for a "substantial period" of less than two years after non-compete was signed, compelling the conclusion that the "Agreement was supported by consideration and is not rendered unenforceable"). Leichtnam was employed for a substantial period after he had signed the Employment Agreement, which was thus independently enforceable. Consequently, for purposes of this motion, the Employment Agreement contains enforceable restrictive covenants that do not fail for lack of definiteness. Accordingly, the Complaint will not be dismissed on this ground.

[2] Defendants also contend that the Complaint must be dismissed to the extent that it alleges that defendants contacted clients that were readily identifiable through public sources. The Court declines defendants' invitation to dismiss on this basis because the Court would have to go well beyond the face of the Complaint to determine which clients are readily identifiable through public sources. Moreover, even assuming arguendo that this Court took judicial notice of the allegation that *all* relevant customers are readily identifiable through public sources, the Court is not prepared to rule as a matter of law that document service companies such as Ikon cannot have proprietary information related to its customers, the identities of which are publicly known.[FN9] Accordingly, the Complaint will not be dismissed on this ground.

FN9. For example, personal contacts and spending habits of publicly known entities may nonetheless represent information that is not readily available from a public source of information. *See e.g., Props for Today, Inc. v. Kaplan,* 163 A.D.2d 177, 558 N.Y.S.2d 38, 39 (1st Dep't 1990) (holding that customer lists containing publicly known entities may nonetheless contain non-public information).

***3** [3] Defendants also contend that plaintiff's tortious interference with business relations claim FN10 must be dismissed because the Complaint fails to allege "wrongful means." It is not clear that the allegations of the Complaint fail to establish "wrongful means" as a matter of law. *See e.g., Ivy Mar Co., Inc. v. C.R. Seasons Ltd.,* 1998 WL 704112, at *16-17 (E.D.N.Y.1998) (noting that it was possible that defendant used "wrongful means" because of "evidence that the Jetmax defendants unfairly used customer information taken from the Companies to their advantage in competing with the Companies"). Indeed, "[d]ishonesty and unfair means are also sufficient to show wrongful means."*Wedeen v. Cooper,* 1998 WL 391117, at *3 (S.D.N.Y.1998) (citing *Goldhirsh Group, Inc. v. Alpert* 107 F.3d 105 (2d Cir.1997)). Accordingly, the Complaint will not be dismissed on this ground.

FN10. The allegations in the Complaint are somewhat ambiguous. *See* footnote 2 *supra.*Accordingly, it is not clear whether Ikon asserts the claim that it says it does or whether it is really asserting a claim for tortious interference with *prospective* business relations. Indeed, such are separate claims. *See Astor-Holdings, Inc. v. Roski,* 2002 WL 72936, at *15-21 (S.D.N.Y.2002) (setting forth the respective standards for both types of claims); *MDC Corp., Inc. v. John H. Harland Co.,* 2002 WL 31175246 (S.D.N.Y.2002) ("The level of interference necessary to support a finding of tortious interference with prospective contractual relations or with contracts terminable at will is significantly higher than the level of interference neces-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 251954 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

> sary to support a finding of interference with an existing contract"). Such ambiguity, however, is not fatal at this point. Moreover, the Complaint, taken as a whole, certainly alleges that the customers doing business with Doculegal would otherwise have done business with Ikon. Accordingly, Defendants' other contentions with respect to this claim are without merit.

[4] Defendants also claim that Ikon's trade secrets claim fails as a matter of law. This contention is also rejected. Although a closer question, some information allegedly misused by Leichtnam *could* constitute a trade secret. For example, Ikon's pricing would be a likely candidate for trade secret protection. *See Gen. Elec. Co. v.. Macejka,* 252 A.D.2d 700, 675 N.Y.S.2d 420 (3d Dep't 1998) (holding that pricing and profit margins constitute trade secrets). Moreover, to determine whether the alleged customer preferences or the details contained on Ikon's customer list are publicly available information, this Court would have to go beyond the face of the Complaint which is not permitted. *See* FRCvP 12(b); *Newman & Schwartz,* at 662.Indeed, the cases cited by defendants do not involve motions to dismiss that were granted. Accordingly, the Complaint will not be dismissed on this ground.

Inasmuch as defendants' motions to dismiss will be denied and, in light of the injunction hearing scheduled for January 31, 2003 on Ikon's motion for a preliminary injunction, Ikon will be allowed to engage in the following discovery: (1) four depositions, (2) ten discovery requests, (3) ten interrogatories, and (4) any number of requests for judicial admission. Likewise, defendants may collectively engage in the following discovery: (1) two depositions, (2) ten discovery requests, (3) ten interrogatories and (4) any number of requests for judicial admission.

Accordingly, it is hereby *ORDERED* that defendants' motions to dismiss are denied, that Leichtnam's motions seeking denial of Ikon's motions for preliminary injunction and expedited discovery are denied without prejudice and that the parties are granted limited discovery as specified above.

W.D.N.Y.,2003.
Ikon Office Solutions, Inc. v. Leichtnam
Not Reported in F.Supp.2d, 2003 WL 251954 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT G

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Westlaw.
Not Reported in F.Supp.2d
Page 1
Not Reported in F.Supp.2d, 1999 WL 627413 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Delphine Software Intern. v. Electronic Arts, Inc.
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DELPHINE SOFTWARE INTERNATIONAL, S.A.R.L., Plaintiff,
v.
ELECTRONIC ARTS, INC., Defendant.
**No. 99 Civ. 4454 AGAS.**

Aug. 18, 1999.

*MEMORANDUM AND ORDER*

SCHWARTZ, J.
*1 This action alleging, *interalia,* misappropriation of trade secrets and breach of contract was commenced on June 22, 1999. The case is before the Court on plaintiff's application for a temporary restraining order ("TRO") and expedited discovery. The application is GRANTED in part and DENIED in part.

*BRIEF FACTUAL BACKGROUND*[FN1]

FN1. The facts discussed herein are taken from the parties' submissions, including (i) plaintiff's Brief in Support of its Application, with accompanying exhibits; (ii) defendant's Brief in Opposition to Plaintiff's Application, with accompanying exhibits; and (iii) plaintiff's Reply Memo and Supplemental Declarations in Support of the Application, with accompanying exhibits.

Plaintiff Delphine Software International, S.A.R.L. ("Delphine") is a French corporation, founded in 1988, which has its offices in Paris, France. Delphine is a developer of games for computers and video game stations. Defendant Electronic Arts ("EA") is a publicly traded Delaware corporation with offices in California. Delphine and EA were parties to a publication agreement pursuant to which EA published and distributed plaintiff's products Motoracer 1 and Motoracer 2. Because EA was provided with substantial information about Delphine's products in the course of this relationship, the publication agreement contained a confidentiality clause providing that EA was

not to use any such Confidential Information for any purpose other than the purpose for which it was originally disclosed to the receiving party, and not to disclose any of such Confidential Information to any third party.

After learning that EA had begun work on its own motorcycle racing game, called SuperCross 2000, Delphine commenced this action asserting that the new game makes use of Delphine's trade secrets and confidential information in violation of the confidentiality provision of the publication agreement. Delphine alleges that EA's access to Delphine's source code and software development techniques-which it asserts are trade secretshas permitted it to develop SuperCross 2000 much earlier than it would have been able to otherwise.

EA answers that SuperCross 2000 is significantly different from MR2 in both the way that it is programmed and in the way that it functions. EA also asserts that Delphine's techniques are not trade secrets, and, even if they are, they were not used in creating SuperCross 2000. EA points out that it did not develop SuperCross 2000 itself, but rather engaged another separate company to develop the game, with minimal assistance from EA employees. EA asserts that no party who materially assisted in the programming of SuperCross 2000 had access to Delphine's source code or trade secrets.

Delphine seeks a TRO enjoining EA from making use of its trade secrets or releasing products based on its trade secrets. EA asserts that preliminary relief is unnecessary at this point, as it will not release SuperCross 2000 before October of this year,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 627413 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

and plaintiff's case is not likely to succeed on the merits. EA further contends that Delphine, by its own admission, had knowledge of EA's proposed release of SuperCross 2000 by January 1999, but delayed at least until June 1999 to seek injunctive relief from this Court. Delphine also seeks expedited discovery.

*DISCUSSION*

*I. MOTION FOR A TEMPORARY RESTRAINING ORDER*

*2 The standard for obtaining a preliminary injunction in this context was explained by Judge Spatt in *Computer Assocs. Int'l Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992). Preliminary injunctive relief is an extraordinary and drastic remedy. *SeeComputer Assocs. Int'l Inc.,* 784 F.Supp. at 986 (citing *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986) and *Borey v. National Union Fire Ins.,* 934 F.2d 30, 33 (2d Cir.1991)). Accordingly, the movant must clearly establish the following required elements in order to obtain a preliminary injunction: "(1) irreparable harm or injury, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant."*SeeComputer Assocs. Int'l Inc.,* 784 F. Supp at 986 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)).

*A. PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM*

A demonstration of probable irreparable harm is generally the most important requirement for the granting of preliminary relief. *SeeComputer Assocs. Int'l Inc.,* 784 F. Supp at 986 (citing *Reuters Ltd. v. United Press International, Inc.,* 903 F.2d 904, 907 (2d Cir.1990)). Movant is required to establish not a mere possibility of irreparable harm, but "that it is likely to suffer irreparable harm if equitable relief is denied."*SeeComputer Assocs. Int'l Inc.,* 784 F. Supp at 986 (citing *Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990)).

The Court is not satisfied that plaintiff has established that irreparable harm will occur if this TRO application is denied. Unlike the majority of cases that have found irreparable harm to occur upon the loss of a trade secret, *see, e.g.,CarpetMaster of Latham, Ltd. v. DuPont Flooring Sys., Inc.,* 12 F.Supp.2d 257, 263 (N.D.N.Y.1998), there is little danger that the absence of a TRO will expand access to plaintiff's trade secrets and result in an incompensable loss. SuperCross 2000 is already in the final stages of development, and, if EA has made use of Delphine's trade secrets, the benefit has already accrued to EA in terms of gaining a "head start" on product development. Additionally, SuperCross 2000 is not scheduled to be released for at least 60 days, which is adequate time in which to permit discovery to take place and to then schedule a full evidentiary hearing in order to assess Delphine's entitlement to injunctive relief.

The Court is also not convinced from this limited record that monetary damages would not be sufficient compensation to Delphine in the event that Delphine shows that EA made use of Delphine's confidential information in the course of the development of SuperCross 2000. "Where money damages are adequate compensation, a preliminary injunction will not issue."*Computer Assocs. Int'l Inc.,* 784 F. Supp at 986 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d at 72).

*B. THE MERITS OF PLAINTIFF'S CAUSE OF ACTION*

*3 In order to demonstrate a likelihood of success on the merits, Movant is not required to show that success on its complaint is an absolute certainty, but rather that the probability that it will prevail is "better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). Disputed factual questions, however, prevent the Court from con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 1999 WL 627413 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

cluding that plaintiff has made such a showing.

In particular, the Court is unable to discern from the record whether, assuming valid trade secrets of Delphine were known to EA, these trade secrets were actually used by the individuals creating SuperCross 2000. It is true that the case law suggests that a person in possession of trade secrets, when working on a similar project, may "inevitably disclose" the proprietary information and techniques of which he is in possession. *See, e.g.,PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995); *Doubleclick Inc. v. Henderson,* No. 11691/97, 1997 WL 731413, at *5- *6 (N.Y.Sup.Ct. Nov. 7, 1997). However, defendant has asserted that the individuals with knowledge of plaintiff's techniques and trade secrets were not computer programmers, and lacked the technical expertise to communicate Delphine's technical and design secrets to the team developing SuperCross 2000. Additionally, the extent to which EA's employees were involved in the creation of SuperCross 2000 is unclear, particularly in light of the submissions by defendant which indicate that SuperCross 2000 has been programmed to a large extent by an outside development team employed by an experienced and unrelated contractor, MBL. Similarly, defendant asserts that SuperCross 2000 is a distinctly different game from Delphine's previous titles, and asserts that Delphine's trade secrets are not directly relevant to the game play and design style used by MBL and EA in the creation of SuperCross 2000.

While the Court does not conclude that plaintiff has demonstrated a likelihood of success on the merits, the Court does conclude that Delphine has demonstrated a cognizable and non-frivolous claim. However, the Court need not reach the question as to whether Delphine has shown "a serious question with respect to the merits," or, as defendant suggests, unreasonably delayed in making this application, because the Court concludes that the balance of hardship in this case tips in favor of defendant EA. Enjoining EA from proceeding with the development of SuperCross 2000, for which extensive development costs have been incurred, is an unnecessarily drastic remedy. SuperCross 2000 is not scheduled to be released for more than two months, and a full preliminary injunction hearing can be held before that time. Additionally, removing individuals from the production team at this point could be very disruptive to EA's production schedule, which is intended to result in a release date in time for the Christmas holiday season.

*II. EXPEDITED DISCOVERY*

Plaintiff's application for expedited discovery is granted. Delphine is entitled to substantial discovery to enable it to proceed with a preliminary injunction hearing before the October release date of SuperCross 2000. Additionally, Delphine has legitimate concerns that, as time passes, evidence of any misappropriation will disappear by expected revisions to the programming of SuperCross 2000 as the game is improved and the possible destruction of documents related to the early development of the game.

*CONCLUSION*

*4 For the reasons stated, plaintiff's application for a TRO is DENIED, and its application for expedited discovery is GRANTED.

The parties are to submit document requests on or by Friday, August 20, 1999. A stipulation of confidentiality for the provided documents is to be submitted to the Court by Wednesday, August 25, 1999. All requested documents should be produced no later than September 10, 1999. Depositions should be scheduled to be conducted shortly thereafter.

Upon receiving notice from the parties that they are prepared to proceed with the preliminary injunction hearing, the Court will schedule a date therefor.

SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 627413 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

S.D.N.Y.,1999.
Delphine Software Intern. v. Electronic Arts, Inc.
Not Reported in F.Supp.2d, 1999 WL 627413 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al
Lewis A. Kaplan, presiding

# EXHIBIT H

**TO COMPENDIUM OF UNREPORTED CASES IN SUPPORT OF CLEAR CHANNEL'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**



Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 1999 WL 317052 (E.D.Pa.), 1999 Copr.L.Dec. P 27,903
**(Cite as: Not Reported in F.Supp.2d)**

Educational Com'n, Foreign School Medical Graduates v. Repik
E.D.Pa.,1999.

United States District Court, E.D. Pennsylvania.
EDUCATIONAL COMMISSION FOR FOREIGN SCHOOL MEDICAL GRADUATES
v.
Maksim REPIK, InfoReality Corporation and Jefferson Data Integration, Inc.
**No. CIV.A. 99-1381.**

May 17, 1999.

*MEMORANDUM ORDER*

WALDMAN.
*1 Presently before the court in this trade secret misappropriation and copyright infringement case is plaintiff's motion for a preliminary injunction and expedited discovery.

Plaintiff is a non-profit organization which administers licensing examinations to graduates of foreign medical schools and certifies successful examinees as eligible for residency and fellowship programs in the United States. Plaintiff has developed what it describes as a "proprietary and confidential" Applicant Valid Through System (AVTS) computer program and Candidate Master (CM) database. Plaintiff has also developed other databases, which it asserts are proprietary and confidential, that can be accessed through its ATVS program. The ATVS program also permits access to certain American Medical Association databases which are subject to a confidential data-sharing agreement between plaintiff and the AMA.

Defendant Repik owns defendant InfoReality and was a part-owner of defendant Jefferson Data, which is now apparently dissolved. InfoReality is, and Jefferson Data was, in the business of website programming and related services. In March 1998, plaintiff entered into an Independent Contractor Agreement with defendants Repik and Jefferson Data under which they were to perform computer-related consulting and advisory services that required them to have access to plaintiff's AVTS program and databases. The Independent Contractor Agreement provided that Mr. Repik and Jefferson Data would maintain all proprietary and confidential programs and databases in confidence and indemnify plaintiff for any expense it might incur if Mr. Repik or Jefferson Data breached plaintiff's confidentiality rights or infringed its copyrights.

Plaintiff believed Mr. Repik was spending too much time and effort on his own internet business and not enough doing work for plaintiff. On December 9, 1998, plaintiff informed Mr. Repik that it was terminating its relationship with him and Jefferson Data as of December 11, 1998.

Plaintiff subsequently discovered that on December 10 and 11, 1998, Mr. Repik had used the ATVS system to transfer significant portions of the CM and American Medical Association databases. Plaintiff also discovered that Mr. Repik had reproduced and transferred to his "Jefferson-Network.com" website additional files from plaintiff's databases as early as March 16, 1998. Plaintiff also discovered that on InfoReality's website, it described itself as "one of the largest Continuing Medical Education sites on the Internet offering the most comprehensive list of accredited resources for physicians" and provided "detailed information regarding program contents, speakers/faculty, accreditation and special offers."Plaintiff alleges that InfoReality's medical education information was confidential data which Mr. Repik pirated from plaintiff.

Plaintiff obtained copyright registrations for its AVTS program and CM database, effective February 1, 1999. It is uncontested that no representative of plaintiff requested or demanded that Mr. Repik return any of the allegedly pirated materials before

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 1999 WL 317052 (E.D.Pa.), 1999 Copr.L.Dec. P 27,903
**(Cite as: Not Reported in F.Supp.2d)**

filing the complaint in this action or the motion for preliminary injunction.

*2 Defendants admit that Mr. Repik made copies of plaintiff's programs, including the AVTS program, but represent that the March 1998 copying was to allow Mr. Repik to do off-site work for plaintiff and that as plaintiff knew Mr. Repik was working off-site, it must have known he had to have made copies in order to do so. Defendants also represent that Mr. Repik made the December 1998 copies for future reference for follow-up consulting work because he was told by the same employee of plaintiff who advised him the contract was being terminated that he might still contact him for some additional work on the programs.

Defendants assert that plaintiff's databases are not creative or original and that, in any event, Mr. Repik was not required to sign the agreement which contained the confidentiality clause until after he had been working for plaintiff for a month and had acquired access to plaintiff's data and files. Defendants represent that they have no use for the AVTS program, do not use it or any related files on the InfoReality website and do not intend ever to use or disclose the information. Mr. Repik claims that he rewrote the AVTS program "from scratch," that the program was not a "work for hire" because he was an independent contractor, that Mr. Repik is therefore the owner of the AVTS program for copyright purposes and thus is entitled to compensation from plaintiff in exchange for the copyright.

In determining whether a preliminary injunction should issue, courts determine whether the movant has shown a reasonable probability of success on the merits, whether the movant will be irreparably injured by denial of the relief, whether granting preliminary relief will result in even greater harm to the nonmoving party and whether granting the preliminary relief will be in the public interest. *See Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999). A plaintiff who makes out a prima facie case of copyright infringement, however, is generally entitled to a preliminary injunction without a detailed showing of irreparable harm as such infringement raises a rebuttable presumption of irreparable harm. *See Marco v. Accent Publishing Co., Inc.*, 969 F.2d 1547, 1553 (3d Cir.1992); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,*464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *CMM Cable Rep., Inc. v. Keymarket Communications, Inc.*, 870 F.Supp. 631, 639 (M.D.Pa.1994). Unless the evidence submitted by the parties leaves no relevant factual issue unresolved, a hearing is generally required. *See Bradley v. Pittsburgh Board of Educ.*, 910 F.2d 1172, 1176 (3d Cir.1990); *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir.1982) (per curiam).

*3 Defendants assert that there is no need for injunctive relief because they are not now using, and will not use, the allegedly infringing and misappropriated material. Courts have held that it is unnecessary and inappropriate to enjoin a defendant from doing what he is not doing and which he represents he will not do in the future. *See, e.g., Harolds Stores, Inc. v. Dillard Department Stores, Inc.*, 82 F.3d 1533, 1555 (10th Cir.) (absent "probability or threat of continuing infringements, injunctive relief is ordinarily inappropriate"), *cert. denied,*519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 216 (1996); *Cass County Music Co. v. Khalifa*, 914 F.Supp. 30, 34 (N.D.N.Y.) (injunction is "extraordinary" remedy to be granted in copyright cases only upon proof of threat of continuing or additional infringement), *aff'd,*112 F.3d 503 (2d Cir.1996); *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F.Supp. 1347, 1358 (S.D.N.Y.1987). Some discovery is appropriate to substantiate or refute plaintiff's belief that Mr. Repik is using the material for commercial gain and to determine whether plaintiff and any defendant in fact are in competition. The court also cannot discern from the record as it stands whether defendants are representing that they have not used any allegedly confidential or proprietary materials obtained from plaintiff or only that they have not used the AVTS software program since Mr. Repik stopped working for plaintiff. Mr. Repik's affidavit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 3
Not Reported in F.Supp.2d, 1999 WL 317052 (E.D.Pa.), 1999 Copr.L.Dec. P 27,903
**(Cite as: Not Reported in F.Supp.2d)**

in opposition to the instant motion is somewhat ambiguous in that regard.

Expedited discovery in connection with a preliminary injunction motion is appropriate. *See Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, 1998 WL 404820, *2 (E.D.Pa. July 15, 1998); *Ellsworth Assocs. v. United States*, 917 F.Supp. 841, 844 (D.D.C.1996). The court will permit the parties a reasonable period of time to conduct discovery relevant to the motion for preliminary injunction, after which a hearing will be scheduled if necessary.

As noted, it is generally unnecessary to enjoin a defendant from doing what it is not doing and does not intend to do. At the same time, however, it is difficult to understand why a defendant who is not doing and does not intend to do what plaintiff seeks to enjoin would not agree to a consent decree without any admission of fault rather than expend substantial time, money and effort in litigating the motion. It appears that defendant has offered to sell plaintiff the copyright he claims with respect to the AVTS software for $20,000. It also appears that attorney fees and costs for which defendants made a demand are rapidly approaching $20,000, and will almost certainly exceed that amount by the time court proceedings on the motion have concluded. Both sides have described the continued prosecution of this case as a "waste of judicial resources." It appears that the costs in this litigation are being compounded well out of proportion to the stakes.

*4 The court will allow discovery and will then conduct such further proceedings as are necessary. The parties, however, may want to consider whether an appropriate interim consent order or overall non-adversarial resolution of their dispute would be in their best economic and practical business interests.

ACCORDINGLY, this day of May, 1999, upon consideration of plaintiff's Motion for Expedited Deposition and Document Production (Doc. # 4) and defendants' response thereto, IT IS HEREBY ORDERED that said Motion is GRANTED in that the parties shall have until June 14, 1999 to conduct discovery in connection with plaintiff's motion for a preliminary injunction and upon advice from counsel that any such discovery undertaken is completed, the court will promptly schedule such further proceedings as may be required to determine whether a preliminary injunction should issue.

E.D.Pa.,1999.
Educational Com'n, Foreign School Medical Graduates v. Repik
Not Reported in F.Supp.2d, 1999 WL 317052 (E.D.Pa.), 1999 Copr.L.Dec. P 27,903

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.