UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Capstar Radio Operating Company, a Delaware Corporation, : : : | No. 08 CV 2976 (LAK) |

Capstar Radio Operating Company, a Delaware : 
Corporation, :
                   :      No. 08 CV 2976 (LAK)
              Plaintiff, :
                   :      **DECLARATION OF**
      v.                :      **JEREMY FEIGELSON**
                   :
Anthony Campbell; Louis Carpino; Adam Gross; :      Filed Electronically
Jose Luis Torres; Citadel Broadcasting Corporation, :
a Nevada Corporation; and John Does 1-10, :
                   :
              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Jeremy Feigelson declares:

1.       I am a member of the bar of this Court and of Debevoise & Plimpton LLP, counsel for defendants in this case. I submit this declaration upon personal knowledge, and in reliance on the record in this matter and in certain other matters pending in Illinois, in support of the cross-motion of defendant Citadel Broadcasting Corporation ("Citadel") to dismiss for lack of subject matter jurisdiction, and in support of the opposition of all defendants to the motion by plaintiff Capstar Radio Operating Company, a subsidiary of Clear Channel Communications ("Clear Channel") for an order granting dismissal under Rule 41(a) of the Federal Rules of Civil Procedure.

2.       Attached as Exhibit 1 is a true and correct copy of the transcript of proceedings in this Court on March 24, 2008.

3.       Attached as Exhibit 2 is a true and correct copy of plaintiff's Order to Show Cause, as modified and endorsed by this Court following the hearing on March 24, 2008.

4.      On March 25, plaintiff's counsel contacted me and asked if defendants would "consent" to "removal" of the case.  I responded that the parties had committed the day before to terms for proceeding in federal court and were bound by that commitment.

5.      Attached as Exhibit 3 is a true and correct copy of plaintiff's First Request for Production of Documents and Things, dated March 25, 2008, with cover letter from plaintiff's counsel of the same date.

6.      Attached as Exhibit 4 is a true and correct copy of the docket sheet in this matter, indicating, *inter alia*, that Clear Channel attempted to submit a Notice of Voluntary Withdrawal through the Court's electronic filing system (ECF) on March 25, 2008 and that the clerk rejected the notice as improperly filed.

7.      Attached as Exhibit 5 is a true and correct copy of the Answer of the Individual Defendants in this matter, dated March 25, 2008, with proof of service by U.S. Mail on March 25, 2008.

8.      Attached as Exhibit 6 is a true and correct copy of the transcript of a conference in this case held on March 28, 2008.  Exhibit 6 includes one handwritten correction of a typographical error.

9.      Attached as Exhibit 7 is a true and correct copy of a letter from Clear Channel to the Court dated April 11, 2008, stating, *inter alia*, that settlement discussions between the parties were continuing.  As of April 11, there were no active settlement discussions.

10.      Attached as Exhibit 8 is a true and correct copy of the decision of Judge Zagel in *AMFM Broad., Inc. v. Osowiec*, No. 08 C 1519 (N.D. Ill.), dated April 11, 2008 and released to the parties on April 17, 2008.

22725035

11.     Attached as Exhibit 9 is a true and correct copy of the complaint in *AMFM Broad., Inc. v. Savier*, 2008 CH 11709 (Circuit Court of Cook County, Ill.), filed March 28, 2008 and served on April 4, 2008.  Upon information and belief Clear Channel has not sought preliminary relief in this action.

12.     Attached as Exhibit 10 is a true and correct copy of the transcript of a conference held in this matter on April 22, 2008.

13.     Attached as Exhibit 11 is a true and correct copy of a letter to the Court from Clear Channel's counsel dated April 23, 2008.

14.     Attached as Exhibit 12 is a true and correct copy of a letter from me to the Court dated April 24, 2008.

15.     Attached as Exhibit 13 is a true and correct copy of an Order issued by the Court in this matter on April 25, 2008.

16.     Attached as Exhibit 14 is a true and correct copy of the cover page of defendant Citadel Broadcasting Corporation's Form 10-K for 2007, identifying Delaware as the company's state of incorporation.  This exhibit was previously provided to the Court as Exhibit 9 to the Declaration of Jeremy Feigelson dated March 24, 2008.  This additional copy is being provided for the convenience of the Court.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2008 at New York, New York:


                              /s/ Jeremy Feigelson
                              Jeremy Feigelson


-3-

22725035

# Exhibit 1

83oncapa.txt

1

83oncapa
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  CAPSTAR RADIO OPERATING
3  COMPANY, a DELAWARE
4  CORPORATION,
4
5                    Plaintiff,        New York, N.Y.
5
6          v.                          08 Civ. 2976 (LAK)
6
7  ANTHONY CAMPBELL, LOUIS
7  CARPINO, ADAM GROSS, JOSE LUIS
8  TORRES, CITADEL BROADCASTING
8  CORPORATION, a Nevada
9  Corporation and JOHN DOES 1-10
9
10                   Defendants.
10
11 ------------------------------x
11
12                                    March 24, 2008
12                                    2:30 p.m.
13
13 Before:
14
14                    HON. LEWIS A. KAPLAN,
15
15                                    District Judge
16
16                    APPEARANCES
17
17 SEYFARTH SHAW
18      Attorneys  for Plaintiff
18 BY:  L. LYNNETTE SARNO
19      GLORIA GALANT
20
20 DEBEVOISE & PLIMPTON
21      Attorneys for Defendant
21 BY:  JEREMY FEIGELSON
22      TRICIA BOZYK SHERNO
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

2

83oncapa
1          (Case called)
2          THE COURT:  All right, Ms. Sarno.
3          MS. SARNO:  Good afternoon, your Honor.
4   We represent Capstar Radio Operating Company.
5          THE COURT:  Use the lectern, please.
6          MS. SARNO:  Sure.
7          Good afternoon again.
8          As mentioned, we represent Capstar Radio Operating
9   Company, and for ease purposes because Capstar is a subsidiary
10  of ClearChannel communications, I'll refer to them as
11  ClearChannel.
12          Your Honor we are here this afternoon at the request
                    Page 1

83oncapa.txt
13  of a temporary restraining order on these individual defendants
14  Mr. Campbell, Mr. Carpino, Mr. Gross and Mr. Torres, as well as
15  Citadel with regard to unfair competition that they have
16  engaged in, in the mere 17 days since they left ClearChannel.
17  In the short time we have learned many things which leads us to
18  believe that they have engaged in a concerted --
19          THE COURT:  Let's start with whether I have
20  jurisdiction.
21          MS. SARNO:  Sure, your Honor.
22          I understand that one of the issues that was raised
23  was -- and we just received Citadel's papers now, but we
24  certainly believe there is diversity jurisdiction.  Capstar and
25  its parent company ClearChannel is a Delaware corporation with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                3
83oncapa
1  its principal place of business in Texas.
2          In addition to that issue, because of the information
3  that we keep learning as time goes, we also believe that we
4  have a Computer Fraud and Abuse Act action.
5          THE COURT:  I'm sorry.
6          MS. SARNO:  What has happened since we've brought this
7  action as well is that we continue to gain information that
8  leads us to believe that we will also have a Computer Fraud and
9  Abuse Act action, that we will be able to amend this claim.
10         THE COURT:  But jurisdiction is determined as of the
11 moment of the filing of the complaint.  Right?
12         MS. SARNO:  Yes, your Honor.
13         THE COURT:  So as of the moment of the filing of the
14 complaint, did I have any jurisdiction?
15         MS. SARNO:  We did not know.  It was our understanding
16 that Citadel was a Nevada corporation incorporated in Nevada.
17         THE COURT:  I understand that's what you thought.  Is
18 there any dispute over the fact as of now that they are in fact
19 a Delaware corporation?
20         MS. SARNO:  The only information that I have is what
21 was given to me today.  So we have been unable to confirm that.
22 But I certainly would expect that --
23         THE COURT:  Did you look at their 10-K before you
24 filed the lawsuit?
25         MS. SARNO:  I believe we did.  We must have gotten it
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                4
83oncapa
1  mixed up with another entity.
2          THE COURT:  You think there is another publicly held
3  company with registered securities that's got another 10-K that
4  is also called Citadel?
5          MS. SARNO:  To be honest, your Honor, I don't know.
6  But it is my understanding that we did check on their
7  jurisdictional issues.
8          THE COURT:  Go ahead.
9          MS. SARNO:  Notwithstanding that issue, your Honor,
10 though, we certainly believe that, given the facts that have
11 been established, we would be able to amend our claim to
12 include a Computer Fraud and Abuse Act action because of the
13 fact that we have direct evidence that documentary files of
14 ClearChannel have been tampered with and basically plagiarized,
15 which would certainly show that they have engaged in
16 misappropriation of our trade secrets through the use of the
17 computer.
                            Page 2

83oncapa.txt
```
18          THE COURT:  You certainly don't expect me to grant you
19   a temporary retraining order on the basis of a complaint you
20   haven't filed, right?
21          MS. SARNO:  I understand that, your Honor.
22          THE COURT:  Let's focus on what's before me.
23          MS. SARNO:  Sure.
24          What is before you, your Honor, is the blatant
25   conspiracy between the parties in this action.  What we have
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                        5
83oncapa
```
 1   since learned in these few days since they have left is that,
 2   as is mentioned in defendant's papers, from what I understand,
 3   a former local sales manager of ClearChannel joined Citadel at
 4   the end of February, which is exactly when his noncompete
 5   agreement with ClearChannel ended.  Since then, actually within
 6   days of that, four of our salespeople joined Citadel.  They
 7   resigned from two different radio stations en masse and joined
 8   a competing station of Citadel, WABC.
 9          From what we understand, they have the exact same
10   roles at the Citadel station as they had at the ClearChannel
11   station.
12          THE COURT:  They are basically entry-level salesmen,
13   right?
14          MS. SARNO:  Yes, your Honor.
15          THE COURT:  So let's not get carried away with this.
16   That's what they are.
17          MS. SARNO:  Your Honor, we concede that.  That is not
18   what we think is an issue here.  What we think is an issue is
19   they have actually taken our confidential and trade information
20   and used it for their own use.
21          THE COURT:  Specifically what?  Where is the evidence
22   of it?
23          MS. SARNO:  Sure, your Honor.  I am happy to go
24   through that.
25          Specifically, we have clients who have said to us,
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                        6
83oncapa
```
 1   directly to our employees that are mentioned in our
 2   declarations that these four salespeople have contacted them.
 3          THE COURT:  Is it not the case that anybody can find
 4   out who advertises on your stations by turning on the radio?
 5          MS. SARNO:  We recognize that, your Honor.
 6          That in and of itself is not what we are concerned
 7   about.  What we are concerned about is the confidential
 8   information that they gained in order make those contacts.  For
 9   example, all of our client information, and I understand the
10   identities in and of themselves may be public, but there is a
11   lot of background information in connection with those clients.
12   For example, in our software which is called Radio Fusion --
13          THE COURT:  Is it true that Radio Fusion is a
14   third-party package that anybody can go buy?
15          MS. SARNO:  Yes.  It is not the software that we are
16   concerned about.  It's the information that's kept within the
17   software.  In that software is our pricing information, our
18   scheduling information.  That pricing is regularly updated
19   depending upon the market.
20          THE COURT:  What's the evidence that anybody either
21   took or used your internal pricing information?
22          MS. SARNO:  We know that they contacted them and
```
                                Page 3

83oncapa.txt
```
23    certainly used it for their solicitation.
24            THE COURT:  How do you know that?  Where is the
25    evidence of that?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    7

83oncapa
```
 1            MS. SARNO:  We know that they contacted them, and we
 2    think through discovery we will be able to find that.
 3            What we do have --
 4            THE COURT:  Do you have an affidavit here that says, I
 5    saw the defendant take the internal information and use it in
 6    pitching client X; or I'm client X, defendant No. 3 pitched me,
 7    and in the course of pitching me he used information about the
 8    prices I paid to ClearChannel, which he could only have found
 9    out because it was from ClearChannel because it was their
10    internal information?  Is there anything like that in the
11    record.
12            MS. SARNO:  No, your Honor.
13            THE COURT:  All you've got is you've got four guys who
14    you say pitched accounts, the existence of which they knew of,
15    and the existence of which as your accounts is knowable to
16    probably 7 million people in the New York City area who listen
17    to the radio, right?
18            MS. SARNO:  Your Honor, what we think is the most
19    egregious thing that's happened, and actually was the impetus
20    for our filing was last Wednesday we received an e-mail from a
21    client with a PowerPoint presentation that was attached to it
22    that had what we have referred to in our papers as the
23    Ask-the-Expert presentation.
24            That is where we have seen direct evidence that
25    Citadel has used our proprietary information.  Ask the Expert,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    8

83oncapa
```
 1    it is a program that several of our stations developed.  In
 2    fact, the gentleman who developed it at ClearChannel is one of
 3    the declarants, Bernhard Weiss.  He developed that over a year
 4    ago.
 5            On Wednesday evening we received an e-mail from one of
 6    our clients saying to us, gee, this looks awfully familiar.
 7    What it was is that it was ClearChannel's PowerPoint
 8    presentation, but with a Citadel station on it.  In fact, some
 9    of the pictures on the cover were exactly the same.  The text
10    was the same.
11            THE COURT:  Is a copy of it in your papers?
12            MS. SARNO:  Your Honor, we have it available for you
13    in camera.  Because it is proprietary we wanted to keep it
14    confidential, but we do have copies for everyone here.
15            THE COURT:  This might be a good time to hand them
16    out.
17            MS. SARNO:  Your Honor, what you will see is one
18    presentation from Z100, which is a ClearChannel station, and
19    another presentation from WPLJ, which is a Citadel station.
20            THE COURT:  You are going too fast.
21            MS. SARNO:  Sure.
22            THE COURT:  We are going to mark this Plaintiff's
23    Exhibit AA for identification.
24            You are telling me this is two different documents, is
25    that right?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                            Page 4
```

83oncapa.txt

83oncapa
1          MS. SARNO:  Yes.  It's two different documents.  You
2   can see they are very similar.  The Z100 --
3          THE COURT:  Ma'am, you talk far faster than I listen.
4          MS. SARNO:  I'm sorry, your Honor.  My apologies.
5          THE COURT:  Z100 belongs to whom?
6          MS. SARNO:  ClearChannel.
7          THE COURT:  I see.  So I only had one of them in front
8   of me when you said I had two.
9          MS. SARNO:  The Light Touch lasers.
10         THE COURT:  Yes.
11         MS. SARNO:  That is the other one.
12         THE COURT:  We will mark that Plaintiff's Exhibit AB?
13         MS. SARNO:  OK.
14         THE COURT:  AA, the one that says Z100, that's
15   ClearChannel?
16         MS. SARNO:  Yes.
17         THE COURT:  All right.  And AB?
18         MS. SARNO:  That is Citadel.
19         THE COURT:  All right.  Go ahead.  Why should I be
20   upset about this?
21         MS. SARNO:  Your Honor, the Ask the Expert program,
22   just to give you a little bit of background, is a sales program
23   of ClearChannel.
24         What they do is they allow the people within specific
25   industries to be expert for that station.  For example, this is
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

83oncapa
1   the dental assistant expert for that station.  They go through
2   this whole advertising program as to the DJs, you know, these
3   people and so forth.
4         This Ask the Expert PowerPoint that you see here was
5   developed by a ClearChannel sales manager, Bernhard Weiss, as
6   mentioned in his declaration, about a year ago.
7         Last Wednesday, we received what you see as AB, 1AB,
8   which is a PowerPoint from WPLJ radio, which is a Citadel
9   station.  From the very beginning, your Honor, it is obvious
10   that one is taken from the other.  On the first page alone, the
11   pictures on the top are the exact same pictures.
12         THE COURT:  Are those pictures trade secrets?
13         MS. SARNO:  No, your Honor.  I am just saying that
14   that is probably what called it to the client's attention, but
15   if you look further, you will see how much more similar it is.
16   The second page is called "Marketing Strategy" on the Z100
17   proposal.  It's also called "Marketing Strategy" on the PLJ
18   proposal.  The text of it, notwithstanding the difference in
19   font, is exactly the same.
20         THE COURT:  The theory of protection is what?
21         MS. SARNO:  Your Honor, this is a sales program that
22   is used exclusively by the account executives of ClearChannel.
23   This is how they pitch to their clients on how you can become
24   well known in the industry as the expert of our station.
25         THE COURT:  Let me ask you this.  When you pitch to
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

83oncapa
1   the client, does the client who receives the pitch sign a
2   confidentiality agreement?
3         MS. SARNO:  I don't know.
                              Page 5

```
                            83oncapa.txt
      4          THE COURT:  So, in the absence of evidence that that's
      5   the case, then you are publicly performing this pitch all over
      6   the place in circumstances in which the entire audience, to
      7   wit, all of the prospective customers to whom you are making
      8   this pitch, are free to tell anybody, let me tell you how
      9   ClearChannel just pitched my business here, right?
     10          MS. SARNO:  Yes, your Honor.
     11          But that doesn't allow Citadel to take the program
     12   with it and take it as their own.
     13          THE COURT:  Why not?
     14          MS. SARNO:  It was a proprietary sales method of
     15   theirs.
     16          THE COURT:  What does "proprietary" mean in this
     17   context?
     18          MS. SARNO:  It was a manner in which they attracted
     19   sales clients, and it was exclusive to their stations.  They
     20   are allowed to take this method of -- I am not following your
     21   Honor.
     22          THE COURT:  You are speaking in totally bottom-line
     23   conclusions.  I am asking you to explain what is proprietary
     24   about it, and you tell me that it is proprietary and
     25   exclusively theirs.  Frankly, that is not legal analysis.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    12
     83oncapa
      1   That's rhetoric.
      2          Sometimes things are proprietary because they are
      3   trade secrets.  Sometimes they are proprietary because they are
      4   copyrighted.  Sometimes they are proprietary in a specialized
      5   sense because they're trademarked.  Sometimes they are
      6   proprietary because they are patented.
      7          We are not talking about patents here.  We are not
      8   talking about trademarks here.  When I inquired about
      9   copyright, I drew a blank from you in the sense that you
     10   weren't asserting that.
     11          So, it must come down to trade secrets.  Now, if the
     12   theory of protection is trade secrets, and you are making this
     13   pitch available without restriction to anybody who is a
     14   prospective customer, then what is the basis for calling any of
     15   it proprietary?
     16          MS. SARNO:  Your Honor, within the presentation is not
     17   only the way in which the -- within the presentation is the way
     18   the advertisement is actually going to be done, the methodology
     19   of it, the streaming media of it, the use of key words, the
     20   e-mail data.
     21          Certainly what they are intending to do by showing
     22   this particular PowerPoint, not necessarily the -- even if the
     23   PowerPoint itself is public, the fact that they intend to use
     24   this means of advertising, that is proprietary.
     25          THE COURT:  Why?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    13
     83oncapa
      1          MS. SARNO:  Because they are going to use our method
      2   of sales for their station.
      3        . THE COURT:  So what?
      4          MS. SARNO:  That would certainly fall under unfair
      5   competition.
      6          THE COURT:  Suppose you were a car dealer, and at the
      7   end of every August, you got your dealership owner to go on
      8   television with a silly hat saying, "Come on down, greatest
                                Page 6
```

83oncapa.txt
```
 9   deals in history.  Get here by Labor Day and you are going to
10   get a fabulous deal.  We'll match any price."
11           Well, that's the way he intends to sell cars.
12           Do you mean to tell me that if another dealer
13   somewhere else decided to do the same thing, that person
14   couldn't lawfully do it because somebody else was doing it?
15           I don't think so.
16           MS. SARNO:  Your Honor, I agree with you with regard
17   to that.  That means of sales is certainly far beyond what is
18   going on here.
19           Here we have an entire sales program that was
20   developed that shows how they are going to do banner ads, how
21   they are going to do streaming media, how they are going to do
22   these things, and they would not have had knowledge of that had
23   they not taken them from ClearChannel.
24           THE COURT:  I don't mean to be rude, I really don't.
25   But the question "so what?" has not yet gone out of my mind.
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
83oncapa
```
 1           This is a perfectly obvious way to sell radio
 2   advertising.  It is hard to imagine doing these things in other
 3   ways.
 4           I don't see the big deal.  I don't see a trade secret
 5   because it is not confidential.  I don't see a patent.  I don't
 6   see a copyright.  I don't see any of that.
 7           So if you have an argument at all, it's some kind of a
 8   fiduciary duty argument.  It is hard for me to see that the law
 9   of fiduciary duty extends so far as to prevent people from
10   doing what is really plain vanilla in the industry.
11           MS. SARNO:  Your Honor, we would certainly not think
12   this particular program is plain vanilla in the industry.  I
13   understand that selling radio ads to different stations and
14   using your usual sales pitch may fall under that.  However,
15   this is a specific program that has done very well.  The fact
16   that they are now going to use it for their stations dilutes
17   the market of this particular program that has done quite well
18   for ClearChannel.
19           THE COURT:  There is a word for that.  The word is
20   competition.
21           MS. SARNO:  But, your Honor, in this particular case
22   we believe it is unfair competition because they have taken the
23   information from ClearChannel and used it for their own
24   purposes.  Certainly the fact that we discovered this
25   information nearly seven business days since they left is
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
83oncapa
```
 1   evidence that this is -- they left ClearChannel.
 2           THE COURT:  What if they rewrote page 2 of the
 3   exhibit?
 4           MS. SARNO:  Your Honor, I believe and we believe that
 5   it's the idea behind the PowerPoint that --
 6           THE COURT:  Tell me what the idea is.  What is the
 7   idea?
 8           MS. SARNO:  The idea is what they do is they reach out
 9   to salespeople and they have an entire program of you click on
10   the website, there's different aspects to it, but this is one
11   aspect.  You click on the website.  It is called Ask the
12   Expert.
13           For example, on Lite FM it's one of the banners that
                              Page 7
```

83oncapa.txt

```
14   you can click.  It says, plastic surgery, dentistry, and then
15   you click on that and it has different endorsements and
16   different information on this particular --
17            THE COURT:  OK.  I will go with you so far.
18            There are people who have bought this from you, right?
19            MS. SARNO:  Yes.
20            THE COURT:  So if I turn on the radio and listen long
21   enough, I am going to hear an Ask the Expert bit, right?
22            MS. SARNO:  Yes.
23            THE COURT:  Some guy is going to come on and say, I'm
24   a chiropractor, and I have got this fabulous way of
25   manipulating somebody's vertebrae and so forth.  And if I am a
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    16
83oncapa
```
 1   competing ad salesman, it doesn't take much to figure out that
 2   if I am hearing that often that is a good way to sell
 3   advertising, right?  Am I not right?
 4            MS. SARNO:  Yes, your Honor.
 5            THE COURT:  So what's the problem?
 6            MS. SARNO:  The problem is that they have taken the
 7   exact methods of ClearChannel and used it for their own.  I
 8   understand that maybe the concept is the same, but what they
 9   have actually done here is taken everything that they've
10   learned from ClearChannel and taken it over to Citadel.
11            Just to give you some more background, your Honor, two
12   of the defendants, Mr. Gross and Mr. Campbell, attended
13   ClearChannel training less than three business days from the
14   day they resigned.
15            We certainly think that what they have done is they
16   have been taking all of the methods and all of the information
17   that they gained from ClearChannel and brought it over to
18   Citadel.  Whether it was by design, we can't make that call,
19   but certainly it's suspicious.  We certainly think it would
20   give us a likelihood of success on the merits because what had
21   happened, just to give you a time line, is Jonathan Mason left
22   ClearChannel in November of 2007.  He had a noncompete
23   agreement and a nonsolicitation agreement that just expired at
24   the end of February 2008.
25            Immediately thereafter, the week afterwards, we get
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    17
83oncapa
```
 1   notices of resignation from these four people.  Two of those
 2   people attended our training process called Solution Based
 3   Selling the Wednesday before they resigned.
 4            They have now taken all of that information and
 5   brought it over to Citadel.  Certainly in that time frame they
 6   gained so much information about ClearChannel products,
 7   ClearChannel --
 8            THE COURT:  What did they gain?  Is there any showing
 9   here in the record?
10            MS. SARNO:  They gained all of the training that they
11   received from ClearChannel University, your Honor.
12            THE COURT:  Listen, the last time I looked,
13   ClearChannel University was not in the Ivy League.  To tell me
14   ClearChannel University, it is just more advertising hype.
15   It's meaningless.  It is an employee training program.
16            What were they trained on?  What is the information
17   that's so sensitive?
18            MS. SARNO:  Within that program, your Honor, they
```
                              Page 8

83oncapa.txt

19  learned ClearChannel's sales techniques, ClearChannel tips --
20          THE COURT:  What specific techniques did they learn,
21  and what's the evidence that they are trade secrets?  What is
22  the evidence, for example, that they are not exactly the same
23  as the sales techniques that Citadel was using before they ever
24  went to Citadel?
25          MS. SARNO:  Your Honor, we would not know what
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        18
83oncapa

1   Citadel's sales techniques are, but certainly these are
2   techniques that have taken years and an extensive amount of
3   resources to develop.
4           THE COURT:  Where is the evidence of that?
5           MS. SARNO:  We have the declaration from the
6   salesperson, and we don't have it here, but the actual booklets
7   and the training programs are quite extensive.
8           THE COURT:  If I had in here XYZ Chevrolet, they could
9   make exactly the same arguments at this level of generality.
10  They would tell me that our car salesmen have got all this
11  wonderful training that we have developed over our 60 years in
12  business, and wowee, it's fabulous.  At the end of the day it
13  may be nothing more than what each and every one of us who has
14  ever bought a car knows for having been through the process.
15  This is all generalities.
16          MS. SARNO:  Your Honor, what the solution based
17  selling includes are client resources, where exactly they
18  should go within the company to get certain information.  They
19  have --
20          THE COURT:  Where within ClearChannel?
21          MS. SARNO:  Yes, where within ClearChannel.
22          THE COURT:  You think that's extremely valuable to
23  Citadel, do you?
24          MS. SARNO:  Sure.
25          THE COURT:  Why?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        19
83oncapa

1           MS. SARNO:  The information that they now have they
2   know where --
3           THE COURT:  You are telling me that it is very
4   important for Citadel to show where within ClearChannel they
5   should go to find something out if they were selling ads for
6   ClearChannel?
7           MS. SARNO:  Yes, your Honor.  They had access to that
8   while they were there.
9           THE COURT:  So what?
10          They probably knew where the men's room was too, but I
11  don't think that would be too valuable to Citadel in most
12  circumstances.
13          MS. SARNO:  Your Honor, the information that they
14  gained during the time that they were there is certainly
15  important, could certainly be important to Citadel.
16          In addition to just that information, they also had
17  all the access to the different ClearChannel products, all the
18  different proposals into the future that they planned on
19  creating.
20          Within that Radio Fusion, your Honor -- I don't want
21  to lose sight of what was in that client information that they
22  had.  We understand that the client lists in and of themselves
23  are readily available.  If I turn on the radio it is available.
                              Page 9

83oncapa.txt

24    But it is the information about those clients which is what was
25    proprietary.  In the Radio Fusion, which is a third-party
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    20
83oncapa
1     program provided by Viero, in there was the company's pricing,
2     scheduling, history of sales.
3             THE COURT:  Is there any evidence they walked out of
4     there with a piece of paper or a CD or a magnetic medium that
5     has any proprietary information on it?
6             MS. SARNO:  Not at this time, but certainly that may
7     be developed.
8             THE COURT:  You think they could remember all this
9     stuff if they ever looked at it?
10            MS. SARNO:  Certainly the names of the people could be
11    remembered, but not the information in there because that
12    information is quite detailed.  It shows the pricing points, it
13    shows differences in pricing points.
14            THE COURT:  All right.  Don't you think that if they
15    were selling ads to an account against ClearChannel and
16    ClearChannel was offering the account a better deal that the
17    account would say, "Hey, I am being offered the following by
18    ClearChannel.  You are going to have to beat that"?
19            Don't you think that's likely?
20            MS. SARNO:  Not necessarily, your Honor.  I mean, even
21    if that were the case, certainly, it would be a different sales
22    pitch if I were to know that ahead of time and wouldn't have to
23    get into that negotiation.  Certainly it could lead to better
24    pricing for them.
25            THE COURT:  But you have no evidence that any of them
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    21
83oncapa
1     has that information, right?
2             MS. SARNO:  Well, they had access to it at that time,
3     your Honor.
4             THE COURT:  Right.  There was a time when I had access
5     to the entire contents of the Harvard University libraries, but
6     I can't repeat them to you.
7             MS. SARNO:  Your Honor, but these particular people
8     had focused on particular clients.  They focused on particular
9     industries, and each of them were different.  Certainly they
10    can remember that information with regard to the ones that they
11    dealt with closely.
12            THE COURT:  When you say "remember that information,"
13    you mean specifically what?
14            MS. SARNO:  For example, the history of a client's
15    sales within that radio station, the pricing and the change of
16    pricing, the specific information about who to contact there
17    and how to pierce the company.  I understand that in the radio
18    industry it can be very difficult to pierce client contacts.
19            THE COURT:  Anything else?
20            MS. SARNO:  Your Honor, just to touch on it as well,
21    certainly the scope and duration of this agreement is very
22    narrow and should be enforced.  180 days within a small
23    industry of radio, within the industry of radio and television
24    in the New York area is very reasonable.
25            THE COURT:  The law in New York is that those
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    22
                              Page 10

83oncapa.txt

83oncapa
```
 1   agreements, correct me if I am wrong, are utterly unenforceable
 2   except to the extent necessary to protect trade secrets.
 3            Isn't that essentially right?
 4            MS. SARNO:  Absolutely, your Honor.
 5            THE COURT:  Where are the trade secrets?
 6            MS. SARNO:  Again, we believe the trade secrets are
 7   within the advertising techniques and programs that they not
 8   only have been aware of but have already used for the benefit
 9   of Citadel.  The information within Radio Fusion that is kept
10   about each particular client and each client that they dealt
11   with we certainly believe is proprietary to ClearChannel, and
12   the fact that they have reached out to them has shown malice on
13   their part that they are already engaging in such
14   misappropriation and unfair competition.
15            THE COURT:  The argument proves more than a little too
16   much.  It proves they would like to continue supporting their
17   families or eating.  And it proves that they know that these
18   are accounts, which anybody else in New York who turns on a
19   radio knows, right?
20            MS. SARNO:  Your Honor, it is not the fact that they
21   know the accounts, but the information about the facts that
22   we're concerned about.
23            THE COURT:  But you don't know that.  You are guessing
24   as to that.  OK.  Thank you very much.
25            MS. SARNO:  Thank you, your Honor.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

23

83oncapa
```
 1            THE COURT:  Mr. Feigelson.
 2            MR. FEIGELSON:  Good afternoon, your Honor.  Jeremy
 3   Feigelson from Debevoise & Plimpton.  We represent the
 4   individual defendants as well as Citadel, with me is my
 5   colleague Tricia Bozyk Sherno.
 6            THE COURT:  What about this Ask the Experts bit?
 7            MR. FEIGELSON:  Let's go right there, Judge.
 8            First of all, you have in the record, we submitted
 9   this afternoon some declarations from each of the four
10   individual defendants disclaiming any knowledge of the
11   PowerPoint presentation that we just seen for the first
12   time and how, if it made its way into Citadel's hands and it
13   was utilized in any way to create the Citadel version of that
14   PowerPoint, these four individuals know nothing about it.  That
15   is now a matter of record, Judge.  So it provides no basis for
16   any injunction against them.
17            We have had this case, your Honor, since late Friday
18   afternoon.  Over the holiday weekend we have been able to learn
19   a lot of facts, but not all the facts.  I cannot, sitting here
20   today, give your Honor a good explanation of the degree to
21   which the slides are similar and what role anyone within the
22   Citadel organization may have played.  That is something
23   obviously that we will look into.
24            But I want to emphasize, your Honor, that the program
25   itself, Ask the Expert, as your Honor suggested in the colloquy
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

24

83oncapa
```
 1   with Ms. Sarno, there is really nothing special or confidential
 2   or proprietary about it.
 3            THE COURT:  It is not dissimilar to Car Talk in a
 4   segment called "Stump the Chumps."
                     Page 11
```

```
                              83oncapa.txt
 5             MR. FEIGELSON:  I am a fan of that show, your Honor,
 6    so I would not disagree.  I was going to direct the court to
 7    the Campbell declaration, which is Exhibit 5 in the declaration
 8    package that we handed up to your Honor earlier.
 9             If the Court looks at Exhibit E to the Campbell
10    declaration, you will see there are two Internet promotions for
11    radio sales programs called Ask the Expert which appear to be
12    essentially identical.  These are from two other radio station
13    companies, Sinclair and Entercom, which have nothing to do with
14    either Citadel or ClearChannel.
15             This is a concept, your Honor, that has been out there
16    in the radio industry for --
17             THE COURT:  For a million years.
18             MR. FEIGELSON:  -- years and years.
19             While the similarity between the couple of the slides
20    and the PowerPoint is a matter of curiosity, Judge, I think
21    it's fair to say that it is of no legal consequence,
22    particularly since the program itself does not embody any kind
23    of a protectable concept.  It's what everybody in the business
24    does.  It is how everybody sells.
25             If the Court has other questions about Ask the Expert,
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                              25
                              83oncapa
 1    I would be pleased to try to answer them.  Otherwise I do want
 2    to touch on jurisdiction.
 3             THE COURT:  I am afraid of asking the expert.
 4             MR. FEIGELSON:  Jurisdiction, your Honor, is quite a
 5    serious issue.  Citadel's incorporation is a matter of public
 6    record.  The 10-K that is in the exhibit package that we handed
 7    up, that we submitted to chambers earlier today, Exhibit 9 to
 8    the Feigelson declaration, is the cover page from Citadel's
 9    10-K, that, of course, is a publicly available document, your
10    Honor.  We have pulled it down from Citadel's website.  It is
11    there for the world to see, including ClearChannel and its
12    counsel.  It is a complete answer to the assertion that there
13    is diversity jurisdiction here.
14             To be clear, your Honor, the complaint only asserts
15    one ground for federal jurisdiction.  That is diversity.
16    Diversity, of course, requires complete diversity.
17             You will see in the caption that Capstar asserts that
18    it is a Delaware corporation.  We now know that Citadel
19    Broadcasting also is a Delaware corporation.  That means, your
20    Honor, that wherever this case belongs, if it belongs anywhere,
21    it does not belong in federal court.
22             THE COURT:  Not necessarily, because if I thought it
23    appropriate, I could permit Citadel to be dropped as a party,
24    right?
25             MR. FEIGELSON:  You could, your Honor.  We are
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                              26
                              83oncapa
 1    certainly aware of that possibility.  That's why in our papers
 2    we did go to on to address the merits.  I will go into those
 3    issues now.
 4             Our position, your Honor, is that certainly there is
 5    no basis in today's record for a TRO.  There will never be a
 6    basis, even after the record is developed, but certainly not
 7    today.
 8             Today, after two days of investigation that we have
 9    been able to document very thoroughly in our papers, Judge,
                                Page 12
```

83oncapa.txt

10    there is absolutely nothing proprietary or confidential that is
11    at issue in this business dispute.
12                This is a dispute about front-line radio ad salesmen,
13    as your Honor noted.  It is not about people with access to
14    high-level corporate information.  It is not about the secret
15    formula for Coke.
16                We are talking about a handful of categories of
17    information.  Each of them is shown very comprehensively in our
18    papers, Judge, based on just two days of investigation, to be
19    matters of public record.  Customer identities, not only your
20    Honor, are they available to any listeners of the radio, but
21    again, pointing to the Campbell declaration, if the Court looks
22    at Exhibit B to the Campbell declaration, this is a report from
23    a subscription based web service called Media Monitors.  What
24    this shows, your Honor, is, with a couple of clicks of a mouse,
25    any salesmen in this industry can call up an extremely detailed
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    27
83oncapa
1     station-by-station, day-by-day, day part-by-day part report of
2     exactly who is advertising on what radio stations.
3                 It is a report that your Honor sees in the record here
4     was actually called up by Mr. Campbell, one of the
5     defendants, using his Citadel-issued log-on ID.  He's able to
6     call up all the detail for WKTU, which is the station he used
7     to sell for at ClearChannel.
8                 Anyone can do that who has access to Media Monitors.
9     It is a totally standard industry tool, and it is the way that
10    salesmen using this public information fairly go after the
11    competition regardless of whether they used to work at the
12    competing company or not.  There is an enormous amount of
13    detail available out there that doesn't even require turning on
14    the radio.
15                As far as customer contact information, it is also a
16    matter of record that it is extremely easy to obtain.  We are
17    talking about salesmen who are targeting primarily small and
18    mid-sized businesses in the New York area, car dealerships,
19    restaurants, doctors.  It does not take a lot of work, your
20    Honor, to find out who at one of these businesses is the right
21    contact person to make an advertising decision.  It is in
22    Mr. Campbell's declaration, again undisputed, that all it takes
23    is typically a couple of clicks of a mouse maybe a phone call
24    or two and you've got the right person.  It is as simple as
25    that.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    28
83oncapa
1                 The contact information, to the extent it is not
2     already publicly available by looking on a business' website,
3     is very easily re-created by anyone without special knowledge
4     or information.
5                 The other categories of information that are at issue
6     here, Judge, I think are the software, the training, and the
7     specific materials.  The software I think it's very clear is
8     not proprietary at all.  It is described explicitly in the
9     papers that ClearChannel submitted as proprietary software.  It
10    is just not.  Every software system that's been described is
11    publicly available for purchase by any radio station company.
12                I think it is also clear from the colloquy we just
13    heard that there is no evidence that these individuals had
14    taken any information from those systems, and their
                           Page 13

83oncapa.txt

15    declarations confirm that.  Those are now in the record, too.
16        The training is generic training.  How do you sell ads
17    on radio?  Again, this is not rocket science, your Honor.  As
18    for specific materials, what we have been able to learn and
19    what the declarations confirm is that these individuals took
20    their contacts lists because those are public information.
21    They provided client contact information for clients whose
22    identity as customers of the ClearChannel station is already
23    well known.  In a couple of cases people seemed to have taken
24    some presentation materials with them, which they have now
25    promised that they will return and which they have not
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                  29
      83oncapa
1     consulted or used any way in the few days that they have been
2     working for WABC.
3         THE COURT:  What about the question of whether they
4     ought to be permitted to contact accounts that were either
5     handed to them at ClearChannel or that they developed beginning
6     while they were at ClearChannel.
7         MR. FEIGELSON:  I think ClearChannel's own views on
8     that are quite important, your Honor.  One of the things we've
9     suggested in our papers is that we agree with ClearChannel that
10    there ought to be expedited discovery.  One of the major topics
11    we would propose to pursue in expedited discovery is how
12    ClearChannel looks at this very issue, because two of the
13    individual defendants, your Honor, have stated in their
14    declarations that when they came to ClearChannel, they were
15    encouraged or even specifically directed to pursue clients from
16    former radio station companies where they used to work.
17        This is how the business functions, your Honor.  It is
18    how ClearChannel functions, too.  So should they be allowed to?
19    I think they should certainly be allowed to do at Citadel what
20    ClearChannel encouraged them to do when they were at
21    ClearChannel.
22        THE COURT:  I'm chuckling because this is deja vu all
23    over for me.  I will explain why later.
24        MR. FEIGELSON:  In any event, your Honor, should they
25    be allowed to -- again it goes back to the question of is there
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                  30
      83oncapa
1     anything confidential or proprietary here.  Anyone could come
2     to a sales job like this, your Honor; and, equipped with the
3     same tools that any of these four individual defendants have,
4     could quickly reconstruct the same client profiles and customer
5     contact information for all the clients of a ClearChannel
6     station.
7         So it is fair competition, your Honor, and there is no
8     reason why these individuals should be forbidden to engage in
9     it.
10        It is also important to note, your Honor, that some of
11    the clients contacts we are talking about here are contacts
12    that these gentlemen brought with them from previous
13    employment.  Certainly, it would be odd to suggest that
14    ClearChannel acquires a proprietary interest in a customer
15    relationship the individual had already developed while working
16    at another employer.
17        THE COURT:  This is just like the Wall Street rating
18    cases when the brokers go from one house to another.  Every
19    firm on Wall Street has the papers on both sides of the issue
                          Page 14

83oncapa.txt

20  in the word processor ready to go depending on whether they are
21  rating or being rated.
22          MR. FEIGELSON:  Well, your Honor, the fact that all
23  these categories of information that the plaintiffs have put in
24  issue are clearly matters of public information and common
25  sense, that is really the thread that pulls you through all of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    31
83oncapa
1   the legal theories that have been thrown up in the plaintiff's
2   papers.
3           All of those legal theories, including the proposition
4   that the noncompete should be enforced, they all require an
5   evidentiary showing of actual trade secrets and confidential
6   information.
7           I think it's very clear that there's been no showing.
8   In fact, with our submission today, your Honor, the record
9   tilts very heavily in the opposite direction.
10          We would be pleased to engage in expedited discovery.
11  We have included in our submission a proposed order and some
12  initial discovery requests.
13          We are ready to be back here in a matter of weeks
14  after quick document productions and quick depositions on both
15  sides to show your Honor on the basis of a full record exactly
16  why this case as absolutely no merit.
17          THE COURT:  Is there any reason why I shouldn't
18  consolidate the preliminary injunction motion with the trial on
19  the merits under Rule 65(a)(2)?
20          MR. FEIGELSON:  Your Honor, that is a question that
21  obviously I need to consult with my client on before answering
22  definitively, but my snap reaction is it sounds like a
23  reasonable idea.
24          THE COURT:  Thank you.
25          Ms. Sarno?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    32
83oncapa
1           MS. SARNO:  Your Honor, just to address a few of the
2   point that were raised by defendant, we are well aware of Media
3   Monitors.  It was an Internet program that is available to
4   everyone and is certainly known to all account executives.
5           What we are talking about is what is available on the
6   information that is within Radio Fusion.  Radio Fusion,
7   although it is provided by Viero, has been particularly
8   tailored for ClearChannel.  In that is specific historical
9   purchase information, product information, benefits
10  information, pricing, scheduling, and sponsorship information.
11          This is all information that was kept about the
12  clients that these four individuals worked with.  These four
13  individuals developed goodwill, and for the most part, with the
14  exception ever a few of them, were developed at ClearChannel
15  and were prior clients of ClearChannel long before they were
16  there.  They now have this information to take with them.
17          With regard to the allegation that these gentlemen
18  were encouraged to solicit clients from their former employers,
19  I am aware of one of them, and, yes, he was encouraged because
20  there was no noncompete agreement.  It is my understanding one
21  of the gentleman came from another radio station, and there was
22  no --
23          THE COURT:  That ultimately doesn't matter if you are
24  right on the law, right?
                          Page 15

83oncapa.txt

25          If in fact it is actionable under New York law on the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    33
     83oncapa
 1   theory of unfair competition to compete with a former employer
 2   for a customer to whom the changing employee was introduced
 3   while at the former employer, then the absence of a noncompete
 4   doesn't matter, right?
 5          MS. SARNO:  Yes, your Honor.  But in this particular
 6   situation, they took the goodwill and they took the client, the
 7   confidential client information with them and they are now
 8   using it.  They have admitted that they have contacted --
 9          THE COURT:  Don't you think that when these guys you
10   hired and encouraged to go after their former accounts came to
11   you that they knew what the business history and the
12   relationship between their former employer and the clients you
13   urged then to go after was?  They couldn't have avoided knowing
14   that if your theory holds water.
15          MS. SARNO:  That is true.  But without a contractual
16   agreement restricting them or a nonsolicitation or
17   noncompete --
18          THE COURT:  If your unfair competition theory is
19   right, the noncompete doesn't matter, does it?
20          MS. SARNO:  I understand where you are going, your
21   Honor, but certainly that goes to the ones that they brought
22   with them.  From my understanding, they're putting those aside,
23   almost all of the clients that they worked with.
24          THE COURT:  It doesn't go to the ones they brought
25   with them.  It goes to what your client's practice is.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    34
     83oncapa
 1          Let us posit for the sake of discussion that it is
 2   unfair competition for an employee to move from employer A to
 3   employer B and then to solicit employer A's clients because he
 4   knows things about employer A's clients that he learned while
 5   working for employer A.
 6          That's your premise, right?
 7          MS. SARNO:  Yes.
 8          THE COURT:  Let's assume that to be true.
 9          If your practice is, notwithstanding that principle,
10   to take somebody who comes from employer A and goes to work for
11   you to solicit the accounts he served while employed by
12   employer A, then you are regularly encouraging and engaging in
13   unfair competition, right?
14          MS. SARNO:  If the circumstances are the same.  The
15   reason why I say that is I also, in addressing your Honor, the
16   radio station -- for example, I believe it was Mr. Carpino that
17   came from a different radio station that brought over some
18   clients and he contacted them.  It is my understanding with
19   regard to him he came from a station that was not in the same
20   market as ours.
21          That is the situation where he was encouraged to
22   solicit.  What we are most concerned about are the clients.
23          THE COURT:  How many thousands of stations does
24   ClearChannel have?  11,000 or 12,000.
25          MS. SARNO:  12,000.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    35
     83oncapa
                           Page 16

83oncapa.txt

```
 1          THE COURT:  Do you think you could identify more than
 2   about 11 markets in the United States that you are not in?
 3          MS. SARNO:  Your Honor, I am talking about the station
 4   that they went to and the station from which they came.  For
 5   example, all four of these went to WABC.  WABC and WKTU and
 6   Lite FM are within the same market.  That certainly is
 7   different from all the different markets that ClearChannel as a
 8   whole belongs to.  What we are comparing is what station they
 9   come from and where they went.
10          THE COURT:  OK.
11          MS. SARNO:  Certainly, your Honor, we believe that
12   information that they gained and the goodwill that they
13   developed with these particular client contacts are proper
14   protectable interests of the company.
15          Thank you.
16          THE COURT:  OK.  I have the same question to you on
17   the 65(a)(2) consolidation that I asked Mr. Feigelson.
18          MS. SARNO:  Your Honor, I as well would have to
19   consult with my client.  But it certainly seems like an
20   expedited way to address the issue.
21          THE COURT:  Let's talk about scheduling.
22          What do you have in mind?  I could try this case in
23   April sometime.
24          MS. SARNO:  Your Honor, I understand that, if I may
25   from here, I have not even had a chance to take a look at
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

83oncapa

```
 1   defendant's proposed schedule.
 2          THE COURT:  I frankly wasn't focused on that either.
 3   What about setting this down for April 23.  Then if it takes
 4   more than a day, I think I can continue past that.  This is
 5   unlikely to take more than two, two and a half days, right?
 6          MS. SARNO:  I don't think so, your Honor.
 7          THE COURT:  OK.  Let's say 9:30 on April 23, at least
 8   the preliminary injunction hearing and, unless you can persuade
 9   me otherwise, trial on the merits.
10          There is no jury demand, right?
11          MS. SARNO:  No, your Honor.
12          THE COURT:  Mr. Feigelson, there's not going to be a
13   jury demand, right?
14          MR. FEIGELSON:  Not from our side, your Honor.
15          THE COURT:  So 9:30 on the 23rd.
16          Expedited discovery you have agreed on.  It is
17   perfectly OK with me.  I am not going to grant a temporary
18   restraining order.
19          First of all, I'm by no means persuaded that there is
20   a substantial threat of irreparable injury.  There's been a lot
21   of talk of generalities, but I don't see any hard facts.
22          That goes also to the issue of likelihood of success
23   on the merits.  With respect to that point, there's the
24   additional problem that it appears, at least on the present
25   state of the matter that diversity is incomplete, at least as
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

83oncapa

```
 1   it respects Citadel, and maybe more broadly there will be no
 2   jurisdiction.  We will see what the future holds on that.  But
 3   I just don't see any reason for a temporary restraining order
 4   here.
 5          Now, if the plaintiff wants to press for a preliminary
```

Page 17

83oncapa.txt

```
 6   injunction, you can file more papers and I'll see whether I get
 7   to it before April 23, but no temporary restraining order.
 8            Let's get to the rest of the schedule.
 9            MR. FEIGELSON:  Your Honor, if it is acceptable to the
10   Court, Exhibit 2 to my declaration is a proposed scheduling and
11   confidentiality order which lays out some dates.  We did not
12   have a chance to consult with plaintiff's counsel on this ahead
13   of today's hearing, but it is there for everyone to look at
14   now.
15            THE COURT:  Ms. Sarno, what is your comment on that.
16            MS. SARNO:  Your Honor, we could certainly expedite
17   our service of document requests.  However, we would ask that
18   it be until Wednesday as opposed to tomorrow, 10:00 a.m. on
19   3/26.
20            THE COURT:  Fine.
21            Document requests to be served by March 26.
22            Document production to be finished by -- what do you
23   want to do on that.  A week from today?
24            MS. SARNO:  A week from today.
25            THE COURT:  OK.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

83oncapa

```
 1            March 31, completion of document requests.
 2            Given that we have the hearing on the 23rd, do you
 3   want to go beyond April 7 on depositions?
 4            MS. SARNO:  Yes, please.
 5            THE COURT:  How much further?
 6            MS. SARNO:  A week thereafter.
 7            THE COURT:  OK.  Depositions and all other discovery
 8   to be completed by April 14.
 9            Exchange premarked exhibits, exhibit lists, and
10   witness lists by April 21.  We will be ready to go on the 23rd.
11            Anything else that we need to do?
12            MR. FEIGELSON:  Your Honor, our proposed order
13   included some confidentiality provisions.  I don't want to
14   impose on my adversary to try to agree on those on the spot.
15   Perhaps we should submit an order that embodies --
16            THE COURT:  Submit a pretty standard confidentiality
17   order and I will sign it.
18            MR. FEIGELSON:  Thank you, your Honor.
19            THE COURT:  Is there something else?
20            Let's go off the record for a minute.
21            (Discussion off the record)
22            THE COURT:  OK.  If you have problems on discovery,
23   you will let me know.  Thank you, folks.
24            (Adjourned)
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# Exhibit 2

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

Capstar Radio Operating Company, a Delaware
Corporation,

        Plaintiff,

        v.

Anthony Campbell; Louis Carpino; Adam Gross;
Jose Luis Torres; Citadel Broadcasting Corporation,
a Nevada Corporation; and John Does 1-10,

        Defendants.

----------------------------------------------------------------x

**08 CV 2976**

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINING ORDER**

This matter having been brought to the Court by Seyfarth Shaw LLP, attorneys for

Plaintiff Capstar Radio Operating Company, an indirect subsidiary of Clear Channel

Communications Inc. ("Clear Channel" or "Plaintiff"), and upon written electornic notice of this

Motion being given to defendants Anthony Campbell ("Campbell"), Lou Carpino ("Carpino"),

Adam Gross ("Gross"), Jose Luis Torres ("Torres") (together "Individual Defendants"), and

Citadel Broadcasting Corporation, a Nevada Corporation ("Citadel") (collectively,

"Defendants") as set forth in the accompanying Rule 65 Certification; and it appearing to the

Court from the facts alleged in the Complaint, the Declarations of Mirian Jerez, Bernhard Weiss,

Robert Williams, Leon Bart-Williams, Steven Kritzman, the Declaration of Lynnette Sarno,

Esq., and the accompanying Memorandum of Law; that immediate and irreparable harm will be

caused to Clear Channel before a hearing may be held on this Motion; and for other good cause

appearing for the entry of this Order, it is hereby

~~ORDERED that sufficient reason having been shown therefore, pending the hearing and~~

~~determination of this motion for~~ preliminary injunction, Defendants, and all persons acting in

concert with them, be, and hereby are, temporarily restrained and enjoined until further Order of the Court as follows:

1.  Individual Defendants are temporarily restrained and enjoined from directly or indirectly, operating, owning, being associated with, or being employed by, or rendering services to, any radio station, television station (including any cable organization or supplier) or any firm or affiliated company owning or operating a radio station, television station or cable system, with an office located in New York, New York, including Citadel;

2.  Defendants, and all persons and/or entities acting on their behalf, for their benefit or in active concert or participation with them, are temporarily restrained and enjoined from directly or indirectly disclosing, reproducing, or using any confidential, proprietary and/or trade secret information of any kind, nature or description belonging to Clear Channel, including but not limited to, information relating to Clear Channel's clients, database systems, business and financial information, marketing and pricing strategies and techniques, etc.;

3.  Defendants, and all persons and/or entities acting on their behalf, for their benefit or in active concert or participation with them, are temporarily restrained and enjoined from directly or indirectly contacting, or soliciting the trade and patronage of Clear Channel's customers or clients;

4.  Defendants, and all persons and/or entities acting on their behalf, for their benefit or in active concert or participation with them, are temporarily restrained and enjoined from directly or indirectly contacting or soliciting Clear Channel's employees and consultants;

2

5.      Defendants, and all persons and/or entities acting on their behalf, for their benefit or in active concert or participation with them, are directed not to destroy, but to immediately return to Clear Channel all documents, records and property of any kind or nature whatsoever and in whatever form, including electronic (including copies thereof and computer records) (collectively referred to as "materials"), which are within the Defendants' possession, custody or control and belong to Clear Channel, including, without limitation, any such materials that contain, reflect or refer to Clear Channel's clients, pricing structure, training materials or other documents reflecting Clear Channel's methods of doing business and/or business strategies;



6.      Defendants, and all persons and/or entities acting on their behalf, for their benefit or in active participation with them, are to provide a sworn statement(s) and accounting(s) of the whereabouts of all Clear Channel property, including all files, data, and/or information removed, downloaded, transferred, printed, accessed or e-mailed from Clear Channel computers or computer network, including, but not limited to, all information copied, downloaded, transferred or printed by the Individual Defendants prior to the termination of their employment with Clear Channel;

7.      Defendants and all persons and/or entities acting on their behalf, for their benefit or in active concert or participation with them, are to produce for inspection and imaging all electronic devices, including, but not limited to, all computers, hard disk drives, floppy disk drives, removable storage devices (*e.g.*, thumb drives), CDs, DVDs, pda's, cell phones, blackberries, and/or all other similar electronic storage devices belonging to, under the control of, accessible to, or operated by

3

the Individual Defendants  to verify the use, access, disclosure, printing, copying, and return of Clear Channel property including, but not limited to, all confidential, proprietary and/or trade secret information belonging to Clear Channel; and

**IT IS FURTHER ORDERED** that Defendants shall preserve, and not destroy, damage, or alter in any way, all potentially relevant evidence in this action, including, but not limited to, any Clear Channel materials residing on any computer database, including, hard disk drives, floppy disk drives, removable storage devices (*e.g.*, thumb drives), CDs, DVDs, pda's, cell phones, blackberries and/or all other similar electronic storage devices belong to, under control of, accessible to, or operated by Defendants. Defendants shall also preserve, and not destroy, damage, or alter in any way, all e-mails in any and all of  Individual Defendants'  email accounts, including, but not limited to, any personal e-mail accounts, which refer to, relate to and/or contain Clear Channel information of any kind; and

**IT IS FURTHER ORDERED** that Defendants immediately produce any and all emails sent to, or from, Defendants from any e-mail account which  belong to, under  the control of, accessible to, or operated by Defendants , which refer or relate in any way to, Clear Channel or any of Clear Channel's employees, clients, business information or strategies, training materials, or any other of Clear Channel Trade Secrets; and

**IT IS FURTHER ORDERED** that

1. ~~Clear Channel  immediately after service of this Order,~~ *The parties* *may* engage in expedited discovery ~~for the purpose of (a) determining any unknown individual or individuals who are aiding and abetting the Defendants in the (i)~~ theft of Clear Channel's confidential, proprietary and trade secret information, or (ii) unfair competition with Clear Channel; and/or (b) determining the full scope of

4

Defendants' breaches of their common law and contractual obligations and the full scope of any Clear Channel information and property stolen and/or used by Defendants;

2.   Clear Channel is permitted, immediately after service of this Order, to inspect and image all computers and other electronic devices, including, but not limited to, computers, hard disk drives, floppy disk drives, removable storage devices (e.g., thumb drives), CDs, DVDs, pda's, cell phones, blackberries and/or all other similar electronic storage devices belonging to, under the control of, accessible to, or operated by Defendants on which Clear Channel information of any kind resides or may have resided. Accordingly, Defendants must produce, within three (3) court days of service of this Order upon them, all computers or other electronic devices described above belong to, under the control of, accessible to, or operated by Defendants on which Clear Channel information of any kind resides or may have resided;

3.   Clear Channel may, immediately after service of this Order upon Defendants, notice the deposition of each Individual Defendant, including inspecting requested documents at the deposition, upon five (5) court days' written notice;

4.   Clear Channel may, immediately after service of this Order upon Defendants, notice the deposition of a corporate witness authorized to testify on behalf of Citadel, pursuant to Fed. R. Civ. P. 30(b)(6), including inspecting requested documents at the deposition, upon five (5) court days' written notice;

5.   Clear Channel may, immediately after service of this Order upon Defendants, notice the deposition of Jonathan Mason, a former employee of Clear Channel

5

and current employee of Citadel, including inspecting requested documents at the

deposition upon five (5) court days' written notice;

6.   Clear Channel may, immediately after service of this Order upon Defendants,

notice the deposition of any non-party pursuant to Fed. R. Civ. P. 45, upon five

(5) court days' written notice;

7.   Clear Channel may, immediately after service of this Order upon Defendants,

propound written discovery upon Defendants requiring verified written responses

and the production of documents and things within five (5) court days after

service of said request(s); and

**IT IS FURTHER ORDERED** that the Defendants show cause before this Court on the

_23rd_ day of ~~March~~ _April_ 2008 at the United States Courthouse for the Southern District of New York,

Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Room _12-D_ at _9:30 a.m._

a.m./p.m., or as soon thereafter as counsel may be heard, why an Order should not be issued

against the Defendants pursuant to Rule 65 of the Federal Rules of Civil Procedure ~~to~~ _preliminarily_
_enjoining them_ ~~preliminarily continue the temporary restraints~~ _in the first decretal paragraph above,_ as set forth above during the pendency of this

action; and

~~**IT IS FURTHER ORDERED** that no security need be posted; and~~

**IT IS FURTHER ORDERED** that service of this Order and Clear Channel's supporting

papers and the Summons and Complaint shall be effected by personal service or overnight

delivery upon the Defendants, or upon their attorney(s), on or before the ___ day of March

2008; and

**IT IS FURTHER ORDERED** that Defendants shall serve and file their papers in

opposition to Clear Channel's motion for a preliminary injunction, if any, on or before

_____ 2008; and

6

**IT IS FURTHER ORDERED** that Clear Channel shall serve and file its reply papers in further support of its motion for a preliminary injunction, if any, on or before _____ 2008.

Dated: New York, New York
       March 2⅞, 2008

SO ORDERED:

_____
U.S.D.J.

7

# Exhibit 3



620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

fax (212) 218-5526

www.seyfarth.com

Writer's direct phone
(212) 218-5531

Writer's e-mail
ggalant@seyfarth.com

March 25, 2008

**VIA FEDERAL EXPRESS**

Jeremy Feigelson, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

      Re:    Capstar Radio Operating Company v. Anthony Campbell, et al.
               Civil Action No. 08-2976

Dear Mr. Feigelson:

    Enclosed herewith is Capstar Radio Operating Company's First Request for Production of Documents.

           Very truly yours,

           SEYFARTH SHAW LLP

           Gloria Galant

cc:    L.Lynnette Sarno, Esq.

BRUSSELS   WASHINGTON, D C   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA

L. Lynnette Sarno, Esq.
Gloria Galant, Esq.
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Attorneys for Plaintiff
  Capstar Radio Operating Company

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
Capstar Radio Operating Company, a Delaware  :
Corporation,                                 :
                                             :
                                             :
                 Plaintiff,                  :    08-CV- 2976
                                             :
        v.                                   :
                                             :
Anthony Campbell; Louis Carpino; Adam Gross; :
Jose Luis Torres; Citadel Broadcasting Corporation, :
a Nevada Corporation; and John Does 1-10,    :
                                             :
                 Defendants.

--------------------------------------------------------------x

## PLAINTIFF CAPSTAR RADIO OPERATING COMPANY'S
## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Local Rules of

Civil Procedure of this Court, and the March 24, 2008 Order of the Court for expedited

discovery, Plaintiff Capstar Radio Operating Company, ("Clear Channel"), by and through its

attorneys, Seyfarth Shaw LLP, hereby requests that Defendants Anthony Campbell

("Campbell"); Louis Carpino ("Carpino"); Adam Gross ("Gross"); Jose Luis Torres ("Torres")

(together "Individual Defendants") and Citadel Broadcasting Company (collectively

"Defendants"), produce the following documents at the offices of Seyfarth Shaw LLP, 620

Avenue of the Americas, New York, New York 10018 within five (5) days of the date of service of this request.

## I.    INSTRUCTIONS

1.    This request for documents is addressed to Defendants, their agents, representatives, or attorneys, if any, or any of them. If the requested documents are known to Defendants to exist, but are not presently in the possession, custody or control of Defendants, their agents, representatives, attorneys, or any of them, Defendants should produce such documents when they do come into their possession, custody, or control.

2.    Documents produced pursuant to Clear Channel's First Request for Production of Documents and Things (the "Request") should be produced as they are kept in the regular course of business or organized and labeled to correspond to the categories of this Request. In addition, documents are to be produced in full and unexpurgated form, including all copies of documents that bear any notes, marks, or notations not existing on the original.

3.    The term "Citadel" shall mean and include Citadel Broadcasting Corporation, NY Radio Asset LLC, its subsidiaries and affiliates and any other divisions of such entities.

4.    If any document called for by this Request has been lost, discarded, or destroyed, Defendants must describe the document, including but not limited to the nature of the document and its contents, the sender, the author, the recipient, the recipient(s) of any copies, the date, the name of each person on the original or any copy that was circulated, and a summary statement of the subject matter of such document, and an explanation of when and why the document was lost, discarded, or destroyed.

5.    Any document responsive to any request should be identified as being responsive to the specific request involved. If the same document is responsive to more than one request, all requests to which it is responsive should be identified.

2

6.    Consistent with the Federal Rules of Civil Procedure, these document requests shall be continuing so as to require Defendants to supplement their responses when and if they obtain any further documentation subsequent to the service of their response to this Request.

## II.    DEFINITIONS

1.    The term "Defendants" shall mean and include Individual Defendants, NY Radio Assets LLC, Citadel, their counsel, and any consultants, experts, investigators, agents, representatives, or other persons acting on behalf of any Defendant (or any combination of Defendants) or subject to his, her or its control.

2.    The term "Clear Channel" shall mean and include Capstar Radio Operating Company and Clear Channel Communications Inc., its subsidiaries and affiliates, and any other division of such entities.

3.    "Person" shall mean and include a natural person, individual, partnership, firm, corporation, or any kind of business or legal entity, its agents and/or employees.

4.    The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, by way of illustration only and not by way of limitation, the following, whether printed or reproduced by any process, or written, and/or produced by hand, and whether or not claimed to be privileged or otherwise excludable from discovery, namely: notes; correspondence; communications of any nature; telegrams; memoranda; notebooks of any character; e-mails or computer files; summaries or records of personal conversations; diaries; routing slips or memoranda; calendars; reports; publications; photographs; minutes or records of meetings; transcripts of oral testimony or statements; reports and/or summaries of interviews; reports and/or summaries of investigations; agreements and contracts, including all revisions and/or modifications thereof; court papers; brochures; pamphlets; press releases; drafts of, revisions of drafts of, and/or translations of any

3

documents; tape recordings; record and dictation belts; audio tapes and video tapes. Any document with any marks on any sheet, back, or side thereof, including by way of illustration only and not by way of limitation, initials, stamped indicia, any comment, or any notation of any character, not part of the original text, or any reproduction thereof, is to be considered a separate document for purposes of this Request.

5.    The term "concerning" means relating to, referring to, describing, evidencing or constituting.

6.    In construing these requests: (i) the singular shall include the plural and the plural shall include the singular; (ii) the masculine, feminine, or neutral pronouns, respectively, shall include the other genders; (iii) "and" as well as "or" shall be construed either disjunctively or conjunctively so as to bring within the scope of these requests all documents that might otherwise be construed to be outside their scope; and (iv) the present tense of a verb shall include its past tense and vice versa.

7.    The word "all" shall be construed to include the word "any" and the word "any" shall be construed to include the word "all."

8.    The relevant time period shall be March 1, 2006 through the present, unless otherwise specified in any Request.

### III.    CLAIMS OF PRIVILEGE

If any document falling within the description contained in any of the following requests is withheld under a claim of privilege, shall serve upon the undersigned attorneys for Clear Channel a written list of the withheld documents, including the following information as to each such item: (a) its date; (b) the name(s) of the person(s) or other entity(ies) who or which drafted, authorized, or prepared it; (c) its title; (d) the type of document (e.g., letter, memorandum, notes of meetings, conversations); (e) the name(s) of each person(s) or other entity(ies) to whom it was

addressed; (f) the name(s) of each person(s) or other entity(ies) to whom the item or any copy or reproduction thereof was ever directed, addressed, sent, delivered, mailed, given, or in any other manner disclosed;  (g)  the subject matter of the document; and  (h) a statement of the ground or grounds on which each such document is considered to be privileged from production.

## IV.    SCHEDULE OF DOCUMENTS TO BE PRODUCED

1.      All documents that reflect each of the Individual Defendants' education, work experience, and professional qualifications, including but not limited to all resumes, curricula vitae, cover letters and/or other correspondence.

2.      All documents concerning any communications between or among any Individual Defendant and Citadel at any time concerning employment or prospective employment at Citadel, including all documents and/or communications exchanged between any Individual Defendant and an employee of Citadel.

3.      All documents concerning Citadel's recruitment and/or hiring of any Individual Defendant for employment, including, but not limited to, applications for employment with Citadel, employment agreements with Citadel, and any communications between any Individual Defendant and an employee of Citadel.

4.      All documents concerning any communications between any employee of Citadel and any Individual Defendant while the Individual Defendant was employed by Clear Channel.

5.      All documents concerning any contracts or agreements between any Individual Defendant and Citadel, including prior agreements and/or drafts, and any offers of employment.

6.      All documents concerning Individual Defendants' decisions to resign from Clear Channel.

7.      All documents concerning Individual Defendants' decision to accept employment with Citadel.

8.    All documents relating to Individual Defendants' job duties and responsibilities at Citadel.

9.    All documents concerning Individual Defendants' compensation and benefits at Citadel.

10.    All documents sufficient to identify all Citadel advertisers obtained as a result of hiring sales personnel who previously had sold to or solicited those accounts, or otherwise had relationships with contacts at those accounts while employed at competing radio companies prior to the sales personnel being hired by Citadel.

11.    All documents concerning any Citadel practices or policies (official or otherwise) relating to Citadel sales personnel's solicitation of account contacts obtained while working for previous employers, including any guidelines or restrictions on their doing so as well as any documents reflecting or relating to particular solicitations or potential solicitations.

12.    Individual personnel files for each Individual Defendant.

13.    All documents that pertain in any way to Clear Channel's business, including, but not limited to, training materials, presentations, business plans, strategic documents, financial information, client contacts, customer lists, customer databases, customer utilization records, information contained on Clear Channel's Radio Fusion or Best Rate databases, contracts, employees, client databases, operations, sales and marketing and pricing strategies, that the Defendants currently have in their possession or control or that the Defendants have provided to any person or entity outside of Clear Channel.

14.    All documents concerning any documents, data or information which was created or maintained by, belongs or refers to, and/or was obtained from Clear Channel, including, without limitation, any customer lists, price information, trade secrets, business information, business strategy, financial information, client contact lists, account books, customer utilization

6

records, contracts, employee lists and resources, client databases, marketing and business plans and strategies, pricing/negotiating strategies, or records and papers pertaining to transactions handled by Individual Defendants while they were employed by Clear Channel, whether received orally, in the original form, or contained in other documents, disks, computer or other data storage or memory devices of any kind.

15.    All documents containing the name, logo, insignia or letterhead of Clear Channel, or any of its affiliates, or any employee, present or former of Clear Channel.

16.    All documents relating to the development of Citadel's "Talk to the Expert" sales program, including any documents created or maintained by Clear Channel in connection with its "Ask the Expert" sales program.

17.    All documents relating to Citadel's use of or sales of the "Talk to the Expert" sales program.

18.    All documents that reflect who has used or promoted Citadel's "Talk to the Expert" sales program.

19.    All documents concerning Citadel's recruitment and/or hiring of any current or former employee of Clear Channel including, but not limited to, resumes, cover letters, notes of conversations, interviews, or meetings, e-mails, employment agreements, personnel files, etc.

20.    All documents concerning the Defendants' solicitation of current or former clients or customers of Clear Channel, or concerning communications between the Individual Defendants and any former or current client or customer of Clear Channel while employed by Citadel.

21.    All documents concerning Mr. Jonathan Mason's ("Mason") employment with Citadel including, but not limited to, personnel files, employment agreements, communications or correspondence between Citadel and Mason regarding Mason's employment with Citadel.

7

22.    All communications exchanged between Mason or any employee of Citadel and/or any of the Individual Defendants regarding Clear Channel.

23.    All communications exchanged between Mason and any of the Individual Defendants while they were employed by Clear Channel.

24.    All documents concerning any communications between Defendants and any current or former, customer or client of Clear Channel while employed by Citadel.

25.    All documents concerning any marketing pitches, sales strategies, sales programs, training materials, or any other documents created or obtained by Individual Defendants while they were employed by Clear Channel.

26.    All documents concerning any communications between Defendants and any current or former Clear Channel employee while employed by Citadel.

27.    All documents relating to Clear Channel's former or current clients which were contacted by Individual Defendants while employed at Citadel.

28.    All documents concerning the solicitation of Clear Channel's customers or clients by any Citadel employee who was formerly employed by Clear Channel.

29.    All notes, logs, journals, calendars, diaries or any other documents maintained by Individual Defendants which reflect their meetings, appointments and/or sales practices.

30.    Copies of all electronically stored files created or maintained by Individual Defendants which contain, or have contained in the past, information created, obtained or maintained by Clear Channel, or any information regarding Clear Channel.

31.    All documents concerning any communications between Individual Defendants and any other employee, officer, director or agent of Citadel regarding  Clear Channel's customers, contractors, candidates, temporary employees, sales, profits, pricing, financial

information, business models, business strategies, or any other aspect of Clear Channel's business.

32.    All documents concerning Clear Channel, or any current or former customer, or employee of Clear Channel, provided or otherwise supplied to Citadel in whole or in part, by Individual Defendants, Mason or any other former or current Clear Channel employee.

33.    All documents concerning the customers or clients, business areas or revenue of Citadel for which Individual Defendants are each responsible, in whole or in part, directly or indirectly, for generating or otherwise developing or obtaining during their employment with Citadel.

34.    All documents concerning Citadel's employment of individuals who have non-compete and/or non-solicitation agreements with other entities including documents concerning Citadel's agreements to provide consideration or compensation to other entities exchange for Citadel's continued employment of the entities' former employees.

35.    All documents concerning any communications between Citadel and any Individual Defendants regarding their confidentiality, trade secrets or non-compete agreements with Clear Channel.

36.    All documents concerning announcements made by Citadel regarding the hiring of any Individual Defendant and/or Mason by Citadel.

37.    All documents reflecting business brought in to Citadel by any Individual Defendant, including identity of the client contact, date, time, and nature of business, contracts, and/or revenues generated for Citadel and commissions earned by Individual Defendants.

38.    All documents concerning Citadel's policies or agreements concerning confidentiality, non-competition, or non-solicitation, including, but not limited to, all such policies or agreements applicable to, or entered into by any Individual Defendant.

39.    All documents concerning Citadel's policies and procedures with respect to the restriction in any way of competition by current or former employees, protection of trade secrets or confidential information, and sample employment agreements.

40.    All documents relating to any lawsuit or claim asserted against any Defendant for tortious interference, breach of contract, unfair competition and/or misappropriation of trade secrets or confidential information.

Dated: New York, New York
      March 25, 2008

                                        SEYFARTH SHAW LLP

                                        By:
                                              Lynnette Sarno, Esq.
                                            Gloria Galant, Esq.
                                    620 Eighth Avenue
                                    New York, New York 10018
                                    (212) 218-5500

                                    Attorneys for Plaintiff
                                    Capstar Radio Operating Company

# Exhibit 4

ECF

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:08-cv-02976-LAK

Capstar Radio Operating Company v. Campbell et al        Date Filed: 03/21/2008
Assigned to: Judge Lewis A. Kaplan                              Jury Demand: None
Cause: 28:1330 Breach of Contract                             Nature of Suit: 190 Contract: Other
                                                                              Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 03/21/2008 | 1 | COMPLAINT against Anthony Campbell, Louis Carpino, Adam Gross, Jose Luis Torres, Citadel Broadcasting Corporation, a Nevada Corporation, John Does 1-10. (Filing Fee $ 350.00, Receipt Number 645614)Document filed by Capstar Radio Operating Company.(js) (Entered: 03/24/2008) |
| 03/21/2008 | | SUMMONS ISSUED as to Anthony Campbell, Louis Carpino, Adam Gross, Jose Luis Torres, Citadel Broadcasting Corporation, a Nevada Corporation, John Does 1-10. (js) (Entered: 03/24/2008) |
| 03/21/2008 | | Case Designated ECF. (js) (Entered: 03/24/2008) |
| 03/21/2008 | | Magistrate Judge Andrew J. Peck is so designated. (js) (Entered: 03/24/2008) |
| 03/21/2008 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Capstar Radio Operating Company.(js) (Entered: 03/24/2008) |
| 03/24/2008 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Oral Argument held on 3/24/2008. Bench Trial set for 4/23/2008 at 09:30 AM before Judge Lewis A. Kaplan. Court reporter Sam Mauro present. (jw) (Entered: 03/27/2008) |
| 03/25/2008 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Citadel Broadcasting Corporation.(Feigelson, Jeremy) (Entered: 03/25/2008) |
| 03/25/2008 | 4 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - NOTICE of Voluntary Dismissal without prejudice dated 3/25/08. Document filed by Capstar Radio Operating Company. (Sarno, Lindafel) Modified on 3/26/2008 (db). (Entered: 03/25/2008) |
| 03/26/2008 | 5 | ANSWER to Complaint. Document filed by Anthony Campbell, Louis Carpino, Adam Gross, Jose Luis Torres. (Attachments: # 1 Certificate of |

| | | Service)(Feigelson, Jeremy) (Entered: 03/26/2008) |
|---|---|---|
| 03/26/2008 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Lindafel C. Sarno to E-MAIL Document No. 4 Notice of Voluntary Dismissal Without Prejudice to orders_and_judgments@nysd.uscourts.gov. This document is not filed via ECF. (db) (Entered: 03/26/2008) |
| 03/28/2008 | 6 | ORDER TO SHOW CAUSE: Defendant shall show cause as to why why an Order should not be issued against the Defendants pursuant to Rule 65 of the Federal Rules of Civil Procedure preliminarily enjoining them as set forth in the first decretal paragraph above during the pendency of this action. Show Cause Hearing set for 4/23/2008 at 09:30 AM in Courtroom 12D, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan. (Signed by Judge Lewis A. Kaplan on 3/24/08) (js) (Entered: 03/28/2008) |
| 03/28/2008 | 7 | DECLARATION of Jeremy Feigelson in Opposition re: 6 Order to Show Cause,. Document filed by Anthony Campbell, Louis Carpino, Adam Gross, Jose Luis Torres, Citadel Broadcasting Corporation. (Attachments: # 1 Affidavit /Certificate of Service)(Feigelson, Jeremy) (Entered: 03/28/2008) |
| 03/28/2008 | 8 | MEMORANDUM OF LAW in Opposition re: 6 Order to Show Cause,. Document filed by Anthony Campbell, Louis Carpino, Adam Gross, Jose Luis Torres, Citadel Broadcasting Corporation. (Attachments: # 1 Affidavit /Certificate of Service)(Feigelson, Jeremy) (Entered: 03/28/2008) |
| 03/28/2008 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Pretrial/Phone Conference held on 3/28/2008. Court Report Pam Utter present. (jmi) (Entered: 04/03/2008) |
| 04/01/2008 | 9 | TRANSCRIPT of proceedings held on 3-24-08 before Judge Lewis A. Kaplan. (sjo) (Entered: 04/01/2008) |
| 04/02/2008 | 10 | DECLARATION of L. Lynnette Sarno in Support re: 6 Order to Show Cause,. Document filed by Capstar Radio Operating Company. (Attachments: # 1 Exhibit A to Declaration, # 2 Exhibits B thru F to Declaration, # 3 Exhibits G thru O to Declaration)(Sarno, Lindafel) (Entered: 04/02/2008) |
| 04/02/2008 | 11 | MEMORANDUM OF LAW in Support re: 6 Order to Show Cause,. Document filed by Capstar Radio Operating Company. (Sarno, Lindafel) (Entered: 04/02/2008) |
| 04/02/2008 | 12 | NOTICE of Compendium of UnReported Cases in Support re: 6 Order to Show Cause,. Document filed by Capstar Radio Operating Company. (Attachments: # 1 Exhibit A to the Compendium of UnReported Cases) (Sarno, Lindafel) (Entered: 04/02/2008) |
| 04/02/2008 | 13 | NOTICE of Rule 65 Certification by James Yu dated 3/21/08 re: 6 Order to Show Cause,. Document filed by Capstar Radio Operating Company. |

| | | (Sarno, Lindafel) (Entered: 04/02/2008) |
|---|---|---|
| 04/14/2008 | 14 | TRANSCRIPT of proceedings held on 3/28/08 before Judge Lewis A. Kaplan. (ama) (Entered: 04/14/2008) |
| 04/21/2008 | 15 | MOTION to Approve an Order Deeming Its Notice of Voluntary Dismissal Without Prejudice Effective Pursuant to Rule 41(a)(1)(A). Document filed by Capstar Radio Operating Company. (Attachments: # 1 Certificate of Service)(Sarno, Lindafel) (Entered: 04/21/2008) |
| 04/21/2008 | 16 | MEMORANDUM OF LAW in Support re: 15 MOTION to Approve an Order Deeming Its Notice of Voluntary Dismissal Without Prejudice Effective Pursuant to Rule 41(a)(1)(A).. Document filed by Capstar Radio Operating Company. (Sarno, Lindafel) (Entered: 04/21/2008) |
| 04/21/2008 | 17 | DECLARATION of L. Lynnette Sarno in Support re: 15 MOTION to Approve an Order Deeming Its Notice of Voluntary Dismissal Without Prejudice Effective Pursuant to Rule 41(a)(1)(A).. Document filed by Capstar Radio Operating Company. (Sarno, Lindafel) (Entered: 04/21/2008) |
| 04/22/2008 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Phone Pretrial Conference held on 4/22/2008. (jw) (Entered: 04/24/2008) |
| 04/25/2008 | 18 | ORDER: For reasons further set forth in said Order, the case is set for a preliminary injunction hearing on 6/2/08. The trial on the merits is consolidated with the preliminary injunction hearing. All document production shall be completed by 5/9/08. Depositions shall be completed by 5/23/08. All other provisions and determinations are as further set forth in said Order. (Deposition due by 5/23/2008.) (Signed by Judge Lewis A. Kaplan on 4/25/08) (db) (Entered: 04/25/2008) |
| 04/28/2008 | 19 | TRANSCRIPT of proceedings held on 4/22/08 before Judge Lewis A. Kaplan. (ama) (Entered: 04/28/2008) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/04/2008 13:27:55 | | |
| PACER Login: dl0349 | Client Code: | 22256-1011 |
| Description: Docket Report | Search Criteria: | 1:08-cv-02976-LAK |
| Billable Pages: 2 | Cost: | 0.16 |

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Capstar Radio Operating Company, a Delaware : 
Corporation, :
 :
        Plaintiff, :
 :
     v. : No. 08 CV 2976 (LAK)
 :
Anthony Campbell; Louis Carpino; Adam Gross; : **ANSWER OF INDIVIDUAL**
Jose Luis Torres; Citadel Broadcasting Corporation, : **<u>DEFENDANTS</u>**
a Nevada Corporation; and John Does 1-10, :
 :
        Defendants. : Filed Electronically

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendants Anthony Campbell, Louis Carpino, Adam Gross and Jose Luis Torres

(the "Individual Defendants"), by their undersigned attorneys, Debevoise & Plimpton LLP,

hereby answer the Complaint in this matter as follows:

       1.     States legal conclusions as to which no responsive pleading is required.

To the extent a responsive pleading is required, deny.

       2.     States legal conclusions as to which no responsive pleading is required.

To the extent a responsive pleading is required, deny.

       3.     Deny knowledge or information sufficient to form a belief as to the truth

of the allegations.

       4.     Deny, except admit that in certain cases Individual Defendants have

contacted and/or solicited clients of Clear Channel as they are lawfully entitled to do.

       5.     Deny knowledge or information sufficient to form a belief as to the truth

of the allegations.

6.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

7.    Admit.

8.    This allegation is directed to defendant Campbell.  He admits.

9.    This allegation is directed to defendant Campbell.  He admits.

10.    This allegation is directed to defendant Gross.  He admits.

11.    This allegation is directed to defendant Gross.  He admits.

12.    This allegation is directed to defendant Carpino.  He admits.

13.    This allegation is directed to defendant Carpino.  He admits, except avers that the proper spelling of the station's name is WLTW and not WLTU.

14.    This allegation is directed to defendant Torres.  He admits.

15.    This allegation is directed to defendant Torres.  He admits.

16.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Citadel is a radio company.

17.    Deny, except admit that Citadel and Clear Channel each are radio station companies, with certain stations operating in the same markets.

2

18.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

19.    This paragraph states legal conclusions to which no responsive pleading is required. To the extent that a responsive pleading is required, deny.

20.    This paragraph states legal conclusions to which no responsive pleading is required. To the extent that a responsive pleading is required, admit on behalf of the Individual Defendants.

21.    Deny, except admit that Clear Channel is in the radio business.

22.    Admit.

23.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

24.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

25.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

28.    Deny.

29-32. Deny, except admit that Radio Fusion is a third-party software program used by Clear Channel and other radio companies for certain purposes.

3

33-37.  Deny, except admit that Best Rate is a third-party software program used by Clear Channel and other radio companies for certain purposes.

38-39.  Deny, except admit that Radio Fusion is a third-party software program used by Clear Channel and other radio companies for certain purposes.

40-50.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

51.     Admit.

52-53.  Deny, except admit that account executives are responsible for selling advertising, in part through certain of the techniques enumerated.

54-55.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that each Individual Defendant received and acknowledged certain employment materials, possibly including the enumerated materials, and signed a document containing the quoted language.

56.     Deny.

57-76.  Each Individual Defendant denies the allegations relevant to him, except admits that he was hired on or about the date stated as to him in the Complaint, signed a document entitled Confidentiality, Trade Secrets and Non-Compete Agreement, received and acknowledged certain employee information materials and attended certain training.

77.     Deny, except admit that each of the Individual Defendants advised Clear Channel on or about March 5, 2008 that they were resigning and would be working at WABC-AM.

78.     Admit.

4

79.    Admit.

80.    Deny, except admit that WABC-AM, WLTW and WKTU are all radio stations in the New York market.

81-84. Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Clear Channel is aware of the Individual Defendants' new employment.

85.    Deny.

86.    Deny, except admit that Carpino attended an event upon request from a person who in another capacity is a Clear Channel client.

87.    Deny.

88.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Clear Channel claims to be aware of an effort by a Citadel station to market a version of a non-proprietary advertising program that is widely used in the radio industry.

89.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

90-92. Deny knowledge or information sufficient to state a belief as to the truth of the allegations.

93-94. Deny, except admit that Citadel has hired account executives in the Chicago market.

95-143. These paragraphs state legal conclusions as to which no responsive pleading is required. To the extent that a responsive pleading is required, deny.

5

WHEREFORE, the Individual Defendants deny that plaintiff is entitled to any of the relief requested or to any other relief, and request that the Complaint be dismissed with prejudice and with an award of costs, fees and such other relief as the Court deems just and proper.

Dated: New York, New York
      March 25, 2008

                  DEBEVOISE & PLIMPTON LLP

                  By: /s/ Jeremy Feigelson
                      Jeremy Feigelson (JF-4963)
                      jfeigels@debevoise.com
                  919 Third Avenue
                  New York, New York 10022
                  (212) 909-6000

                  *Attorneys for Defendants*

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Capstar Radio Operating Company, a Delaware    :
Corporation,
                                           :

           Plaintiff,                        :

           v.                               :      No. 08 CV 2976 (LAK)

                                           :

Anthony Campbell; Louis Carpino; Adam Gross;  :     **CERTIFICATE OF**
Jose Luis Torres; Citadel Broadcasting Corporation, :  **SERVICE**
a Nevada Corporation; and John Does 1-10,     :

                                           :

           Defendants.                    :      Filed Electronically

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        The undersigned, an employee of Debevoise & Plimpton LLP, counsel for defendants,

certifies: On the 25th day of March 2008, I caused the within Answer of Individual Defendants

to be served by express mail on plaintiff, L. Lynnette Sarno, Esq., Seyfarth Shaw LLP, 620

Eighth Avenue, New York, New York 10018.

Dated:  New York, New York
       March 25, 2008

                               /s/ Benjamin Sirota

                               Benjamin Sirota

# Exhibit 6

83S5CAPC.txt

```
    83S5CAPC                 phone conference - corrected
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------x
2
3   CAPSTAR RADIO OPERATING
3   COMPANY,
4
4             Plaintiff,
5
5        v.                           08 Civ. 2976 (LAK)
6
6   ANTHONY CAMPBELL, et al.,
7
7             Defendants.
8
8   ----------------------------x
9
9                                    March 28, 2008
10                                   9:16 a.m.
10  Before:
11
11                  HON. LEWIS A. KAPLAN,
12
12                               District Judge
13
13                 APPEARANCES
14
14  SEYFARTH SHAW, L.L.P.
15       Attorneys for Plaintiff
15  BY:  LYNNETTE SARNO
16
16  DEBEVOISE & PLIMPTON, L.L.C. (NYC)
17       Attorneys for Defendants
17  BY:  JEREMY FEIGELSON
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
    83S5CAPC                 phone conference - corrected
1        (In chambers)
2        THE COURT:  Good morning, counsel.  While I set this
3   up in light of Mr. Feigelson's letter of March 26th, how do you
4   folks pose we proceed?
5        MR. FEIGELSON:  Your Honor, this is Jeremy Feigelson.
6   If I could say just a word or two, I will be brief your Honor.
7        We certainly took to heart your comments about the
8   case on Monday that the case should settle and that's where we
9   expected everybody's energy to be.  This attempt to withdraw,
10  we thought, was regrettable for a number of reasons, but oddly
11  because it took us away from what should have been a
12  concentrated effort on settlement.  We have tried to put that
13  back on track since this exchange of letters and I think we are
14  beginning to make some progress.
15        Ms. Sarno made a suggestion of settlement concepts to
```

*mostly* [handwritten annotation in right margin]

Page 1

83S5CAPC.txt

16    me on the phone and we've offered to prepare a term sheet and
17    to get that back to her today.  I think we will be able to do
18    that and move the case quickly from that point.
19         That's really where I think the real world focus ought
20    to be and, in light of that, from the defense perspective, I'm
21    not sure it is essential that your Honor make any decision or
22    any quick decision on the validity of the attempt at voluntary
23    dismissal.
24         If we do have to get to those issues I think a couple
25    of points are worth mentioning, the first is that I think the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              3
      83S5CAPC              phone conference - corrected
1     real key here is that there was, we thought, an agreement on
2     the record to a procedure and a schedule for moving this
3     forward, if necessary, in front of your Honor, and that is an
4     issue that isn't even addressed in the response letter from
5     yesterday from Seyfarth Shaw.
6          THE COURT:  I haven't seen a response letter.
7          MS. SARNO:  Your Honor, we hand-delivered a response
8     letter yesterday.
9          THE COURT:  Well, I'm sure you did and I'm sure that
10    some bomb-sniffing dog is enjoying it this morning.
11         MS. SARNO:  We actually made sure that we delivered it
12    mid-day yesterday, so I apologize.  We thought you would have
13    it.
14         THE COURT:  Well, have you to talk to the canine
15    division.
16         MS. SARNO:  Okay.
17         MR. FEIGELSON:  Well, beyond that your Honor, I guess
18    I will let Ms. Sarno speak for herself as to the contents of
19    the letter.
20         If we do have to get to the technicalities under
21    41(A)(1), we should just mention to your Honor that the
22    clerk -- subsequent to my letter the clerk sent notice
23    essentially bouncing the 41(A)(1) notice as not having been
24    correctly filed so it is not in the record at this point.  So,
25    if this is being decided on technicalities under Rule 41(A)(1),
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              4
      83S5CAPC              phone conference - corrected
1     the service of the answer at this point clearly precedes filing
2     the notice because there is no notice on file.  Beyond that, if
3     we look at this again from a more substantive perspective this
4     is an effort, we think, that is just not appropriate for all
5     the reasons set forth in the letter.
6          So, looking at it this either as a 41(A)(1) issue,
7     under Harvey Aluminum or, we think, more properly as a 41(A)(2)
8     issue, it is clearly a matter for your Honor's discretion and
9     for the reasons in the letter that discretion ought to be in
10    favor of not allowing a dismissal.
11         THE COURT:  Ms. Sarno?
12         MS. SARNO:  Your Honor, we do join Plaintiff's
13    sentiments as far as settlement is concerned.
14         Just to give the Court some background, there is
15    another, actually, I believe, two cases in Chicago pending
16    between these two parties involving some employees that left
17    back in December, and a temporary restraining order exists in
18    Chicago.  So, we believe that the most appropriate way to
19    proceed is for a global settlement and we have been discussing
20    that.
                            Page 2

83S5CAPC.txt

```
21          We really do apologize that your Honor did not receive
22   our letter.  We made sure that was hand-delivered mid-day to
23   make sure that it was before the Court.
24          Just to address Mr. Feigelson's application in his
25   papers --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

83S5CAPC                    phone conference - corrected
```
 1          THE COURT:  You folks in private practice have no idea
 2   how good you have it in terms of support services.  None.
 3          MS. SARNO:  Having worked with a Judge earlier in my
 4   career, your Honor, I certainly understand.  And if the Court
 5   would like, we can certainly forward another copy to you.
 6          THE COURT:  Well, I will probably get that in the
 7   middle of next week.
 8          MS. SARNO:  Okay.
 9          But, just to address Mr. Feigelson's application as
10   far as what we have filed and what has happened with ECF -- and
11   I will go through a little more background because this is all
12   in our letter and I want --
13          THE COURT:  I know exactly what happened.  I have been
14   over the docket with a fine tooth comb.
15          MS. SARNO:  I meant as far as the background behind
16   what preceded the notice of filing.
17          Upon returning back to the office certainly there was
18   a mistake on our part in that we named Citadel Broadcasting
19   Corporation.  What had happened is we intended to name Citadel
20   Broadcasting Company which is the Nevada corporation that we
21   make note of in our complaint and in our papers.  It is Citadel
22   Broadcasting Company, the Nevada corporation, that is our
23   understanding is authorized to do business in New York and
24   that's who we intended to name.
25          Before amending the complaint to include the party
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

83S5CAPC                    phone conference - corrected
```
 1   that we thought had complete jurisdiction I contacted
 2   Mr. Feigelson to discuss, you know, before we go down this
 3   road, let's see who is the proper party in this case.  I know
 4   in the papers they mention New York Radio Assets and wanted to
 5   know if there was a relationship between New York Radio Assets
 6   and the Citadel Company as opposed to Corporation.  He told me
 7   that he did not think there was one and the conversation went
 8   very cordially.  I said, okay, we will look into that, confirm
 9   it, and if we have to take it to a different venue certainly we
10   will have to do that.
11          I had our corporate department do a search whether
12   there was connection between the company and this New York
13   Radio Assets.  It turns out they are neither a direct nor
14   indirect subsidiary.
15          THE COURT:  This is probably more than I need to know
16   for this purpose, don't you think?
17          MS. SARNO:  Well, the reason why I raise that is
18   because we tried to resolve the issue and it turns out that it
19   doesn't appear that there is diversity jurisdiction.  It is
20   plaintiff's intent to proceed against all of the parties
21   including the individual defendants and the corporation and we
22   just wanted to bring it to a venue that was proper.
23          We filed a notice of voluntary withdrawal because we
24   had seen that no answer had been served.  We received the
25   rejection from ECF yesterday.  And, upon speaking to the clerk,
```
Page 3

83S5CAPC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

83S5CAPC              phone conference - corrected
1  we just wanted to know where in the rule they told us we
2  couldn't do that because it is a notice, it is not an order, it
3  is not a stipulation, and there is, from our review of the
4  local rules, the rules on filing ECF, your Honor's individual
5  rules and the Federal Rules of Civil Procedure, we could not
6  find a single rule that said we couldn't file this by ECF.
7          I think the overall issue is that the plaintifs want
8  to proceed in the jurisdiction where they can adjudicate the
9  entire claim and I understand that the defendant -- you know,
10  the individual defendants filed an answer soon after they
11  received our notice but I think the bottom line is that this
12  matter belongs in a different venue and certainly your Honor
13  pointed that out in your decision.  We had recognized that a
14  scheduling order was set in this court but it is my
15  understanding that was done from your Honor's order on the
16  bench that there was still a question as far as jurisdiction.
17          THE COURT:  As well as a question of whether in the
18  event there was no jurisdiction that could be cured by dropping
19  the corporate defendant.
20          MS. SARNO:  Yes, your Honor.
21          THE COURT:  To be complete.
22          MS. SARNO:  We recognize that, but certainly what the
23  plaintiffs would like to do is proceed against all parties and
24  it would be much more --
25          THE COURT:  Well, I understand what you would like to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

83S5CAPC              phone conference - corrected
1  do.  You would also like to get into a forum where the judge
2  already hadn't denied a TRO.  That's as clear as a bell too.
3          MS. SARNO:  Your Honor, we recognize that your Honor
4  has made an order, submitted an order on the TRO.  We do not
5  intend to file another application for TRO in state court.
6  That never really crossed our mind.  There is a binding order
7  on the TRO.
8          THE COURT:  Look.  This is all very nice but if you
9  are going to settle the case, that's fine.  If you are not
10  going to settle the case, then it seems to me that there is
11  going to be motion practice over this.  And given the uncertain
12  or at least what you have described as an uncertain status of
13  the electronically filed or purportedly electronically filed
14  notice, I imagine that could be framed by either or both of a
15  motion by the plaintiff either to determine that it was filed
16  before the answer and was effective; a motion by the defendant
17  to vacate it if it was in fact filed before the answer; or
18  both.
19          But, in any case, we will have a lot of interesting
20  discussion about Harvey Aluminum and electronic filing, and so
21  I'm simply asking what your pleasure is.  I'm certainly not
22  going to decide anything definitively on the basis of a letter.
23          MR. FEIGELSON:  Your Honor, our suggestion from the
24  defense perspective would be that the parties be given the
25  weekend and perhaps Monday to see where we can get on
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

83S5CAPC              phone conference - corrected
1  settlement and perhaps advise the Court the status on Tuesday.
Page 4

83S5CAPC.txt

```
 2              THE COURT:  Ms. Sarno?
 3              MS. SARNO:  Certainly additional time and an extension
 4     of discovery would be great in order to pursue this settlement.
 5     I know that at least from my conversations with Mr. Feigelson
 6     that there has been issues with communicating with his client.
 7     I don't know when they're going to get that information to me
 8     and I don't know the availability of my client over the
 9     weekend.  Certainly a few days next week would be great.
10              THE COURT:  All right.  Well, I will just wait to hear
11     from you next week.
12              MR. FEIGELSON:  That's fine with us, your Honor.
13              THE COURT:  Okay.  Thank you.
14              MR. FEIGELSON:  Thank you, your Honor.
15              MS. SARNO:  Thank you, Judge.
16              THE COURT:  Bye-bye.
17                             oOo
18
19
20
21
22
23
24
25
```

# Exhibit 7



**ATTORNEYS**

620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

Fax (212) 218-5526

www.seyfarth.com

# Facsimile Transmission

Date:  April 11, 2008

| RECIPIENT | COMPANY | PHONE NO. | FAX NO. |
|-----------|---------|-----------|---------|
| **Jeremy Feigelson** | Debevoise & Plimpton LLP | (212) 909-6595 | **(212) 521-7230** |

**FROM:**   L. Lynnette Sarno

**PHONE:**   (212) 218-5528

**RE:**   Capstar Radio Operating Company v. Citadel, et al.   **REPLY FAX NO.: (212) 218-5526**
Docket No. 08 CV 2976 (LAK)

| File No: | 53163/16 | Number of Pages, Including Cover: | 2 |
|----------|----------|-----------------------------------|---|

☐ Hard copy to follow          ☐ Hard copy will not follow
☐ Per your request             ☐ Please review and revise if necessary
☐ Please telephone me

**MESSAGE:**

Please see attached.

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO CONTAIN PRIVILEGED ATTORNEY-CLIENT INFORMATION OR WORK PRODUCT. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. THANK YOU.

ANY TAX INFORMATION OR WRITTEN TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED TO BE AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER. (THE FOREGOING LEGEND HAS BEEN AFFIXED PURSUANT TO U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE.)

**IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE PHONE (212) 218-5500 AS SOON AS POSSIBLE.**

NY1 26507614.1



**SEYFARTH SHAW LLP**
ATTORNEYS

620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500
fax (212) 218-5526
www.seyfarth.com

Writer's direct phone
(212) 218-5528

Writer's e-mail
lsarno@seyfarth.com

Writer's direct fax
(917) 344-1247

April 11, 2008

**VIA FEDERAL EXPRESS**

Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-2012

     Re:    Capstar Radio Operating Company v. Citadel, et al.
            Docket No. 08 CV 2976 (LAK)

Dear Judge Kaplan:

     We represent Plaintiff, Capstar Radio Operating Company, and write to advise the Court that settlement discussions between the parties are continuing. We will inform Your Honor of when the parties have reached an agreement or an impasse.

     Thank you for the Court's attention to this matter.

                         Respectfully submitted,

                         SEYFARTH SHAW LLP

                         L. Lynnette Sarno

cc:    Jeremy Feigelson, Esq. (Via Facsimile)

BRUSSELS   WASHINGTON, D.C.   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA

# Exhibit 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMFM BROADCASTING, INC.,

    Plaintiff,

    v.

REBECCA OSOWIEC, *et al.*,

    Defendants.

No. 08 C 1519
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

### I.   BACKGROUND

In this case, Rebecca Osowiec left her job selling radio advertising for Clear Channel and went to work for another Chicago radio station, this one owned by Citadel. At the time she began her employment with Clear Channel, Ms. Osowiec signed a non-compete agreement ("Agreement") in which she agreed that, for 180 days after her employment with Clear Channel ended, she would not work for any radio or television station in the greater Chicago area (Chicagoland).

Following Ms. Osowiec's departure—and the commencement of her employment with a Citadel-owned station—Clear Channel initiated this suit, seeking, among other things, injunctive relief. Clear Channel wanted to enforce the non-compete agreement Ms. Osowiec had signed. On March 17 I imposed a temporary restraining order (TRO) and set a hearing for the following week on Clear Channel's application for a preliminary injunction. I held a substantive hearing on April 8 and 9, at which I heard from several witnesses, including Ms. Osowiec. At this time, I deny further extension of the TRO.

## II.    STANDARDS FOR INJUNCTIVE RELIEF TO ENFORCE NON-COMPETE AGREEMENTS

In order to be entitled to injunctive relief,[1] Clear Channel must show that:  (1) it has a protectible interest, such as near-permanent customer relationships or confidential information; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted; and (4) there is a likelihood it will succeed on the merits.  *Appelbaum v. Appelbaum*, 823 N.E.2d 1074, 1081 (Ill. App. Ct. 2005) (*citing Lyle R. Jager Agency, Inc. v. Stewart*, 625 N.E.2d 397 (1993)).  I also must consider whether the balance of hardships supports granting injunctive relief.  *See Keefe-Shea Joint Venture v. City of Evanston*, 773 N.E.2d 1155 (Ill. App. Ct. 2002).

## III.    PLAINTIFF HAS REASONABLE LIKELIHOOD OF SUCCESS ON ESTABLISHING THAT THERE IS A PROTECTIBLE INTEREST

Illinois courts recognize two ways in which a party can establish that it has a protectible business interest:[2]  "(1) it can show the employee acquired the party's confidential information

---

[1]Illinois law applies.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  I first look to the state legislature and the state supreme court's interpretation of its own statutes. *Erie*, 304 U.S. at 78; *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001).

[2]In a special concurring opinion in *Lifetec Inc. v. Edwards*, 880 N.E.2d 188 (Ill. App. Ct. 2007), Judge Steigmann discusses the enforceability of restrictive covenants.  After accurately stating the law in Illinois, he argues that the "legitimate business interest" test is inconsistent with recent Illinois Supreme Court decisions.  880 N.E.2d at 201 (Steigmann, P.J., concurring).  Judge Steigmann opines that "courts at any level, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate only the time and territory restrictions contained therein.  If the court determines that they are not unreasonable, then the restrictive covenant should be enforced." *Id.* at 204 (Steigmann, P.J., concurring).  Of course, as Chief Judge Easterbrook has written:  "Under *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the federal court's task is not to make an independent decision but to predict how the Supreme Court of [Illinois] would understand and apply its own law." *Intec USA, LLC v. Engle*, 467 F.3d 1038, 1040 (7th Cir. 2006).  Judge Steigmann's well-reasoned approach notwithstanding, I hesitate to predict that the Supreme Court of Illinois would abandon the test

2

and attempted to use that information for his own benefit; or (2) it can show it has a

near-permanent relationship with its customers, and but for his employment with the party, the

employee would not have had access to those customers." *Office Mates 5, North Shore, Inc. v*

*Hazen*, 599 N.E.2d 1072 (Ill. App. Ct. 1992).

      While it is a somewhat close call, I find that Plaintiff has shown a sufficient likelihood of

success on the existence of a legitimate business interest. I determine that Plaintiff establishes

that it has near-permanent relationship with its customers, in part because I credit the testimony

from Clear Channel's employees stating that 70% of their customers are repeat business.[3] In

addition, I find that Ms. Osowiec acquired Clear Channel's confidential information, in the form

of training methods, pricing data, and operation.

      In sum, I find that Plaintiff has shown a sufficient likelihood of success on the question of

protectible interest under the existing standard. *But see Springfield Rare Coin Galleries, Inc. v.*

*Mileham*, 620 N.E.2d 479, 488 (Ill. App. Ct. 1993) ("[A] near-permanent relationship with

customers is generally absent from businesses engaged in sales . . . . [and] is not generally present

in a business which does not engender customer loyalty by providing a unique product or

personal service, and customers of the business utilize many suppliers simultaneously to meet

their needs."). While I conclude that Plaintiff has carried its burden at this preliminary stage, this

is this is by no means a determination about whether Plaintiff's case is proved.

---

used by every district of the appellate court in Illinois for decades. Moreover, I find that Plaintiff
has established its burden under the existing test, the approach for which Judge Steigmann
advocates would only favor Plaintiff further.

     [3]I recognize that the customers' fidelity may be to the programming format as opposed to
the radio station, but again, Plaintiff has done enough to establish it burden at this preliminary
stage.

IV.    **IRREPARABLE HARM / INADEQUATE LEGAL REMEDY**

I find that Plaintiff has carried its burden on both the irreparable harm and the inadequate

legal remedy prongs because Clear Channel's loss of customer relationships cannot be

quantified.

V.    **BALANCE OF HARDSHIPS**

I find that the balance of hardships cuts in favor of Defendants; it is on this basis that I

decline to extend the TRO.  Ms. Osowiec was a relatively low level employee whose share of

customer relationships was fairly small.  Her knowledge of the details of pricing methods

has—even according to the testimony of Plaintiffs' witnesses—substantially expired and

continues to expire rapidly.  According to both the terms of the agreement and the testimony of

Plaintiff's witnesses, the effective life span of the information Ms. Osowiec possesses is at most

26 weeks following her departure.

So there is relatively little harm to Plaintiff if I err in denying equitable relief.

Conversely, if I erroneously grant injunctive relief, Citadel will have to divert its human

resources into supervising and monitoring Ms. Osowiec's work.  If, alternatively, it discharges

Ms. Osowiec, she will have been deprived of a significant employment opportunity that may not

be available in the future.

I do not consider Ms. Osowiec's financial loss.  Nor do I consider any pecuniary loss

Citadel may suffer if it believes that it has a moral obligation to pay her.  These harms do not

constitute irreparable damage.

I conclude that the balance of hardships weighs in favor of Defendants.  It is not clear

whether this suit is driven by a concern that what Defendants have done damages Plaintiff's

protectible interest, as opposed to a desire to forfend the poaching of employees. When Plaintiff's counsel began her argument at the hearing, among the first things she said was that Citadel entered the market in 2007 whereas Clear Channel has been a market participant since 2000. She went on to bemoan the fact that Citadel has poached multiple of Clear Channel's employees. I am hesitant to say that the poaching of employees constitutes the requisite protectible interest to warrant injunctive relief. *See Hanchett Paper Co. v. Melchiorre*, 792 N.E.2d 395, 400 (Ill. App. Ct. 2003) (holding that covenants not to compete are strictly construed to ensured that their intended effect is not to prevent competition *per se*). I cannot say that the public interest weighs strongly on either side. That is, the public interest will not be implicated by granting or denying equitable relief.

## VI.    **CONCLUSION**

Weighing everything, while I preliminarily determine that a protectible interest does exist, I do not accord great weight to the relative value of that interest. Nor can I say that there is an exceptionally high probability of success on the merits. Weighing this against the balance of harms, which favors Defendants, I exercise my discretion to deny further extension of the TRO.

This ruling does not constitute a vacation of the TRO that was previously granted in this case.

ENTER:

James B. Zagel
United States District Judge

DATE: April 11, 2009

5

# Exhibit 9

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process
Transmittal**
04/04/2008
CT Log Number 513278609

|||||||||||||||||||||||||||||||||||||||||||||||||||||||

**TO:**  Joseph O'Brien, Corporate Controller
Citadel Broadcasting Company
7201 West Lake Mead, #400
Las Vegas, NV 89128

**RE:**  **Process Served in Illinois**

**FOR:**  Citadel Broadcasting Company (Domestic State: NV)
*According to our records representation services for this entity have been discontinued in this jurisdiction.*

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | AMFM Broadcasting Inc., etc., Pltf. vs. Jaclyn Savier, etc. and Citadel Broadcasting Company, etc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Verified Complaint, Verification, Exhibit(s) |
| **COURT/AGENCY:** | Cook County Circuit Court, County Department, Chancery Division, IL Case # 2008 CH 11709 |
| **NATURE OF ACTION:** | Breach of Contract - Failing to retain or return Clear Channel's confidential information after employment was terminated |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 04/04/2008 at 14:12 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Yvette A, Heintzelman Seyfarth Shaw LLP 131 South Dearborn Street Suite 2400 Chicago, IL 60603 312-460-5000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 790977754881 |
| **SIGNED:** | C T Corporation System |
| **PER:** | Tawana Carter |
| **ADDRESS:** | 208 South LaSalle Street Suite 814 Chicago, IL 60604 |
| **TELEPHONE:** | 312-345-4336 |

Page 1 of  1 / LV

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.

2120 – Served            2121 – Served
2220 – Not Served        2221 – Not Served
2320 – Served By Mail    2321 – Served By Mail
2420 – Served By Publication    2421 – Served By Publication
SUMMONS                  ALIAS - SUMMONS        CCG N001-10M-1-07-05 (          )

*7-4-08*
*2-12-ᵖᵐ*

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, <u>CHANCERY</u> DIVISION

(Name all parties)

AMFM BROADCASTING INC.
_____

v.
_____

JACLYN SAVIER & CITADEL BROADCASTING CO.
_____

}

2008CH11709
CALENDAR/ROOM 14
TIME 00:00
Injunction

No. _____

Citadel Broadcasting Company
c/o CT Corporation, Registered Agent
208 South LaSalle St., Ste 814
Chicago, Illinois 60604

### SUMMONS

To each Defendant:

    **YOU ARE SUMMONED** and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

    ☑ Richard J. Daley Center, 50 W. Washington, Room ___*8D2*___ , Chicago, Illinois 60602

❑ **District 2 - Skokie**          ❑ **District 3 - Rolling Meadows**     ❑ **District 4 - Maywood**
   5600 Old Orchard Rd.          2121 Euclid                           1500 Maybrook Ave.
   Skokie, IL 60077              Rolling Meadows, IL 60008            Maywood, IL 60153

❑ **District 5 - Bridgeview**      ❑ **District 6 - Markham**             ❑ **Child Support**
   10220 S. 76th Ave.            16501 S. Kedzie Pkwy.               28 North Clark St., Room 200
   Bridgeview, IL 60455          Markham, IL 60426                   Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

    This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

MAR 28 2008

Atty. No.: 90747
Name: SEYFARTH SHAW LLP/ J. BEYER
Atty. for: AMFM BROADCASTING INC.
Address: 131 South Dearborn, Ste. 2400
City/State/Zip: Chicago, Illinois 60603
Telephone: (312) 460-5000
Service by Facsimile Transmission will be accepted at: _____
                                                (Area Code)  (Facsimile Telephone Number)

WITNESS, _____ , _____

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Clerk of Court

Date of service: 4/4/08
(To be inserted by officer on copy left with defendant or other person)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| AMFM Broadcasting, Inc., a Delaware Corporation, d/b/a Clear Channel | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| Jaclyn Savier, an Illinois resident, and Citadel Broadcasting Company, a Nevada Corporation. | ) ) ) |
| Defendants. | ) ) ) ) |

Case No.

2008 CH 11709

## AMFM BROADCASTING, INC.'S VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, AMFM Broadcasting, Inc., doing business as Clear Channel (collectively "Clear

Channel"), brings this Verified Complaint against Defendants Citadel Broadcasting Company

("Citadel") and Jaclyn Savier ("Savier"), and for its causes of action states as follows:

## INTRODUCTION

Clear Channel seeks injunctive relief to protect its contractual rights and enjoin the use of

highly confidential and proprietary information regarding Clear Channel's new product launches

and anticipated upgrades, business development plan and competitive strategy, financial

estimates and future projections. For over a year, Savier worked as an account executive for

Clear Channel and solicited bids for media advertising buys based on software developed

exclusively for Clear Channel, namely Best Rate. Upon her resignation, Savier breached her

contract not to compete and improperly used confidential and proprietary information without

Clear Channel's authorization. Clear Channel seeks to enjoin Savier from carrying out any job

functions at Citadel for six months, as contemplated in the non-compete agreements she agreed

to at the onset of her employment with Clear Channel. The specific details surrounding Savier's improper acts are detailed herein.

## NATURE OF THE ACTION

1.    This is an action for an injunction and damages arising out of Savier's employment with Citadel in violation of her non-compete agreement and use of Clear Channel's confidential information during such employment. Clear Channel seeks to enjoin Savier to return to Clear Channel its confidential information, to enjoin Savier from utilizing or disclosing Clear Channel's confidential and proprietary information, and to enjoin Savier from working in a capacity in which she threatens to or will utilize or disclose Clear Channel's confidential and proprietary information. Clear Channel also seeks all damages it has suffered as a result of Savier's and Citadel's actions.

## PARTIES, JURISDICTION AND VENUE

2.    AMFM Broadcasting, Inc. (d/b/a Clear Channel) is a Delaware corporation with its corporate headquarters and principal place of business located in San Antonio, Texas. AMFM Broadcasting, Inc. owns six radio stations in Chicago.

3.    Savier was employed at Clear Channel's radio station of WLIT-FM as an Account Manager and, on information and belief, is currently employed by Citadel in the same capacity. On further information and belief, Savier is domiciled at and resides at 873 W. Larrabee, Apt. #512, Chicago, Illinois 60610 and is an Illinois citizen.

4.    Citadel Broadcasting Corporation is a Nevada corporation with its corporate headquarters and principal place of business located in New York, New York. One of Citadel's affiliates is located in Chicago, Illinois at 190 North State Street, 8th Floor.

5.    Venue is proper in the Circuit Court of Cook County pursuant to 735 ILCS 5/2-101 because Clear Channel, Citadel, and Savier conduct business in Cook County, Illinois. The

2

events which give rise to the allegations to the complaint took place in Cook County, Illinois and

Defendant Savier was employed in Cook County, Illinois.

     6.     Jurisdiction is proper in Illinois pursuant to 735 ILCS 5/2-209 because Clear

Channel, Citadel, and Savier conducted business in the State of Illinois. The events giving rise

to the tortious allegations to the complaint took place in the State of Illinois.

## STATEMENT OF FACTS

     7.     AMFM Broadcasting, Inc., doing business as Clear Channel or Clear Channel

Communications, Inc., is a Delaware corporation with its corporate headquarters and principal

place of business in San Antonio, Texas. Clear Channel provides entertainment, information

products, and services to communities and effective solutions to advertisers in those

communities. Clear Channel's assets include radio stations, television stations, and outdoor

advertising formats, such as signs and billboards, through which it sells advertising time and

access to its customer base. Clear Channel has six radio stations located in Chicago, Illinois.

Clear Channel's parent corporation, Clear Channel Broadcasting, Inc., and sister companies

reach more than 110 million listeners each week with over 1,100 locally-operated and locally-

programmed radio stations in the U.S. With its international partners, Clear Channel's parent

owns and operates more than 240 radio stations in Australia, Mexico, and New Zealand. Clear

Channel's parent's Premier Radio Networks unit syndicates more than 70 programs to more than

5,000 radio affiliates, including Rush Limbaugh, Dr. Laura, Jim Rome and Carson Daly. Clear

Channel's parent has affiliations, which include NBC, ABC, CBS, FOX, MyNetworkTV, The

CW and Telemundo.

     8.     In June 2007, Citadel acquired ABC Radio, Inc.'s holdings, including WZZN FM

and WLS AM in Chicago and various radio stations in New York. Prior to that time, Citadel had

no presence in the Chicago radio market or the radio advertising market.

3

9.      Since that time, Citadel has begun poaching its account executives, including Jaclyn Savier and Rebecca Osowiec in Chicago and Jose Torres, Lou Carpino, Adam Gross and Anthony Campbell in New York City, New York. In total, Citadel has recently employed six Clear Channel Account Executives between the Chicago and New York markets.

10.     Each of the six former Clear Channel employees all had signed a Confidentiality Agreement with Clear Channel as a condition of their employment with Clear Channel. Based on Clear Channel's communications with Citadel, Citadel knew or should have known that it was not permitted to hire these employees for a span of six months after the end of their employment. In spite of this knowledge, Citadel, on information and belief, has undertaken a systematic and repeated attempt to poach Clear Channel's business and customers, namely by hiring Clear Channel's account executives responsible for business Citadel later solicited. On information and belief, Citadel has encouraged Clear Channel's former employees to misappropriate and used Clear Channel's confidential information for Citadel's gains and Clear Channel's detriment.

## CLEAR CHANNEL'S CONFIDENTIAL AND PROPRIETARY INFORMATION

11.     Clear Channel has invested substantial time and money gathering and developing confidential and proprietary information concerning its markets, services, clients, and its clients' customer base. Because of its vast presence in radio, television, and outdoor advertising, Clear Channel's confidential and other proprietary information is unique and sets it apart from its competitors in the marketplace. The competitive nature of the radio, television, and advertising industry is such that Clear Channel greatly depends on maintaining and preserving its confidential information and trade secrets to maintain its competitive edge.

12.     Clear Channel's confidential and proprietary information currently includes proprietary software systems called Best Rate, and, until November 2007, Tapscan.

4

13.    Best Rate is a software program that employs an algorithm to create a pricing system used by Clear Channel to sell advertising to its clients on the various radio stations it owns. Best Rate incorporates historical information including, but not limited to, costs, product development, date and time of day, time slot and amount of time, historical data, and forecasting. This software system not only determines the rates that should be charged, it alerts personnel to sales that are outside the desired parameters or when actual sales are not aligned with sales targets. Clear Channels' pricing strategy information is extremely valuable and directly effects its competitive position in the marketplace. Savier had access to and used Best Rate while she was employed at Clear Channel.

14.    Tapscan was a scheduling program, utilized by Clear Channel until November 2007, when it was replaced. Through Tapscan, Clear Channel's employees could access scheduling information and various market rates and ad space scheduling for particular clients of any of Clear Channel's six Chicago radio stations. Savier had access to and used Tapscan while she was employed by Clear Channel.

15.    Clear Channel also maintains information concerning Non Traditional Revenue ("NTR") sources. NTR includes information on Clear Channel's internet capabilities and event marketing. This information is maintained on the "N" Drive and is accessible only to individuals who need the information, such as Account Executives and higher-ranking management officials. Savier had access to the N Drive while she was employed at Clear Channel.

## CLEAR CHANNEL PROTECTS ITS CONFIDENTIAL INFORMATION

16.    Clear Channel requires that its information be kept strictly confidential by its employees and restricts access to this information. Clear Channel takes specific measures to preserve the confidentiality of this information, including but not limited to, the following:

5

a.  Clear Channel requires employees to sign Employment Agreements containing covenants designed to maintain confidentiality and to return Clear Channel property upon termination;

b.  Clear Channel requires its employees to maintain confidentiality of Clear Channel information and protect Clear Channel's assets;

c.  Clear Channel requires files to be maintained in locked cabinets and cleared from desks when not in use;

d.  Clear Channel prohibits the use of Clear Channel time, materials or facilities not directly related to Clear Channel business, or the removal or borrowing of Clear Channel property without permission;

e.  Clear Channel uses swipe cards to restrict access to and within Clear Channel's facilities;

f.  Clear Channel prohibits the use of Clear Channel's computer systems for non-company purposes; and

g.  Clear Channel restricts access to its computerized information through the use of passwords.

17.     Clear Channel rigorously maintains the confidentiality of its information because the information provides Clear Channel a competitive advantage in the marketplace from which Clear Channel derives economic value.

18.     Clear Channel's confidential information is of great value to Clear Channel and would give any competitor of Clear Channel — including Savier and her new employer, Citadel — an unfair competitive advantage.  A competitor could use Clear Channel's information to unfairly develop competing products and processes, unfairly improve its products  through , obtain regulatory approvals for process changes and products developed through the expenditure of Clear Channel's time and resources, unfairly price its products, move business and/or long standing customer relationships away from Clear Channel, and obtain a head start or streamline its research and development efforts.

6

19.     Clear Channel enjoys long-standing, near permanent relationships with many of its customers.

20.     Only as a result of her position at Clear Channel, Savier received and was given access to extensive confidential and proprietary information of the type described herein.

### SAVIER'S OBLIGATIONS OWED TO CLEAR CHANNEL

21.     On September 26, 2006, as a condition of, and as consideration for Savier's employment by Clear Channel, Savier was required to review and sign Clear Channel's Confidentiality, Trade Secrets and Non-Compete Agreement. (*See* Confidentiality, Trade Secrets and Non-Compete Agreement (the "Agreement"), attached hereto as Ex. 1.)

22.     Also, pursuant to Clear Channel's employment requirements and her corresponding obligation, on information and belief, Savier received and reviewed both a Code of Conduct (the "Code") and an Employee Guide (the "Guide") designed to outline Clear Channel's requirements and Savier's duties and rights in the employment relationship, and to protect Clear Channel's legitimate business interest in its confidential and proprietary information and customer relationships.

23.     The Agreement was designed to protect Savier's and Clear Channel's interests in the employment relationship, and to protect Clear Channel's legitimate business interest in its confidential and proprietary information and customer relationships.

24.     The Agreement provides as follows:

> Employee agrees that in consideration of his/her employment or continued employment with Employer, training in Employer's techniques, access to confidential trade secrets or Employer's expenditure of money and energy in advertising, training, promoting or dissemination of information about Employee or various programs in which Employee may participate, Employee does hereby agree that during his/her employment with Employer in the capacity above stated or otherwise and for a period of one hundred eighty (180) days thereafter, he/she shall neither engage

7

directly or indirectly in the rendering of services similar to those provided for Employer nor have any direct or indirect interest in or employment relationship with any radio or television station (including cable organization or supplier) or firm or affiliated company owning or operating a radio or television station or cable system located within or purporting to serve the above-referenced Metropolitan Statistical Area(s), as defined by the U.S. Government, other than properties operated by Employer. The parties have attempted to limit Employee's right to compete only to the extent necessary to protect Employer from unfair competition. The parties recognized, however, that reasonable people may differ in making such a determination. Consequently, the parties thereby agree that, if the scope or enforceability of the restrictive covenant is in any way disputed at any time, a court may modify and enforce the covenant to the extent that it believes to be reasonable under the circumstances existing at that time. In the event Employee violates the restrictive covenant set forth above, it is agreed that the term of the restrictive covenant so violated shall be extended for a period of one hundred eighty (180) days from the time Employee ceases such violation or, in the event of court action, for a period of one hundred eighty (180) days after the entry of a final order or judgment.

Employee further acknowledges that in the event his/her employment with Employer terminates for any reason, he/she will be able to earn a livelihood without violating the foregoing restrictions and that his/her ability to earn a livelihood without violating such restrictions is a material condition to his/her employment with Employer.

Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and good will of Employer and that a breach of those covenants will irreparably and continually damage Employer, for which money damages may not be adequate. Consequently, Employee agrees that in the event he/she breaches or threatens to breach any of these covenants, Employer shall be entitled to both a preliminary or permanent injunction in order to prevent the continuation of such harm and money damages insofar as they can be determined.

25.     The Guide and Code also set forth various requirements under which Savier was to protect Clear Channel's confidential information. These requirements included, but were not limited to, Savier maintaining the confidentiality of Clear Channel's:

8

- Business promotion strategies and plans (these may be in writing, communicated orally, or exist as a matter of practice or custom).

- Proposals to clients or potential clients, including information compiled or prepared to assist with proposals to clients or potential clients.

- Client lists or prospective (e.g., "target") client lists.

- Client requests (whether presented orally or in writing) for information, proposals, promotional assistance, or other information, which relates to Clear Channel or to the client.

- Event or potential event information, including dates, locations, costs, ticket prices, on-sale information, ticket price determination formulas, methods, strategies, or variations.

- Information regarding other employees and their employment with Clear Channel, including personal information that employees learn in the course of their job duties.

- Information regarding the talents, skills, abilities, and work experience of other employees.

- Computer hardware, software, or computer-related information, whether purchased or created by or on behalf of Clear Channel, as used or applied to Clear Channel's business.

- Information, which pertains – directly or indirectly – to contemplated or actual business relationships between Clear Channel and businesses that engage in activities related to Clear Channel business, e.g., promoters, advertising or marketing firms, etc.

- The identity of consultants, vendors, or other third parties that provide or seek to provide services to Clear Channel, together with the nature of any such services.

- Personal information regarding non-employees, which is obtained through Clear Channel's promotional activities (such as information regarding Internet website visitors, contest winners, email newsletter subscribers, etc.).

26.     The Guide also contains a policy that prohibits the dissemination of Clear Channel's confidential and trade-secret information through use of electronic communications.

27.     Moreover, every time an employee accesses any Clear Channel computer system, Clear Channel reminds the employee that the information stored on its computers are the property of Clear Channel through a warning message.

CHI 11438350.1

28.     Upon separation from Clear Channel, network access is terminated immediately and any passwords given to access Clear Channel's computers and systems are disabled to prevent any further access.

## SAVIER'S EMPLOYMENT AT CLEAR CHANNEL

29.     Jaclyn Savier ("Savier") began working for Clear Channel in Chicago on September 26, 2006 as an Account Executive.  Prior to that time, Savier had worked for another Clear Channel affiliate in Denver from October 1, 2003 through April 1, 2005.

30.     An Account Executive is responsible for meeting local business owners and advertising agency representatives, in order to build relationships, and selling all Clear Channel assets as marketing solutions to help clients meet their key business challenges.  The essential duties of an Account Executive is to maintain existing business relationships while striving to increase billing and market share; attract new business accounts and sponsorships for the employee's home station, as well as Clear Channel; develop and maintain ongoing relationships with corporate, advertising, and public relations communities; develop presentations to corporations and agencies designed to sell marketing solutions; solicit funding for broadcast and non-broadcast projects, special events web-streaming, and other off-air projects; maintain ability to analyze client marketing analysis, target consumer needs, benefits sought, assignments; develop and sell new accounts.

31.     When she was hired, on information and belief, Savier received a copy of Clear Channel's Guide and Code of Conduct.  Additionally, at the time she was hired and, as a condition of her employment, Savier signed a non-compete agreement.  (*See* Ex. 1.)  Because she agreed to abide by Clear Channel's policies, Savier was offered employment with Clear Channel.

10

## SAVIER'S RESIGNATION FROM CLEAR CHANNEL

32.     On October 3, 2007, Savier tendered her resignation from Clear Channel. Also on October 3, 2007, Nancy O'Brien, General Sales Manager, conducted an exit interview with Savier. At the time she tendered her resignation, Savier informed Clear Channel that she had accepted a job at WLS AM, a radio station owned by Citadel Communications, Inc. ("Citadel").

33.     Accordingly, O'Brien contacted John Gallagher, General Manager for WLS AM ("Gallagher") and informed him that Savier had a non-compete agreement and that she had agreed not to disclose or work for a competitor or compete with Clear Channel for business for a period of 180 days.

34.     Shortly thereafter, on October 8, 2007, Counsel for Clear Channel, Lauren Wood, sent Savier and Gallagher correspondence informing them of Clear Channel's non-compete agreement with Savier and asking for assurances that Savier had not disclosed or otherwise violated the terms of the agreement.

35.     Thereafter, Earl Jones, the President and Marketing Manager for AMFM Broadcasting, Inc., and Gallagher reached an agreement whereby Savier could continue to work for Citadel, provided that Citadel sign a settlement agreement, Savier serve only as a sales assistant for 90 days, and not call any individuals on a no-call list for another 90 days. At no point did Citadel sign that agreement and Savier has continued to work for Citadel in an account executive position. By the terms of her Confidentiality Agreement, Savier has breached her obligations to Clear Channel.

11

## COUNT I

## BREACH OF CONTRACT
### (Savier)

36.    Clear Channel hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 35.

37.    Savier's Agreement is a valid and enforceable contract. The post-employment covenants, confidentiality covenants, and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect legitimate, protectable interests in the goodwill, long-term customer relationships, and proprietary business and customer information of Clear Channel.

38.    Clear Channel has fully performed all of its obligations under the Agreement.

39.    Savier is breaching her Employment Agreements in at least one of the following ways by:

- working for Citadel, a competitor of Clear Channel, within six months of ending her employment with Clear Channel;

- removing from, retaining, or failing to return Clear Channel's confidential information; and/or

- utilizing or disclosing confidential information of Clear Channel.

40.    Clear Channel has been and will be damaged as a result of Savier's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its property as well as enjoin Savier from working for Citadel.

**WHEREFORE**, AMFM Broadcasting, Inc. prays that this Court enter judgment in its favor and against Jaclyn Savier:

(a)    enjoining Savier from further communication with any of Clear Channel's customers;

12

(b)     enjoining Savier from working for Citadel Broadcasting Corporation for a period up to six months from the date of entry of the Court's order;

(c)     awarding costs and expenses, including reasonable attorneys' fees incurred by AMFM Broadcasting, Inc. in obtaining this requested relief against Jaclyn Savier; and

(d)     awarding AMFM Broadcasting, Inc. such other and further relief as is warranted by the evidence.

## COUNT II

### ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION
#### (Savier)

41.     Clear Channel hereby repeats and realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 40.

42.     The proprietary business and customer information of Clear Channel constitutes trade secrets because Clear Channel derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

43.     Savier misappropriated and/or threatens to inevitably misappropriate Clear Channel's trade secrets without Clear Channel's consent in violation of the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.*

44.     On information and belief, Savier has become employed by or affiliated with a competitor of Clear Channel and has unlawfully removed Clear Channel's trade secrets to benefit herself and/or a competitor and thus, will inevitably utilize or disclose Clear Channel's trade secrets and/or confidential information.

45.     Savier has been or will be unjustly enriched by the misappropriation of Clear Channel's trade secrets and/or confidential information, and will continue to threaten to use,

13

actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Clear

Channel's trade secrets and confidential information.

46.    Savier's misappropriation has been willful and malicious.

47.    As a result of the misappropriation of Clear Channel's trade secrets, Clear

Channel faces irreparable injury, has been injured, and/or Savier has been unjustly enriched.

48.    Clear Channel has been damaged as a result of Savier's actions in an amount to be

determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary

and permanent injunctive relief to recover and protect its property as well as enjoin Savier from

working for Citadel for six months.

**WHEREFORE**, AMFM Broadcasting, Inc. prays that this Court enter judgment in its

favor and against Savier on Count II in an amount that the evidence supports for loss of business

and compensatory damages, plus costs, attorneys' fees and such other relief as this Court deems

just and equitable.

## COUNT III

### CONVERSION
### (Savier)

49.    Clear Channel repeats and realleges the allegations contained in paragraphs 1

through 48 above as if fully set forth herein.

50.    Savier removed from Clear Channel or retained its property, including but not

limited to, confidential and proprietary information, without authorization, and converted it to

her own use.

51.    Clear Channel has demanded from Savier the return of its confidential

information through the terms of the Agreement.

14

52.     Clear Channel is entitled to the return of its property from Savier according to the Agreement.

53.     Savier has failed to return to Clear Channel its property.

54.     As a direct and proximate result of Savier's actions Clear Channel has been damaged.

55.     Clear Channel has suffered damages as a result of Savier's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its property.  Because Savier's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have for Clear Channel, the award of exemplary and punitive damages in an amount to be proven at trial are proper.

**WHEREFORE**, AMFM Broadcasting, Inc. prays that this Court enter judgment in its favor and against Savier on Count III in an amount that the evidence supports for loss of business, compensatory damages, plus costs, attorneys' fees, and such other relief as this Court deems just and equitable.

**COUNT IV**

**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Citadel)**

56.     Clear Channel incorporates by reference the allegations which are contained in paragraphs 1 through 41 above as if fully set forth herein.

57.     Savier's Agreement is a valid and enforceable contract.  The post-employment covenants, confidentiality covenants, and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect legitimate, protectable

15

CHI 11438350.1

interests in the goodwill, long-term customer relationships, and proprietary business and customer information of Clear Channel.

58.     Citadel knew of this Agreement before soliciting Savier's employment, at the time of her hiring, and at present.

59.     On information and belief, Citadel intentionally and unjustifiably induced Savier's breach of her Agreement and induced her to misappropriate Clear Channel's trade secrets, violating the terms of her non-compete agreement with Clear Channel, and violating her non-solicitation agreement with Clear Channel by soliciting business from Clear Channel customers.

60.     As a result of Citadel's tortious conduct, Clear Channel has suffered damages in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

WHEREFORE, AMFM Broadcasting, Inc. prays that this Court enter judgment in its favor and against Citadel Broadcasting Corporation on Count IV in an amount that the evidence supports for loss of business, compensatory damages, plus costs, attorneys' fees, and such other relief as this Court deems just and equitable.

**DATED: March 27, 2008**                       Respectfully submitted,

                                                 AMFM BROADCASTING, INC.


                                                 By: _____
                                                          One of Its Attorneys

Yvette A. Heintzelman
Christopher A. Garcia
Justin K. Beyer
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
Firm No. 90747


17

## <u>VERIFICATION BY CERTIFICATION</u>

I am the President and Marketing Manager for AMFM Broadcasting, Inc., doing business as Clear Channel. I have or have been provided with full knowledge of and am competent to testify to all matters stated herein. Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I certify that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____

Earl Jones

DATED: _____8/26/08_____



# CONFIDENTIALITY, TRADE SECRETS AND NON-COMPETE AGREEMENT

The Parties to this Agreement and certain referenced elements therein are as follows:

Employer: *Clear Channel*          Incorporated in: _____

Corporate Headquarters: *Austin, San Antonio* etc.

Station and City and State License: *WLIT    Chicago, IL*

Metropolitan Statistical Area(s) in which Station Competes: *Chicago*

Employee: *Jaclyn Sarvier*

Employment Capacity (Job Duties): *AE* _____

This Agreement is entered into by and between the above-referenced "Employee" and the above-referenced "Employer." Employee is entering into employment with or is currently employed by Employer at the above-referenced Station in the above-referenced capacity.

During the term of this agreement, Employee will have access to and become familiar with various trade secrets and confidential information and techniques of Employer. Employee acknowledges that such confidential information and techniques, and trade secrets are owned and shall continue to be owned solely by Employer. During the term of his/her employment, and after such employment terminates, Employee agrees not to use such information for any purpose whatsoever or to divulge such information to any person other than Employer or person to whom Employer has given its consent. Under no circumstances shall Employee remove from Employer's office any of Employer's books, records, format materials, documents, or customer lists, or any copies of such documents without the written permission of Employer, nor shall employee make any copies of such books, records, materials, documents, or customer lists for use outside of Employer's office except as specifically authorized in writing by Employer.

Employee agrees that in consideration of his/her employment or continued employment with Employer, training in Employer's techniques, access to confidential trade secrets or Employer's expenditure of money and energy in advertising, training, promoting or dissemination of information about Employee or various programs in which Employee may participate, Employee does hereby agree that during his/her employment with Employer in the capacity above stated or otherwise and for a period of one hundred eighty (180) days thereafter, he/she shall neither engage directly or indirectly in the rendering of services similar to those provided for Employer nor have any direct or indirect interest in or employment relationship with any radio or television station (including cable organization or supplier) or firm or affiliated company owning or operating a radio or television station or cable system located within or purporting to serve the above-referenced Metropolitan Statistical Area(s), as defined by the US Government, other than properties operated by Employer. The parties have attempted to limit Employee's right to compete only to the extent necessary to protect Employer from unfair competition. The parties recognize, however, that reasonable people may differ in making such a determination. Consequently, the parties hereby agree that, if the scope or enforceability of the restrictive covenant is in any way disputed at any time, a court may modify and enforce the covenant to the extent that it believes to be reasonable under the circumstances existing at that time. In the event Employee violates the restrictive covenant set forth above, it is agreed that the term of the restrictive covenant so violated shall be extended for a period of one hundred eighty (180) days from the time Employee ceases such violation or, in the event of court action, for a period of one hundred eighty (180) days after the entry of a final order or judgment.

Employee further acknowledges that in the event his/her employment with Employer terminates for any reason, he/she will be able to earn a livelihood without violating the foregoing restrictions and that his/her

Form #110
07/01/01

ability to earn a livelihood without violating such restrictions is a material condition to his/her employment with Employer.

Employee acknowledges that compliance with the covenants previously set forth herein is necessary to protect the business and good will of Employer and that a breach of those covenants will irreparably and continually damage Employer, for which money damages may not be adequate. Consequently, Employee agrees that in the event he/she breaches or threatens to breach any of these covenants, Employer shall be entitled to both a preliminary or permanent injunction in order to prevent the continuation of such harm and money damages insofar as they can be determined.

Nothing is this agreement, however, shall be construed to prohibit Employer from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative. As such money damages for the period of time during which Employee violated these covenants, Employer shall be entitled to recover the amount of fees, compensation or other remuneration earned by Employee as a result of any such breach. If in one or more instances either party fails to insist that the other party perform any of the terms of this agreement, such failure shall not be construed as a waiver by such party of any past, present or future right granted under this agreement; the obligations of both parties under this agreement shall continue in full force and effect.

The obligations contained in the preceding paragraphs shall survive the termination of this agreement. In addition, the termination of this agreement shall not affect any of the rights or obligations of either party arising prior to or at the time of the termination of this agreement, or which may arise by any event causing the termination of this agreement.

If any provision, paragraph or subparagraph of this agreement is adjudged by any court to be void or unenforceable in whole or in part, this adjudication shall not affect the validity of the remainder of the agreement including any other provision, paragraph, or subparagraph. Each provision, paragraph and subparagraph of this agreement is separable from every other provision, paragraph and subparagraph, and constitutes a separate and distinct covenant.

This agreement shall be binding upon and shall inure to the benefit of the parties and their successors, assigns, executors, administrators, and personal representatives. This agreement constitutes the complete understanding between the parties, all prior representations or agreements having been merged into this agreement. No alteration or modification to any of the provisions of this agreement shall be valid unless made in writing and signed by both parties. This agreement shall be subject to and governed by the laws of the above referenced State. If Employee breaches any of the terms of this agreement, the Employee shall pay to Employer all of Employer's costs and expenses, including attorney's fees, incurred by Employer in enforcing the terms of this agreement.

Employee agrees and acknowledges that this agreement is not a contract for employment or continued employment and does not place any obligations upon Employer except as specifically stated herein.

"EMPLOYER"

By: _Nancy O'Brien_

Its: _____

_10/4/07_

"EMPLOYEE"

Signature: _____

Date: _9/26/06_

# Exhibit 10

84MJCAPC.txt

84MJCAPC                    Teleconference
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CAPSTAR RADIO OPERATING COMPANY,
a Delaware Corporation,

                    Plaintiff,

          v.                        08 Civ. 2976 LAK

ANTHONY CAMPBELL, et al.,

                    Defendants.

------------------------------x

                                    April 22, 2008
                                    4:00 p.m.


Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge


                        APPEARANCES


SEYFARTH SHAW LLP
     Attorneys for plaintiff
BY:  LINDAFEL C. SARNO, Esq.
                    of counsel

DEBEVOISE & PLIMPTON LLP (NYC)
     Attorneys for defendants
BY:  JEREMY FEIGELSON, Esq.
                    of counsel

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

84MJCAPC                    Teleconference
1          (Teleconference in chambers)
2          THE COURT:  Good afternoon, counsel.  This is the
3   Judge.
4          MS. SARNO:  Good afternoon, your Honor.
5          THE COURT:  Is Mr. Feigelson there?
6          MR. FEIGELSON:  Yes.  Good afternoon, your Honor.
7          THE COURT:  I have received your letters.  I gather
8   you both agree you don't want to go forward with the hearing
9   tomorrow, right?
10          MS. SARNO:  Yes.
11          MR. FEIGELSON:  That's correct.
12          THE COURT:  Refresh my recollection.  Had I previously
13   consolidated the trial under 65 (a)(2)?
14          MR. FEIGELSON:  There was discussion of that on the
15   record, Judge, at the hearing on March 24th.  There was an
                        Page 1

84MJCAPC.txt
16    agreement in principle between the parties as to what should
17    happen, but that was never actually reduced to a written order.
18          MS. SARNO:  If I recall correctly, we both needed to
19    discuss it with our clients before we could consent.
20          THE COURT:  Have you discussed it with your clients?
21          MS. SARNO:  We have not had an opportunity.  We were
22    looking to discuss settlement instead.
23          THE COURT:  Sure you've had an opportunity.  You
24    elected not to do it, I gather?  You have had weeks to do it,
25    right?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    3
84MJCAPC                    Teleconference
1           MS. SARNO:  Yes, your Honor.
2           THE COURT:  Okay.
3           MR. FEIGELSON:  We are prepared to proceed on that
4     basis.
5           THE COURT:  Sorry?
6           MR. FEIGELSON:  Citadel and the individual defendants
7     are willing to proceed on that basis, that is, to consolidate
8     the hearing and the trial on the merits.
9           THE COURT:  Okay.  I am just making a note.
10          Now, it seems to me the initial question is what we
11    ought to do about the pending motion, and the suggestion by Mr.
12    Feigelson is for a principal and counsel conference.
13          Any views, Ms. Sarno?
14          MS. SARNO:  Your Honor, we are not opposed to further
15    discussions of settlement.  What had happened, since Mr.
16    Feigelson has addressed some of it in his letter, we did
17    receive a term sheet from Mr. Feigelson.
18          Thereafter, settlement conversations are actually
19    between the CEOs of both respective companies.  I was under the
20    impression that those discussions were continuing, and I was
21    told by -- and a lot of this is through our Chicago office --
22    we presented terms to the other side, we being Clear Channel,
23    and that there was no response to that.
24          Since then Mr. Feigelson has mentioned there was an
25    evidentiary hearing in Chicago, where there was a protectable

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    4
84MJCAPC                    Teleconference
1     interest found.  That case is proceeding.  We still believe
2     this is a matter that should be resolved.
3           THE COURT:  Mr. Feigelson.
4           MR. FEIGELSON:  Your Honor, the reason we suggested
5     the conference is because we think that the case can and should
6     settle.  We were advised by Clear Channel they would only
7     discuss settlement on a global basis, including the Chicago
8     litigation, so we attempted to address that in a term sheet.
9           I think that the discussions were fitful at best.  It
10    is difficult to get any traction in these discussions because
11    Clear Channel has shown an obvious preference for expanding the
12    litigation rather than trying to bring it to an end.  That is
13    why we made the suggestion we did in our letter, to see if we
14    can change that dynamic through a conference that would include
15    principals.  Nothing has changed about the merits.  To be clear
16    about what happened in Chicago, there was an ex-parte TRO
17    entered.
18          THE COURT:  I take it this is AMFM Broadcasting
19    against Osowiec?
20          MS. SARNO:  Yes.

                              Page 2

84MJCAPC.txt
```
21          MR. FEIGELSON:  Yes.
22          THE COURT:  I read Judge Zagel's decision.
23          MR. FEIGELSON:  What he did and did not decide.  We
24     think it is a sensible way to proceed.  Your Honor made some
25     pointed comments at the March 24th conference about the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    5
84MJCAPC                          Teleconference
```
 1     desirability of trying to bring this to an end without
 2     substantial new expenditures of time, energy and legal fees.
 3     That is certainly the way Citadel is prepared to proceed, but
 4     it takes two.
 5          MS. SARNO:  Clear Channel is certainly prepared to
 6     proceed that way, too.  It was my understanding that we made an
 7     offer, it was a starting point, but it was my understanding and
 8     Clear Channel's understanding was the ball is in Citadel's
 9     court and there was no further discussions from there.  I
10     certainly would appreciate further settlement discussions and
11     do believe that we could push things along.
12          THE COURT:  Are you prepared to put all the litigation
13     on hold while you do that?
14          MS. SARNO:  That is not my call, but I can certainly
15     discuss it with my client.
16          THE COURT:  Well, what is your view on that, Mr.
17     Feigelson?
18          MR. FEIGELSON:  We think that a global hold makes a
19     lot of sense, Judge.  This is a case that should settle.
20     Again, it is very hard to have those discussion in a productive
21     way when receiving a steady flurry of deposition notices and
22     motion papers and the like.
23          THE COURT:  Well, Ms. Sarno, get back to me on that
24     tomorrow.
25          MS. SARNO:  Yes, Judge.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    6
84MJCAPC                          Teleconference
```
 1          THE COURT:  I am prepared, either myself or through
 2     Magistrate Judge Peck, depending on availability, to try to get
 3     involved in mediating a settlement assuming everything is put
 4     on hold.  .
 5          But if you want to engage in a wrestling match where
 6     you're trying to go forward in one forum that you perceive to
 7     be more favorable and to avoid going forward in the other, I am
 8     not sure that is entirely fair.  So it seems to me that there
 9     is at least some case for the proposition that even though you
10     helped yourself to a consensual stay of discovery after getting
11     expedited discovery granted, that we ought to try this case
12     very quickly unless you can settle it or agree to put
13     everything on ice.
14          MS. SARNO:  I can certainly discuss it with my client
15     this evening, your Honor.  When would you like to us call
16     tomorrow?
17          THE COURT:  You can give it to me in writing.
18          MS. SARNO:  Okay.
19          THE COURT:  Then if I see a need for a telephone
20     conference, I'll set it up.
21          MS. SARNO:  We will hand deliver a letter to you
22     tomorrow, your Honor.
23          THE COURT:  Okay.  You can even fax it.  You have
24     special dispensation for this letter only.
25          MS. SARNO:  Yes.  The fax number, just to be sure?
                               Page 3
```

```
                          84MJCAPC.txt
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                    7
      84MJCAPC                  Teleconference
 1              THE COURT:  805-7910.
 2              MS. SARNO:  Thank you.
 3              THE COURT:  Mr. Feigelson, if you need to respond --
 4    and I stress the word "need" -- you may.
 5              MR. FEIGELSON:  Thank your Honor.  We'll keep that in
 6    mind.
 7              THE COURT:  Thanks.
 8              (Court adjourned)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

# Exhibit 11



620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

Fax (212) 218-5526

www.seyfarth.com

# Facsimile Transmission

Date:  April 23, 2008

| RECIPIENT | COMPANY | PHONE NO. | FAX NO. |
|---|---|---|---|
| **Jeremy Feigelson** | Debevoise & Plimpton LLP | (212) 909-6595 | **(212) 521-7230** |

**FROM:**    L. Lynnette Sarno

**PHONE:**    (212) 218-5528

**RE:**    Capstar Radio Operating Company v. Citadel, et al.    **REPLY FAX NO.: (212) 218-5526**
Docket No. 08 CV 2976 (LAK)

| File No: | 53163/16 | Number of Pages, Including Cover: | 3 |
|---|---|---|---|

☐ Hard copy to follow              ☐ Hard copy will not follow

☐ Per your request                    ☐ Please review and revise if necessary

☐ Please telephone me

**MESSAGE:**

Please see attached.

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO CONTAIN PRIVILEGED ATTORNEY-CLIENT INFORMATION OR WORK PRODUCT. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. THANK YOU.

ANY TAX INFORMATION OR WRITTEN TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED TO BE AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER. (THE FOREGOING LEGEND HAS BEEN AFFIXED PURSUANT TO U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE.)

**IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE PHONE (212) 218-5500 AS SOON AS POSSIBLE.**



620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

fax (212) 218-5526

www.seyfarth.com

Writer's direct phone

(212) 218-5528

Writer's e-mail

lsarno@seyfarth.com

Writer's direct fax

(917) 344-1247

April 23, 2008

**VIA FACSIMILE (212) 805-7910**

Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-2012

      Re:    Capstar Radio Operating Company v. Citadel, et al.
               Docket No. 08 CV 2976 (LAK)

Dear Judge Kaplan:

      Per the Court's request, on behalf of Plaintiff Capstar Radio Operating Company, we write in response to the Court's inquiry on whether we will agree to a global stay of the proceedings pending settlement negotiations. In order to fully address the Court's suggestion, we believe it is necessary to share the status of the proceedings thus far. However, pursuant to Rule 408, we will address the circumstances in general, in the event that this matter proceeds to trial.

      As the Court is aware, there is a separate matter pending before the Northern District of Illinois, and it was brought by a different entity than the Plaintiff in this matter. Citadel's behavior in that matter, however, significantly affects plaintiff's position in that case and impacts the Court's suggested stay.

      The Illinois litigation was filed only after outside counsel for Citadel proffered the opinion that Clear Channel's non-compete agreements were not enforceable in the broadcast industry in Illinois, that Clear Channel had no protectable interest, and that such agreements could not be the subject of equitable relief. Those opinions have now been determined to be in error. Instead, after two extensions of the initial TRO, and without the benefit of any discovery, the Court ruled that Clear Channel had a protectable interest in its client relationships, training, rate information and operations, and that Plaintiff had established irreparable harm.

      The plaintiff in the Illinois matter maintains that it has viable claims which will be a matter for summary judgment, and require discovery immediately. Their urgency has been predicated by

BRUSSELS   WASHINGTON, D.C.   SAN FRANCISCO   SACRAMENTO   NEW YORK   LOS ANGELES   HOUSTON   CHICAGO   BOSTON   ATLANTA

Case 1:08-cv-02976-LAK    Document 21-2    Filed 05/05/2008    Page 98 of 106



ATTORNEYS

Honorable Lewis A. Kaplan
March 27, 2008
Page 2

the undue delay already created by the defense in the Illinois case – which caused it to file the case approximately four months after the employee resigned and, presumably, took the company's protectable information.  Thus, further delay of that matter will only exacerbate the irreparable harm that has already resulted.

Since speaking to the Court yesterday, the parties in this action have already continued to discuss settlement, and hope that we can proceed expeditiously, even prior to the Court's assistance. We are awaiting response from defense to our last two proposals.  That being said, Plaintiff will agree to a thirty (30) day stay of the proceedings in New York, and request that Your Honor assign this matter to a Magistrate Judge for a settlement conference.

Thank you for the Court's attention to this matter.

Respectfully submitted,

SEYFARTH SHAW LLP

L. Lynnette Sarno

cc:    Jeremy Feigelson, Esq. (Via Facsimile)

NY1 26511406.1

# Exhibit 12

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
Fax  212 909 6836
www.debevoise.com

| | | | |
|---|---|---|---|
| Date | April 24, 2008 | | |
| From | Jeremy Feigelson | | **Facsimile** |
| Tel | 212-909-6230 (voice), 212-521-7230 (direct fax) | | 2    pages including cover page |
| To | Hon. Lewis A. Kaplan<br>U.S. District Court | Tel  212-805-0216 | Fax  212-805-7910 |
| | L. Lynnette Sarno, Esq.<br>Seyfarth Shaw LLP | Tel  212-218-5528 | Fax  212-218-5526 |

**For assistance or confirmation please call 212 909 6407**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

22720280v1

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
Fax 212 909 6836
www.debevoise.com

April 24, 2008

**BY FAX**

Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-2012

**Capstar v. Campbell et al., No. 08 CV 2976 (LAK)**

Dear Judge Kaplan:

On behalf of defendants, we write to respond briefly to the April 23 letter from plaintiff's counsel. Plaintiff's proposal for a 30-day stay of only the New York litigation is not acceptable to defendants. Piecemeal litigation based on Clear Channel's forum preferences is not a fair or sensible way to proceed. Accordingly, we ask that the Court set this matter down for expedited discovery and a hearing consolidated with trial on the merits. We respectfully request entry of a scheduling order substantially in the form that we previously submitted. See Declaration of Jeremy Feigelson, Ex. 2 (Mar. 24, 2008).

As for Clear Channel's statement that it is "awaiting defense response to our last two settlement proposals," we previously made clear that the first proposal was a non-starter. Clear Channel's second proposal was emailed to me by plaintiff's counsel at the same moment that the April 23 letter was being faxed to Your Honor. Although we are now reviewing the proposal, we note that it applies only to the New York litigation and proposes restrictions that New York law would not support.

As for Clear Channel's description of Judge Zagel's opinion in the Chicago litigation, this Court can draw its own conclusions as to the accuracy of that description.

Respectfully yours,

Jeremy Feigelson

Enclosure

cc (by fax):    L. Lynnette Sarno, Esq.

New York • Washington, D.C. • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

# Exhibit 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CAPSTAR RADIO OPERATING COMPANY,

          Plaintiff,

      -against-                                08 Civ. 2976 (LAK)

ANTHONY CAMPBELL, et al.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### ORDER

LEWIS A. KAPLAN, *District Judge*.

       Plaintiff commenced this action on March 21, 2008. It seeks, among other things, preliminary and permanent injunctions with respect to alleged breaches of covenants not to compete. On the same day, it presented an order to show cause with temporary restraining order ("TRO") to the Part I judge, who deferred the matter to the undersigned.

       After hearing the parties on March 24, I denied the TRO, granted expedited discovery, and set the preliminary injunction motion down for a hearing on April 23, 2008. I solicited also the parties' views as to whether the trial on the merits should be consolidated with the preliminary injunction hearing pursuant to Rule 65(a)(2).

       On April 21, 2008, counsel for plaintiff advised the Court that "discovery in this action ha[d] been stayed pending the parties' settlement discussions"[1] and that the parties had been unable to settle. She asked also that the April 23 hearing be cancelled or adjourned pending resolution of another question.[2] The Court conferred by telephone with both sides on April 22 at which time the parties agreed that they did not wish to go forward with the hearing on the following day, so the hearing was adjourned *sine die*. During the conference, however, defendants' counsel

---

[1] This of course was not strictly accurate. There was no stay. The parties simply did not do any discovery.

[2] There is a dispute as to whether plaintiff effectively discontinued the action without prejudice after the adverse result on the TRO application.

2

agreed to Rule 65(a)(2) consolidation. When asked plaintiff's position, plaintiff's counsel admitted that she had not discussed the question with her client. The Court directed that she discuss it and advise the Court of its position by the following day. No such advice has been forthcoming.

On April 23, plaintiff's counsel advised the Court by letter that plaintiff preferred to proceed first with another litigation in Chicago between the corporate parties or their affiliates and offered to agree to a thirty-day stay of this action. Defendants oppose that application and ask that the matter be set down for expedited discovery and trial.

It is perfectly plain that the plaintiff, having been rebuffed on the TRO application, is seeking a forum more to its liking and that both parties are jockeying for position. It is clear also that there hangs in the balance in this Court the question whether the individual defendants may continue in their present employment, assuming that their employer remains willing to have them, while this matter remains unresolved. I see no reason why they should be subjected to the risk and uncertainty inherent in such a situation. Accordingly, this action will proceed on an expedited basis. Moreover, since plaintiff has had since March 24, 2008 to respond to my inquiry about Rule 65(a)(2) consolidation without responding, even after a direction on April 22 that it do so by the following day, any objection it otherwise might have had has been waived.

Accordingly, the case is set for a preliminary injunction hearing on June 2, 2008. The trial on the merits is consolidated with the preliminary injunction hearing. All document production shall be completed by May 9, 2008. Depositions shall be completed by May 23, 2008. Premarked exhibits and witness lists shall be exchanged no later than May 27, 2008. The provisions of paragraph 3 of the proposed stipulation and order regarding scheduling and confidentiality that was included in Exhibit B to Mr. Feigelson's letter dated March 26, 2008 is incorporated herein by reference and shall govern in this action absent contrary order of the Court. All of the foregoing, of course, is subject to whatever determination ultimately may be made with respect to the question whether plaintiff effectively discontinued this action without prejudice, the briefing and argument of which has not yet been completed.

SO ORDERED.

Dated:      April 25, 2008

_____
Lewis A. Kaplan
United States District Judge

# Exhibit 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-31740

# CITADEL BROADCASTING CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **51-0405729** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**City Center West, Suite 400
7201 West Lake Mead Blvd.
Las Vegas, Nevada 89128**
(Address of principal executive offices and zip code)

**(702) 804-5200**
(Registrant's telephone number, including area code)

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, par value $0.01 per share | New York Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check One):

Large accelerated filer ☒       Accelerated filer ☐       Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting and nonvoting common equity held by nonaffiliates of the registrant on June 30, 2007, based upon the closing price of the common stock, was $1.2 billion.

As of February 22, 2008, there were 264,483,835 shares of common stock, $.01 par value per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the 2008 Annual Meeting of Stockholders are incorporated by reference into Part III.